Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
Charles H. Linehan (#307439)
Pavithra Rajesh (#323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIPPE DAMIBA, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| NEKTAR THERAPEUTICS, HOWARD W. ROBIN, and GIL M. LABRUCHERIE, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

CLASS ACTION COMPLAINT

Plaintiff Philippe Damiba ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Nektar Therapeutics ("Nektar" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Nektar; and (c) review of other publicly available information concerning Nektar.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Nektar securities between February 15, 2019 and August 8, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Nektar is a biopharmaceutical company that develops medicines in areas of high unmet medical need, including therapies for cancer, autoimmune disease, and chronic pain. Nektar's lead immuno-oncology candidate is NKTR-214, also known as bempegaldesleukin or bempeg; it is a biologic substance developed to stimulate proliferation and growth of tumor-killing immune cells in the tumor-micro-environment. In the PIVOT-02 clinical study, the Company evaluates the benefit, safety, and tolerability of combining NKTR-214 with Opdivo, an antibody, in collaboration with Bristol-Meyers Squibb Company.

3.     On August 8, 2019, after the market closed, the Company revealed that a manufacturing issue caused two batches of bempegaldesleukin to differ from the other 20 batches that were produced. Moreover, these batches resulted in variable clinical benefit than other batches used in the Company's PIVOT-02 clinical trial.

4.     On this news, the Company's share price fell $8.65, or nearly 30%, to close at $20.92 per share on August 9, 2019, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company did not comply with current good manufacturing practices; (2) that, as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (3) that clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (4) that, as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this district.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

---

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

11.     Plaintiff Philippe Damiba, as set forth in the accompanying certification, incorporated by reference herein, purchased Nektar securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Nektar is incorporated under the laws of Delaware with its principal executive offices located in San Francisco, California.  Nektar's common stock trades on the NASDAQ under the symbol "NKTR."

13.     Defendant Howard W. Robin ("Robin") was the Chief Executive Officer ("CEO") of the Company at all relevant times.

14.     Defendant Gil M. Labrucherie ("Labrucherie") was the Chief Financial Officer ("CFO") of the Company at all relevant times.

15.     Defendants Robin and Labrucherie, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Nektar is a biopharmaceutical company that develops medicines in areas of high unmet medical need, including therapies for cancer, autoimmune disease, and chronic pain. Nektar's lead immuno-oncology candidate is NKTR-214, also known as bempegaldesleukin or bempeg; it is a biologic substance developed to stimulate proliferation and growth of tumor-killing immune cells in the tumor-micro-environment. In the PIVOT-02 clinical study, the Company evaluates the benefit, safety, and tolerability of combining NKTR-214 with Opdivo, an antibody, in collaboration with Bristol-Meyers Squibb Company.

### Materially False and Misleading
### Statements Issued During the Class Period

17.     The Class Period begins on February 15, 2019. On that day, the Company presented clinical data from the PIVOT-02 Study at the 2019 ASCO Genitourinary Cancers Symposium. In a press release, the Company stated, in relevant part:

> "Preliminary data from the ongoing PIVOT-02 trial in metastatic urothelial cancer patients demonstrated important response rates, including complete responses, in patients who were cisplatin-ineligible or refused standard of care," said Mary Tagliaferri, M.D., Chief Medical Officer of Nektar Therapeutics. "These responses were observed regardless of baseline PD-L1 expression and no relapses occurred. In this cohort of Stage IV bladder cancer patients with a median age of 70, the combination therapy was generally well tolerated with no Grade 4 or 5 adverse events reported. Of note, our translational research demonstrated that in patients with the highest unmet medical need – those whose tumors did not express PD-L1 at their baseline scan – treatment with the combination resulted in 70 percent of patients converting to PD-L1 positive expressors. These data support our development strategy in this tumor setting, including the Phase 2 PIVOT-10 study underway in cisplatin-ineligible urothelial cancer patients with low PD-L1 tumor expression."

**Highlights from the ASCO-GU presentation in 1L metastatic urothelial carcinoma patients include:**

***Clinical Efficacy***
*Response measured per RECIST 1.1 for per protocol efficacy-evaluable patients treated at the recommended Phase 2 dose (RP2D) and with ≥1 post-treatment scan as of December 3, 2018[2]:*

- Best overall response rate (ORR) was 48% (13/27) in efficacy-evaluable patients, with a 19% (5/27) complete response (CR) rate.[3]

- ORR by immune-related RECIST (irRECIST) was 52% (14/27); ORR in patients with visceral non-nodal metastases was 53% (8/15).

- ORR in patients that refused standard of care was 55% (6/11); in cisplatin-ineligible patients ORR was 44% (7/16).

- Disease control rate (DCR) was 70% (defined as CR + partial response (PR) + stable disease (SD)).

- Median percent reduction in target lesions from baseline in all 27 efficacy-evaluable patients was 32%.

- Median percent reduction in target lesions from baseline in all 13 responders was 78%.

- Median time to response was 2.0 months.

- In patients with RECIST response, no patients discontinued due to relapse.

- Amongst the 23 patients with known pre-treatment programmed death-ligand 1 (PD-L1) status, ORR in PD-L1 negative patients was 45% (5/11) and in PD-L1 positive patients was 50% (6/12).

18.     On March 1, 2019, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"). Therein, under "Risk Factors," the Company stated that it depends on the success of NKTR-214, stating in relevant part:

**We are highly dependent on the success of NKTR-214, our lead I-O candidate. We are executing a broad development program for NKTR-214 and clinical and regulatory outcomes for NKTR-214, if not successful, will significantly harm our business.**

Our future success is highly dependent on our ability to successfully develop, obtain regulatory approval for, and commercialize NKTR-214. In general, most early stage investigatory drugs, including oncology drug candidates such as NKTR-214, do not become approved drugs. Accordingly, there is a very meaningful risk that NKTR-214 will not succeed in one or more clinical trials sufficient to support one or more regulatory approvals. To date, reported clinical outcomes from NKTR-214 have had a significant impact on our market valuation, financial position, and business prospects and we expect this to continue in future periods. If one or more clinical studies of NKTR-214 are delayed or not successful, it would materially harm our market valuation, prospects, financial condition and results of operations. For example, under the BMS Collaboration Agreement, we are entitled to up to $1.43 billion in development milestones that are based upon clinical and regulatory successes from the NKTR-214 development program. One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated.

19.     Regarding risks related to manufacturing, the 2018 10-K stated, in relevant part:

**Our manufacturing operations and those of our contract manufacturers are subject to laws and other governmental regulatory requirements, which, if not met, would have a material adverse effect on our business, results of operations and financial condition.**

We and our contract manufacturers are required in certain cases to maintain compliance with current good manufacturing practices (cGMP), including cGMP guidelines applicable to active pharmaceutical ingredients and drug products, and with laws and regulations governing manufacture and distribution of controlled substances, and are subject to inspections by the FDA, the Drug Enforcement Administration or comparable agencies in other jurisdictions administering such requirements. We anticipate periodic regulatory inspections of our drug manufacturing facilities and the manufacturing facilities of our contract manufacturers for compliance with applicable regulatory requirements. Any failure to follow and document our or our contract manufacturers' adherence to such cGMP and other laws and governmental regulations or satisfy other manufacturing and product release regulatory requirements may disrupt our ability to meet our manufacturing obligations to our customers, lead to significant delays in the availability of products for commercial use or clinical study, result in the termination or hold on a clinical study or delay or prevent filing or approval of marketing applications for our products. Failure to comply with applicable laws and regulations may also result in sanctions being imposed on us, including fines, injunctions, civil penalties, failure of regulatory authorities to grant marketing approval of our products, delays, suspension or withdrawal of approvals, license revocation, seizures, administrative detention, or recalls of products, operating restrictions and criminal prosecutions, any of which could harm our business. Regulatory inspections could result in costly manufacturing changes or facility or capital equipment upgrades to satisfy the FDA that our manufacturing and quality control procedures are in substantial compliance with cGMP. Manufacturing delays, for us or our contract manufacturers, pending resolution of regulatory deficiencies or suspensions could have a material adverse effect on our business, results of operations and financial condition.

20.     On June 1, 2019, the Company presented clinical data from the PIVOT-02 Phase 2 study at the 2019 American Society of Clinical Oncology Meeting. In a press release, the Company stated, in relevant part:

"The Stage IV melanoma patients enrolled in the ongoing PIVOT-02 study continue to experience both deepening and durability of response over time," said Jonathan Zalevsky, Ph.D., Chief Scientific Officer at Nektar Therapeutics. "This translated into a 34% rate of complete response at a 12-month follow-up for the 38 efficacy-evaluable patients in this cohort. Further, 42% of patients achieved a 100% reduction in target lesions. Finally, corresponding lymphocyte data highlight the benefit of replenishing and stimulating T cells continuously over the course of treatment with an I-O doublet regimen."

21.     On August 1, 2019, the Company announced that the U.S. Food and Drug Administration ("FDA") had granted Breakthrough Therapy Designation for the use of bempeg with Opdivo for the treatment of patients with previously untreated unresectable or metastatic melanoma.

22.     The above statements identified in ¶¶17-21 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company did not comply with current good manufacturing practices; (2) that, as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (3) that clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (4) that, as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

23.    On August 8, 2019, after the market closed, the Company revealed that a manufacturing issue caused two batches of bempegaldesleukin to differ from the other 20 batches that were produced. Moreover, these batches resulted in variable clinical benefit than other batches used in the Company's PIVOT-02 clinical trial. In a conference call held to discuss the Company's second quarter 2019 financial results, Defendant Robin stated, in relevant part:

> At the recent ASCO 2019 meeting, we reported an update from the first-line melanoma cohort in PIVOT-02 that showed an improvement in complete response rates and deepening of responses for patients who responded to the doublet therapy, a clear benefit for these patients. We recently announced that these compelling data led to a breakthrough designation from the FDA.

> * * *

> [W]e conducted a thorough characterization of all of the 22 lots of bempeg peg produced to-date, including all of those which currently supply and we'll supply our current and future registrational studies. ***The characterization work from these new assays revealed that two of the earliest production batches of bempeg were different than the other 20 batches produced.*** These two early manufacturing lots are known as lots two and five and the time of their production bidding beginning in 2016 it was early on in the manufacturing campaign and these lots were within the manufacturing controls and release specifications.

> As such, we did not detect any meaningful variability upon their release. Various early production batches of bempeg were sequentially distributed in PIVOT-02, lots one, two, three and five. As more clinical data matured and became available in PIVOT-02 and once we had identified the outlier variances of lots two and five, we then had the basis to start analyzing any potential differences between data from patients that started treatment with lots one and three as compared to lots two and five. ***We found notable correlations in several cohorts with evidence of an improved clinical benefit and patients who started treatment with lots one and three as compared to patients who started treatment with lots two and five.***

24.     On this news, the Company's share price fell $8.65, or nearly 30%, to close at $20.92 per share on August 9, 2019, on unusually heavy trading volume.

**THE INDIVIDUAL DEFENDANTS' SUSPICIOUS STOCK SALES SUPPORT SCIENTER**

25.     Defendants Robin and Labrucherie took advantage of the artificially inflated price of Nektar stock resulting from the false statements by selling a significant amount of their personally held shares in the days and weeks following the February 15, 2019 disclosure of the PIVOT-02 clinical results.

26.     Defendant Robin made the following stock sales during the Class Period:

| Date | Shares Sold | Price | Total Proceeds |
|---|---|---|---|
| 02/19/2019 | 42,215 | $42.32 | $1,787,161 |
| 02/20/2019 | 33,334 | $43.20 | $1,440,029 |
| 02/21/2019 | 33,333 | $41.01 | $1,366,986 |
| 05/16/2019 | 13,383 | $31.37 | $419,825 |
| 05/21/2019 | 33,333 | $32.93 | $1,097,656 |
| 05/22/2019 | 33,334 | $33.38 | $1,112,689 |
| 05/23/2019 | 33,333 | $32.69 | $1,089,656 |
| 07/23/2019 | 33,333 | $32.10 | $1,069,989 |
| 07/24/2019 | 33,334 | $32.11 | $1,070,355 |
| 07/25/2019 | 33,333 | $29.65 | $988,323 |

27.     Defendant Labrucherie made the following stock sales during the Class Period:

| Date | Shares Sold | Price | Total Proceeds |
|---|---|---|---|
| 02/19/2019 | 3,592 | $42.39 | $152,265 |
| 05/16/2019 | 3,767 | $31.37 | $118,171 |
| 06/17/2019 | 25,000 | $33.71 | $842,750 |
| 07/10/2019 | 25,000 | $34.57 | $864,250 |

28.     These sales were suspicious in both timing and amount. Defendant Robin received proceeds of $11,442,669, and Defendant Labrucherie received proceeds of $1,977,436. Such dramatic selling was inconsistent with the Individual Defendants' prior trading practices.

### CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Nektar securities between February 15, 2019 and August 8, 2019, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nektar's common shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Nektar common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Nektar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

1      (a)     whether the federal securities laws were violated by Defendants' acts as alleged

2 herein;

3      (b)     whether statements made by Defendants to the investing public during the Class

4 Period omitted and/or misrepresented material facts about the business, operations, and prospects

5 of Nektar; and

6      (c)     to what extent the members of the Class have sustained damages and the proper

7 measure of damages.

8      34.     A class action is superior to all other available methods for the fair and efficient

9 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

10 damages suffered by individual Class members may be relatively small, the expense and burden of

11 individual litigation makes it impossible for members of the Class to individually redress the

12 wrongs done to them.  There will be no difficulty in the management of this action as a class

13 action.

14      **UNDISCLOSED ADVERSE FACTS**

15      35.     The market for Nektar's securities was open, well-developed and efficient at all

16 relevant times.  As a result of these materially false and/or misleading statements, and/or failures

17 to disclose, Nektar's securities traded at artificially inflated prices during the Class Period.

18 Plaintiff and other members of the Class purchased or otherwise acquired Nektar's securities

19 relying upon the integrity of the market price of the Company's securities and market information

20 relating to Nektar, and have been damaged thereby.

21      36.     During the Class Period, Defendants materially misled the investing public, thereby

22 inflating the price of Nektar's securities, by publicly issuing false and/or misleading statements

23 and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth

24 herein, not false and/or misleading.  The statements and omissions were materially false and/or

25 misleading because they failed to disclose material adverse information and/or misrepresented the

26 truth about Nektar's business, operations, and prospects as alleged herein.

27      37.     At all relevant times, the material misrepresentations and omissions particularized

28 in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Nektar's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

38.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

39.     During the Class Period, Plaintiff and the Class purchased Nektar's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

40.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Nektar, their control over, and/or receipt and/or modification of Nektar's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nektar, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

41.    The market for Nektar's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Nektar's securities traded at artificially inflated prices during the Class Period. On February 20, 2019, the Company's share price closed at a Class Period high of $43.03 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Nektar's securities and market information relating to Nektar, and have been damaged thereby.

42.    During the Class Period, the artificial inflation of Nektar's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Nektar's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Nektar and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

43.    At all relevant times, the market for Nektar's securities was an efficient market for the following reasons, among others:

(a)    Nektar shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Nektar filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Nektar regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

1  national circuits of major newswire services and through other wide-ranging public disclosures,

2  such as communications with the financial press and other similar reporting services; and/or

3      (d)    Nektar was followed by securities analysts employed by brokerage firms who

4  wrote reports about the Company, and these reports were distributed to the sales force and certain

5  customers of their respective brokerage firms.  Each of these reports was publicly available and

6  entered the public marketplace.

7      44.    As a result of the foregoing, the market for Nektar's securities promptly digested

8  current information regarding Nektar from all publicly available sources and reflected such

9  information in Nektar's share price.  Under these circumstances, all purchasers of Nektar's

10  securities during the Class Period suffered similar injury through their purchase of Nektar's

11  securities at artificially inflated prices and a presumption of reliance applies.

12      45.    A Class-wide presumption of reliance is also appropriate in this action under the

13  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

14  because the Class's claims are, in large part, grounded on Defendants' material misstatements

15  and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

16  information regarding the Company's business operations and financial prospects—information

17  that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to

18  recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable

19  investor might have considered them important in making investment decisions.  Given the

20  importance of the Class Period material misstatements and omissions set forth above, that

21  requirement is satisfied here.

22                          **NO SAFE HARBOR**

23      46.    The statutory safe harbor provided for forward-looking statements under certain

24  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

25  The statements alleged to be false and misleading herein all relate to then-existing facts and

26  conditions.  In addition, to the extent certain of the statements alleged to be false may be

27  characterized as forward looking, they were not identified as "forward-looking statements" when

28  made and there were no meaningful cautionary statements identifying important factors that could

---

CLASS ACTION COMPLAINT

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Nektar who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

47.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

48.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Nektar's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

49.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Nektar's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Nektar's financial well-being and prospects, as specified herein.

51.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Nektar's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Nektar and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

52.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

53.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Nektar's financial well-being and prospects from the

investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Nektar's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Nektar's securities during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Nektar was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Nektar securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

1

2

3

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

4        58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully

5   set forth herein.

6        59.     Individual Defendants acted as controlling persons of Nektar within the meaning of

7   Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and

8   their ownership and contractual rights, participation in, and/or awareness of the Company's

9   operations and intimate knowledge of the false financial statements filed by the Company with the

10  SEC and disseminated to the investing public, Individual Defendants had the power to influence

11  and control and did influence and control, directly or indirectly, the decision-making of the

12  Company, including the content and dissemination of the various statements which Plaintiff

13  contends are false and misleading. Individual Defendants were provided with or had unlimited

14  access to copies of the Company's reports, press releases, public filings, and other statements

15  alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and

16  had the ability to prevent the issuance of the statements or cause the statements to be corrected.

17        60.     In particular, Individual Defendants had direct and supervisory involvement in the

18  day-to-day operations of the Company and, therefore, had the power to control or influence the

19  particular transactions giving rise to the securities violations as alleged herein, and exercised the

20  same.

21        61.     As set forth above, Nektar and Individual Defendants each violated Section 10(b)

22  and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position

23  as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange

24  Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other

25  members of the Class suffered damages in connection with their purchases of the Company's

26  securities during the Class Period.

27

28

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

# JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 19, 2019                 **GLANCY PRONGAY & MURRAY LLP**

By:     */s/ Lesley F. Portnoy*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

Nektar Therapeutics, **SECURITIES LITIGATION**

I, Philippe Damiba, certify:

1. I have reviewed the complaint and authorized its filing and/or adopted its allegations.

2. I did not purchase Nektar Therapeutics, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Nektar Therapeutics, during the class period set forth in the Complaint are as follows:

   See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   _____ Check here if you are a current employee or former employee of the defendant Company.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 8/13/2019

_____
(Please Sign Your Name Above)

(REDACTED)

**Philippe Damiba's Transactions in Nektar Therapeutics Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Price |
|------|------------------|---------------|--------------|----------|-------|
| 4/12/2019 | Bought | Call | Jan 17, 2020 / $70 | 90 | $1.1000 |