**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
GEOFFREY C. JARVIS (*Pro Hac Vice*)
MARK FRANEK (*Pro Hac Vice*)
FARZANA ISLAM (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Tele:    (610) 822-2220
Fax:     (610) 667-7056
gjarvis@ktmc.com
mfranek@ktmc.com
fislam@ktmc.com
*Counsel for Lead Plaintiff Kanti K. Patel,*
*Individually and as Trustee for the Kanti K Patel*
*Living Trust U/A 3/30/16, and Named Plaintiff*
*Henry J. Juske, and Lead Counsel for the Class*

[*Additional counsel listed on signature page.*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| KANTI K. PATEL, Individually and as Trustee for the Kanti K Patel Living Trust U/A 3/30/16, THE TECH TRADER FUND LP, and HENRY J. JUSKE, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>NEKTAR THERAPEUTICS, HOWARD W. ROBIN, GIL M. LABRUCHERIE, and MARY TAGLIAFERRI,<br><br>        Defendants. | Case No. 19-cv-05173-JSW<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: The Hon. Jeffrey S. White<br>Courtroom: 5, 2nd  Floor |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 2

II.   JURISDICTION AND VENUE ........................................................................... 8

III.  PARTIES ............................................................................................................. 9

    A.    Plaintiffs ................................................................................................... 9

        1.    Lead Plaintiff ................................................................................ 9

        2.    Additional Named Plaintiffs ........................................................ 9

    B.    Defendants ................................................................................................ 9

        1.    Corporate Defendant .................................................................... 9

        2.    Individual Defendants ................................................................ 10

    C.    Former Employees ................................................................................. 12

IV.   FACTUAL ALLEGATIONS ............................................................................. 13

    A.    Background On Nektar And N214 .......................................................... 13

    B.    Nektar's Initial Collaboration And Record-Setting Agreement With Bristol-Myers ......................................................................................... 14

    C.    The Lucrative Milestone Payments Were Tied To The Pursuit And Success Of Eighteen To Twenty Indications Across Nine Tumor Types ............. 16

    D.    Nektar Reports Success And Then Setbacks Regarding The Efficacy Of N214 ....................................................................................................... 18

    E.    Nektar Continues To Tout The Number Of Cancers And Indications For Which It Was Proposing To Test N214 ................................................... 19

    F.    By Mid To Late February 2019, Nektar And Bristol-Myers Had Already Abandoned Their Planned Twenty Indications In Nine Tumor Types, And Instead Were Pursuing A Much Smaller Subset .................................. 20

    G.    Nektar Continued To Make Material Misstatements And Omissions Regarding The Number Of Indications It Was Pursuing And Other Aspects Of Its Plans For N214 ............................................................... 23

    H.    Nektar Discovers A Significant Manufacturing Problem With Batches Of N214 Used In Its Clinical Trials.............................................................. 24

    I.    Nektar Erases $1.8 Billion Of Market Value After Announcing A Severe Reduction In The Planned Indications, And A Manufacturing Issue .... 25

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................................................ 28

A.    February 28, 2019 Press Release And Earnings Call ........................................... 28

B.    May 8, 2019 Press Release and Earnings Call ....................................................... 30

VI.    LOSS CAUSATION ............................................................................................. 34

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 38

VIII.    CLASS ACTION ALLEGATIONS .............................................................................. 43

IX.    THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ........... 44

X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
ARE INAPPLICABLE ................................................................................................ 45

XI.    CAUSES OF ACTION ............................................................................................ 46

XII.    PRAYER FOR RELIEF ............................................................................................ 49

XIII.    DEMAND FOR JURY TRIAL ................................................................................... 49

Lead Plaintiff Kanti K. Patel, individually and as trustee for the Kanti K Patel Living Trust U/A 3/30/16, along with named Plaintiffs The Tech Trader Fund LP and Henry J. Juske (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action alleging violations of the federal securities laws individually and on behalf of all other persons and entities who purchased or otherwise acquired securities of Nektar Therapeutics ("Nektar" or the "Company") during the period from February 28, 2019 to August 8, 2019, both dates inclusive (the "Class Period"), and who were damaged thereby (the "Class").

Plaintiffs bring this class action to recover damages proximately caused to themselves (and the Class) resulting from violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as a result of false and misleading statements made by or on behalf of: (i) corporate Defendant Nektar; (ii) Nektar's Chief Executive Officer ("CEO") Howard W. Robin ("Robin"); (iii) Nektar's Senior Vice President and Chief Financial Officer ("CFO") Gil M. Labrucherie ("Labrucherie"); and (iv) Nektar's Vice President of Clinical Development and Chief Medical Officer ("CMO") Mary Tagliaferri ("Tagliaferri") (collectively, "Defendants").

Plaintiffs allege the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based upon the investigation conducted by and through its attorneys, which included, among other things: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Nektar and the Individual Defendants (defined herein); (ii) research reports issued by financial analysts concerning the Company and Individual Defendants; (iii) reports filed publicly by Nektar with the SEC and corresponding earnings calls; (iv) interviews with former Nektar and Bristol-Myers Squibb Company ("Bristol-Myers") employees; and (v) other publicly available information. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth in this Complaint, and will be available after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.     This securities class action arises from Defendants' materially false and misleading statements and omissions during the Class Period concerning Bempegaldesleukin ("bempeg"), also known as NKTR-214 ("N214"), a developmental drug that Nektar describes as its "Lead Immuno-oncology Candidate."  N214 has been described as Nektar's "flagship" product and is the driver of virtually all of the Company's value.  It is designed to use the body's own immune system to fight cancer cells and thus potentially could be used as a treatment for many kinds of cancer.

2.     Nektar is a medium-sized San Francisco-based biopharmaceutical company that specializes in developing medicines to treat cancer, autoimmune diseases, and chronic pain.  Its drugs largely are in the development stage and it has relatively limited revenues (just over $100 million in 2019) in comparison to its market valuation of nearly $4 billion.  Bristol-Myers, which is not a defendant in this action, is a global biopharmaceutical company that manufactures and sells prescription medications and biologics in many therapeutic areas, with $22.6 billion in revenues in 2018.

3.     On February 13, 2018, Nektar and Bristol-Myers entered into a collaboration agreement ("Agreement") to develop, bring to market, and sell N214, with Nektar and Bristol-Myers sharing 65% and 35%, respectively, of net worldwide profits.  One of the primary purposes of the collaboration was to investigate the use of a combination therapy of N214 together with Bristol-Myers' drug Opdivo® (nivolumab).

4.     The deal was the largest single-drug deal in biotech history—rarer still because Bristol-Myers paid an enormous sum of money for a minority stake in an experimental drug's potential profits, far on the horizon and certainly not guaranteed.

5.     The Agreement consisted of a massive infusion of money from Bristol-Myers to Nektar in the form of cash and proceeds from stock purchases, and the possibility of lucrative cash payouts upon the successful completion of certain milestones.  The total cash and stock payment to Nektar was $1.85 billion.  The deal also provided Nektar with the ability to earn an additional $1.78 billion through an incentive program tied to the developmental progress of N214.

6.    The combination of up-front cash, purchased stock, and incentives signaled to the market that N214 was a potential "homerun" cancer therapy.  Further, as a result of the Agreement, Bristol-Myers obtained an ownership foothold in the Company and the ultimate ability to outright purchase Nektar.

7.    Nektar called the Agreement "transformative."  The collaboration with Bristol-Myers "enables us to speed development of NKTR-214 in registrational trials that allow us to establish NKTR-214 as a key backbone therapy in immuno-oncology."

8.    On February 14, 2018, the day the deal was announced to the public, Nektar's CEO Robin, underscored a "key component[]" of the Agreement: "Nektar and Bristol-Myers Squibb have agreed to a broad clinical development plan of *registration-enabling clinical trials in over 20 indications[1] in 9 tumor types[2]* in up to 15,000 patients."  The press repeated these specific numbers in articles covering the Agreement.

9.    Nektar's Form 10-K for 2018 utilized similar language, even adding to the number of planned indications: "We and [Bristol-Myers] are jointly developing NKTR-214 under an expansive joint development plan . . . that encompasses more than 20 indications across nine tumor types. . . . Many other registrational studies in additional tumor types and indications are planned to begin in 2019."[3]

10.    The "more than 20" indications in nine tumor types were a key element of the Bristol-Myers collaboration since, as Nektar explained: "[u]nder the [Agreement], we and [Bristol-Myers] will collaborate to develop and conduct clinical studies of NKTR-214 pursuant to a joint development plan, which includes a series of registration-enabling trials in more than 20 indications in nine tumor types" that "*may be revised only upon mutual agreement of the parties.*"

11.    The number and scope of indications impacted the additional incentives: "under the [Agreement], we are entitled to up to $1.43 billion in development milestones that are based upon

---

[1] In medicine, an indication is a medical condition, symptom, or sign that leads to the recommendation of a treatment, test, or procedure.
[2] Throughout the Complaint, all emphases are added to quotations unless otherwise noted.
[3] At points in the Class Period, including May 8, 2019, Defendants referred to the collaboration as encompassing eighteen indications.  Accordingly, the Complaint generally refers to eighteen to twenty indications as the initially described scope of the Agreement.

clinical and regulatory successes from the NKTR-214 development program.[4] One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated."

12.     For the latter half of 2018 and first half of 2019, Nektar featured the Agreement in its SEC filings, touting that Bristol-Myers was a great partner, and that the parties continued to pursue eighteen to twenty indications in nine tumor types. Further, throughout the first nine months of 2018, Nektar reported and touted preliminary clinical results for N214 that supported its potential to be a blockbuster cancer treatment that would justify its high market valuation and the substantial payments it had received from Bristol-Myers. On June 2, 2018, however, Nektar publicly disclosed results for an N214 trial that were substantially worse than the market had anticipated. On October 1, 2018, a short seller issued a report that substantially challenged the N214 clinical trial results. Nektar's disclosure and information in the short seller's report negatively impacted Nektar's stock price and shook investor confidence.[5]

13.     In an ongoing effort to repair investor confidence after Nektar's disclosure and the short seller's report, Defendants continued to tout their developmental agreement with Bristol-Myers and the number of indications for which they were planning to test N214.

14.     On February 28, 2019, the first day of the Class Period, Nektar's SEC Form 8-K highlighted the history of the collaboration and affirmed that everything was on track: "In February 2018, Nektar and Bristol-Myers Squibb entered into a global development and commercialization agreement to evaluate the full potential of [N214] with nivolumab in more than 20 indications in 9 tumor types." Nektar did not provide any inkling that the number and scope of indications were subject to any type of internal discussions or agreements as to present or future reductions.

[4] The remaining $350 million of the total $1.78 billion in incentives are tied to sales milestones.
[5] Nektar's June 2, 2018 disclosure and the information set forth in the short seller's report are the subject of a separate securities class action pending in this Court before Judge Gilliam, with a class period ending on September 28, 2018. *See In re Nektar Therapeutics Securities Litigation,* No. 4:18-cv-06607-HSG. None of the allegations herein relate to Nektar's alleged failures to accurately disclose the results of its clinical trials relating to N214 prior to October 1, 2018.

15. In fact, Nektar's CEO repeated the scope of the agreement in the corresponding Earnings Call and indicated that many of the planned trials had, in fact, commenced: "the joint development plan with Bristol includes about 20 registrational trials across multiple tumor types. And so far, the first 10 of these trials in the joint development plan, including our accelerated approval strategy in bladder cancer, have been initiated or in the process of starting. . . . [T]he [Bristol-Myers] and Nektar teams have been working very closely together on the program, and we've made tremendous progress over a short period of time in building out a comprehensive registrational strategy across the tumor types in this collaboration."

16. But these statements, as well as subsequent statements regarding the number and timing of trials, were false, and Nektar knew they were false, but apparently were unwilling to disclose the substantial change in the scope of the collaboration with Bristol-Myers given the widely reported issues with its clinical study results for N214.

17. Prior to February 28, 2019, Nektar and Bristol-Myers had already decided to significantly reduce the number and scope of indications for which the parties would conduct clinical trials and seek Food and Drug Administration ("FDA") approval. A Bristol-Myers employee who was substantially involved in the collaboration stated: It was clear by January 2019 that Nektar did not have conclusive data on all nineteen contemplated indications. Beginning with kickoff calls involving Nektar and Bristol-Myers representatives in February 2019, it was discussed that the nineteen N214 indications would be reduced to indications attacking renal cell, prostate, and lung cancers. During the next three to four months, until the employee left in the second quarter of 2019, weekly and biweekly conference calls concerning the world-wide development of N214, of which the employee was a direct Webex participant, focused solely on only three indications: "[I]t was very, very clear, from a clinical study point of view, and the sponsor/investor point of view, that they [Nektar and Bristol-Myers] were only going to pursue the three indications."[6]

18. A former Nektar employee corroborated Nektar's knowledge and timing of the significant reductions, observing that there was an internal announcement to Nektar employees that

---

[6] The former employee also noted that there was work being done with respect to a fourth indication—melanoma—but she viewed that slightly differently from the three organ groups.

the number of trials would be reduced.  That announcement occurred at either the monthly Department Meeting, Divisional Meeting, or All Hands meeting, before the employee left the Company in the first quarter of 2019.

19.    Nektar hid this information from the public and instead issued false statements from February 28, 2019 through May 8, 2019, including omissions of material fact.  Specifically, Nektar represented that the Company was on track to perform eighteen to twenty indications across nine tumor types and failed to mention that Nektar and Bristol-Myers, as of mid to late February 2019, were no longer pursuing the vast majority of indications and tumor types.  Instead, the companies were pursuing a much smaller subset.  Therefore, the Individual Defendants and Nektar knew that the Company's ability to meet lucrative milestone payments under the Agreement and the potential viability of N214 as a treatment for a broad spectrum of cancers would be negatively impacted.

20.    Nektar's May 8, 2019 Form 8-K continued to paint a rosy picture about the collaboration with Bristol-Myers and N214's overall progress.  The 8-K stated that "Nektar continues to advance our immuno-oncology and immunology pipeline with clinical trials initiating for multiple drug candidates across multiple indications. . . . We are working with our partner, [Bristol-Myers], to execute on our broad joint development program for [N214] in combination with nivolumab, with registrational trials in melanoma, RCC, urothelial and non-small cell lung cancer underway and additional trials planned to begin in the coming months."  Nektar acknowledged, however, that it had "agreed to extend the target date by 4 months for registrational trials in the joint development program that [had] not yet been started."

21.    An analyst in the corresponding earnings call attempted to get additional information about N214 and the "[Bristol-Myers] relationship" with respect to timelines and data releases that kept being pushed back. "Can you comment about what the genesis of that is? Are there any issues at all with enrolling? Or is it owing to shifts of strategy?"

22.    Nektar's CEO reinforced the lie: "[I]n regard to the 4-month extension, look, these are very, very complex programs. . . . We're working very closely with [Bristol-Myers].  We have a great relationship with them.  And this is a tremendous amount of work and a lot of thinking must go into these studies to get them right."  Later in the same call, the CEO indicated that "the contract and the

agreement and the collaboration was to have the trials running by June by next month.  And we've moved that to [the] end of September.  So we moved that 4 months. So the new date is end of September."

23.    In the same call, Nektar's CMO Tagliaferri, underscored that the delays did not affect the number or scope of indications: "[W]e have the broadest clinical development program ever known to man in a short period of time.  And really this delay is a factor of going forward with 18 registrational trials in a short period of time. We were very aspirational. We thought we would hit these 18 in a 14-month timeframe.  And I think what we realized is we need a few more extra months to file all those INDs, design the studies, and get the first patient in."

24.    None of the Company's disclosures on May 8, 2019, hinted at a material reduction in indications or curtailment of the scope of the collaboration.  Instead, Nektar's statements reinforced the original dynamic.  Investors took the Company at its word.

25.    In the Spring of 2019, Defendants learned significant adverse news regarding the N214 clinical program.  A former Nektar employee explained that, as a result of an internal investigation regarding the poor clinical trial results reported in September 2018, the Company determined that there had been issues in the manufacturing of N214 used for clinical trials that had impacted the results of those trials.  He indicated that he was informed of the problem by mid-May 2019, but that the investigation that led to the discovery of manufacturing issues had been ongoing for some time.  Another employee explained that, as a result of the manufacturing issue, clinical trials related to N214 were put on hold for a period that may have been as long as six months.

26.    Given the unbridled optimism of the Defendants' public statements, investors were stunned when the Company announced on August 8, 2019, that going forward, the collaboration with Bristol-Myers as to N214 would focus only on five or six indications, in contrast to Nektar's steady drumbeat of statements to the contrary for over a year.  The announcement represented a significant narrowing of the collaboration and potential curtailment of Nektar's opportunity to receive cash incentives.  It further announced that data on a key lung cancer trial would be delayed by at least 4 months.  Finally, the Company announced the existence of the N214 manufacturing defect.

27.     As a result of these disclosures, Nektar's stock dropped by nearly 40% on August 9 and 12, 2019, from a close of $29.57 per share on August 8th, to $20.92 per share on August 9th, and $18.58 per share on August 12th.  As a result, the Company's investors lost nearly $2 billion in the market value of their Nektar shares.

28.     Plaintiffs seek to hold Nektar and the Individual Defendants accountable for deceiving investors about the state of Nektar's collaboration with Bristol-Myers as to N214.  Nektar and the Individual Defendants repeatedly lied to the market by representing that the collaboration as to N214, which numbered at least eighteen to twenty indications across at least nine tumor types, was on track. Simultaneously, Defendants withheld and omitted material information for more than five months that the collaboration would not pursue the trumpeted amount of indications and tumor types, but instead would focus only on a small subset.  Nektar also withheld information on the existence of manufacturing issues that resulted in the delays and difficulties in commencing clinical trials.

## II.     JURISDICTION AND VENUE

29.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal offices are located in this district.

32.     This securities class action is exempt from identifying the basis for assignment to a particular location or division of the Court pursuant to Civil L.R. 3-2(c) ("The following are excluded from this division-specific venue rule and will be assigned on a district-wide basis: . . .  Securities Class Actions.").

33. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to United States mails, interstate telephone communications, and the facilities of a national securities exchange.

**III.   PARTIES**

**A.   Plaintiffs**

**1.   Lead Plaintiff**

34. Lead Plaintiff Kanti K. Patel, individually and as trustee for the Kanti K Patel Living Trust U/A 3/30/16, purchased Nektar common stock during the Class Period and suffered damages as a result of the violations alleged herein. Lead Plaintiff's Class Period transactions in Nektar common stock are reflected in the certification attached hereto as Exhibit A.

**2.   Additional Named Plaintiffs**

35. Named plaintiff, The Tech Trader Fund LP, is a hedge fund established in 2015, by the investment management subsidiary of Autodidactic I.  The Tech Trader Fund LP, as set forth in the certification attached hereto as Exhibit B, purchased Nektar securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

36. Named plaintiff, Henry J. Juske, purchased Nektar common stock during the Class Period and suffered damages as a result of the violations alleged herein. Class Period transactions in Nektar common stock by named plaintiff, Henry J. Juske, are reflected in the certification attached as Exhibit C.

**B.   Defendants**

**1.   Corporate Defendant**

37. Defendant Nektar is a clinical-stage biopharmaceutical company that develops medicines.  It is a Delaware corporation with its principal individual offices located at 455 Mission Bay Boulevard South, San Francisco, California.  Nektar also owns or leases property in Huntsville, Alabama, for a Manufacturing and Scale-up Facility, and in India, for a Research and Development Support Facility.

38.     The Company's stock is listed on the Nasdaq Stock Market (the "NASDAQ") under the ticker symbol "NKTR."

39.     The Company's focus is on discovering and developing new medicines to treat patients living with debilitating diseases and conditions.  Nektar's portfolio includes investigational medicines in different stages of clinical development. The Company also engages in strategic partnerships ranging from joint-discovery and co-development to licensing and royalty agreements with numerous companies, including Bristol-Myers.

## 2.     Individual Defendants

40.     Defendant Robin has served as the CEO of the Company since 2007.  During the Class Period, Robin reviewed, approved, and signed Nektar's SEC filings.  Robin also reviewed and approved press releases and Form 8-Ks issued by Nektar during the Class Period and actively participated in conference calls with securities analysts, during which false and misleading statements with respect to N214 were made.  Robin personally made statements during these conference calls, where he stated that of the twenty registrational trials included in the joint development plan with Bristol-Myers, ten were initiated or "in the process of starting" as of March 2019.  In May 2019, Robin expressed that despite some delay, the Company was moving forward rapidly with Bristol-Myers to get all registrational trials underway.

41.     Defendant Labrucherie has served as the Senior Vice President and CFO of the company since 2016.  During the Class Period, Labrucherie reviewed, approved and signed Nektar's SEC filings.  Labrucherie also reviewed and approved Form 8-Ks issued by the Company during the Class Period.  During a conference call with securities analysts on February 28, 2019, Labrucherie reaffirmed execution of the development plan with Bristol-Myers and expressed that multiple registrational studies were already underway with additional studies planned.

42.     Defendant Tagliaferri has served as the Vice President of Clinical Development and CMO of the Company since 2017.  During the Class Period, Tagliaferri participated on several conference calls with securities analysts and often answered inquiries regarding N214's progress.  In January 2019, Defendant Tagliaferri stated that the joint development plan with Bristol-Myers would include "over 20" indications in several different tumor types.  In May 2019, when the Company

disclosed a four month delay in certain clinical trials, Tagliaferri expressed that the delay was caused by attempting to move forward with 18 registrational trials, and more time was needed.

43. Defendants Robin, Labrucherie, and Tagliaferri are collectively referred to as the "Individual Defendants" and, together with Nektar, as the "Defendants." The Individual Defendants directly participated in the management of Nektar's operations with respect to the joint development plan with Bristol-Myers. They were also involved in the dissemination of false and misleading statements and information alleged herein, were aware, or recklessly disregarded that false and misleading statements were being issued. The Individual Defendants ratified or approved the misstatements and omissions, fully described below, in violation of the federal securities laws.

44. Defendants are liable under Section 10(b) of the Exchange Act for making false and misleading statements and omitting material adverse facts and/or participating in the fraudulent course of conduct alleged herein. In addition, each of the Individual Defendants was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, as they possessed direct or indirect power to direct or cause the direction of the management and the policies of the Company and persons who engaged in the unlawful conduct complained of herein in violation of Section 10(b). Due to their control, the Individual Defendants are jointly and severally liable for any false and misleading statements, omissions, or conduct alleged herein that are attributable to Nektar or other person they controlled.

45. Because of their positions and responsibilities, each of the Individual Defendants had access to the adverse disclosed and undisclosed information about Nektar and Bristol-Myers's Agreement as to N214, all pendant provisions of the collaboration, including all details about Nektar's role in the collaboration, by way of internal controls, access to internal corporate documents, conversations and contact with other corporate officers and directors, attendance at meetings, and receipt of and/or access to reports and other information provided to them. Each of the Individual Defendants, by virtue of his or her high-level position, was directly involved in the operations of Nektar at the highest levels and was privy to confidential information concerning the Company.

46. Their positions of control and authority as officers or directors also enabled these Individual Defendants to control the content of the SEC filings, press releases, and other public

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW                11

statements of Nektar during the Class Period. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.

47.    During the Class Period, each of the Individual Defendants substantially approved, participated in the preparation of, furnished information in connection with, and had ultimate authority for Nektar's SEC filings, press releases, and public statements, and engaged in conduct that made it necessary or inevitable that material misrepresentations or omissions would be made to investors based on that conduct.

48.    The Defendants were obligated to refrain from issuing false and misleading public filings and were prohibited from using the instrumentalities of interstate commerce or the U.S. mails to: (i) employ any device, scheme or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice or course of business which operates or would operate as a fraud upon any person.  Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Nektar Securities.  Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Nektar Securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Nektar's Agreement and collaboration with Bristol-Myers, as to N214, including the number of planned indications across tumor types, and the severe reduction in those numbers and types to a small subset. Defendants' course of conduct deceived the investing public and caused Plaintiffs and other members of the Class to be damaged as a result of their acquisition of Nektar Securities.

**C.    Former Employees[7]**

49.    FE1 was a Bristol-Myers Clinical Site Manager for many months prior to the class period, until serving as a Subject Matter Expert from just prior to the class period into mid-Q2 2019.

---

[7] Former Employees ("FEs") are identified by number, and their allegations are described using gender-neutral language or the feminine pronoun to protect their identities.

In early Q1 2019, FE1 was brought into the N214 Bristol-Myers collaboration as a Subject Matter Expert to leverage a network of existing relationships and solicit interest in the N214/Opdivo® Pivot 2b renal study.  In that role, FE1 directly participated in weekly Webex calls with Nektar's VP of Clinical Operations, Bristol-Myers's Protocol Manager for the collaboration, a Medical Monitor, a dozen or so other Bristol-Myers managers, and an array of vendors.

50. FE2 was a multi-year employee with Nektar and worked in the Clinical area as a mid-level manager in Compliance for a couple of years prior to the class period and through Q1 2019. FE2 was involved in a Pivot study for N214 from early 2017 through mid-2018.

51. FE3 was a Nektar Director from prior to the class period through Q2 2019. FE3 worked primarily on another Nektar program, and had a peripheral role in and some visibility into the N214 program.

52. FE4 was a Nektar senior executive from prior to the class period through late Q2 2019, who had involvements with the N214 program.

53. FE5 was a Director at Nektar headquarters throughout the entirety of the Class Period.

54. FE6 was a senior research scientist who worked on the N214 program from before the class period through early Q2 2019.

**IV. FACTUAL ALLEGATIONS**

**A. Background On Nektar And N214**

55. Nektar is a biopharmaceutical company that was founded in 1990, and is based in San Francisco, California.  The company develops new drug candidates by applying its proprietary PEGylation and advanced polymer conjugate technologies to modify chemical structure of substances.  PEGylation is a means of attaching polyethylene glycol (PEG) polymers to therapeutic agents, to improve their efficacy.  The technology can be used to extend drugs' half-lives and potentially eliminate negative aspects of the active chemical.

56. Cancer researchers have understood since the 1970s that a human protein called Interleukin-2 ("IL-2") can cause the human body to produce cancer-fighting cells. As Defendant Robin has noted, IL-2 "stimulates the immune system, and that's very, very important." IL-2, however, also triggers the production of immunosuppressive cells, which are also known as "Treg"

cells. IL-2 has long been an approved cancer therapy but, as explained by Defendant Robin, "you have to give significant quantities of native IL-2 to get any kind of effect, and at that point it's wildly toxic."

57. In an attempt to have human bodies produce cancer-fighting cells, without also producing toxic cells, Nektar applied its proprietary PEGylation technologies to modify IL-2. N214 is the result.

58. N214 is a pegylated version of the recombinant IL-2, a naturally occurring cytokine that was first discovered in 1976, and approved for treating cancer in 1992. Press releases on Nektar's website first mention N214 in April 2013.

59. The Company's current website describes N214 as:

> [A] CD122-preferential IL-2 pathway agonist designed to stimulate the patient's own immune system to fight cancer. Bempegaldesleukin [or N214] 8 is designed to grow specific cancer-killing T cells and natural killer (NK) cell populations in the body which fight cancer, which are known as endogenous tumor-infiltrating lymphocytes (TILs). [N214] stimulates these cancer-killing immune cells in the body by targeting CD122 specific receptors found on the surface of these immune cells, known as CD8+ effector T cells and NK cells. CD122, which is also known as the Interleukin-2 receptor beta subunit, is a key signaling receptor that is known to increase proliferation of these effector T cells. In clinical and preclinical studies, treatment with [N214] resulted in expansion of these cells and mobilization into the tumor micro-environment. [N214] has an antibody-like dosing regimen similar to the existing checkpoint inhibitor class of approved medicines.

60. Reporters covering the biotech industry similarly have described N214 as "a CD122 agonist that utilizes the interleukin-2 (IL-2) pathway, [which] is designed to increase the number and activation state of cancer-fighting T cells in the tumor microenvironment, while limiting IL-2 toxicity, with the hope of improving and lengthening patient responses" to various types of cancer.

**B.     Nektar's Initial Collaboration And Record-Setting Agreement With Bristol-Myers**

61. Nektar's press releases and corresponding presentations at conferences by some of the Individual Defendants, including early data on N214 combined with other agents, and patient

---

[8] Nektar interchangeably uses Bempegaldesleukin, bempeg, and NKTR-214 on its website and in press releases to refer to the same drug, but N214 will be used throughout this Complaint.

responses, caught the attention of Bristol-Myers and resulted in successively more interest and elaborate collaboration.

62.    Among Bristol-Myers's arsenal of cancer-fighting drugs already on the market were Opdivo® and Yervoy®, known as checkpoint inhibitors, which have been hailed as new weapons in doctors' ability to stop or slow cancer.  But such drugs reportedly work in only about one in five patients with solid tumors.  Giant cancer immunotherapy developers, like Bristol-Myers, have started to explore combining their approved drugs with others, still in development, setting off a sort of marriage ritual between large biopharmaceutical companies and small- to mid-size biotechs, such as Nektar, to see which combinations of drugs work best, hoping for a leg-up on the competition, or a *bona fide* game-changer.

63.    Results from an early collaboration between Nektar and Bristol-Myers, begun in 2016 and carried through 2017, showed that N214 and Opdivo®  together could generate a response in more than half of patients, with N214 believed to stimulate the immune system into producing a protein known as PD-1.  Enhancing the amount of relevant protein plays well into Bristol-Myers's Opdivo® drug, and other checkpoint inhibitors, which bind to PD-1 to prevent tumors from dimming a signal that otherwise would alert the immune system to the presence of foreign invaders, such as cancer cells.

64.    According to one Forbes reporter, early results combining Opdivo® and N214 were presented in November 2017, and "showed the drug combination shrinking skin, kidney, and lung tumors in many patients, including some who saw their tumors disappear.  But there was no control group of patients randomly assigned to receive Opdivo alone, [which] ma[de] it hard to be certain that the results were really due to adding NKTR-214."

65.    But Bristol-Myers and Nektar, masters of the data, believed they were on the threshold of a genuine game-changer.

66.    On February 14, 2018, Nektar announced that Bristol-Myers had agreed to pay Nektar $1.85 billion for a global development and profit-sharing deal on N214.  The $1.85 billion included $1 billion in cash and another $850 million from Bristol-Myers's purchase of 8.28 million Nektar shares at $102.60 per share, a 35% premium to Nektar's closing price on February 13, 2018, giving

Bristol-Myers an equity stake of just under 5% of the Company. The deal was announced to the public on February 14, 2018, and became effective on April 3, 2018.

67. The $1.85 billion cash and stock deal also included a massive incentive program worth an additional $1.78 billion in milestone payments upon the completion of certain developmental, regulatory, and sales targets.

68. Following anticipated regulatory approvals, Nektar would retain rights to N214 and the authority to book revenue for worldwide N214 sales. Under the Agreement, the companies would split global profits of N214, with Nektar receiving 65% and Bristol-Myers 35% percent.

69. The Agreement was hailed by the press as unique—the largest single-drug collaboration ever—and extremely lucrative for Nektar. It was reported that Nektar investors may have desired an outright purchase of Nektar, worth approximately $14 billion at the time, but Bristol-Myers's 5% stake in the Company signaled that a future buyout was possible, especially in light of the magnitude of the milestone payments.

70. The San Francisco Business Times called the deal "record-smashing" and a "drug industry record," while Forbes declared it "a whopping sum, especially for a minority stake in [one] drug."

71. Nektar called the Agreement "transformative." The collaboration with Bristol-Myers "enables us to speed development of NKTR-214 in registrational trials that allow us to establish NKTR-214 as a key backbone therapy in immuno-oncology." A representative from Bristol-Myers explained that N214 was expected to translate to a larger share of the market for the panoply of cancer drugs already offered by Bristol-Myers. A writer from the website Fierce Biotech affirmed: "If NKTR-214 lives up to expectations, that could enable [Bristol-Myers] to establish combinations based on Opdivo and Yervoy as go-to treatments for a range of cancers."

**C.     The Lucrative Milestone Payments Were Tied To The Pursuit And Success Of Eighteen To Twenty Indications Across Nine Tumor Types**

72. Both companies and the press touted that the bedrock of the Agreement rested on clinical trials in eighteen to twenty indications across nine tumor types, and that the lucrative

milestone payments were tied to the success of those indications. The message to the market was clear and consistent.

73. A Nektar press release on February 14, 2018, stated that the Agreement *"[e]stablishes a broad joint clinical development plan combining NKTR-214 with [Bristol-Myers's] Opdivo and Opdivo plus Yervoy (ipilimumab) in registration-enabling trials in more than 20 indications across 9 tumors."* Nektar repeated this phrase three more times in the same release. Bristol-Myers's corresponding February 14 press release issued the same day used the same wording.

74. The press underscored the same language: "The two- and three-drug combinations will be tested in more than 20 cancer indications across nine types of cancer—nonsmall cell lung cancer, small cell lung cancer, melanoma, the kidney cancer known as renal cell carcinoma, the urinary tract cancer known as urothelial cell cancer, breast cancer, colorectal cancer, gastric cancer and sarcoma—beginning over the next 14 months. The earliest trials will start this summer."

75. Defendant Robin, during Nektar's Investor and Analyst Call and document release on February 14, 2018, stressed that Nektar was entitled to "Substantial Upfront" cash totaling $1.85 billion and eligible for "Future Cash Payments" totaling $1.78 billion. Robin noted that a key component of the Agreement as to the milestone payments encompassed "registration-enabling clinical trials in over 20 indications in 9 tumor types in up to 15,000 patients."

76. Numerous press reports repeated the twenty-indications-across-nine-tumor-types phrase, noting that Bristol-Myers had lined up another $1.78 billion in milestone payments, putting the potential value of the entire deal worth north of $3.6 billion.

77. Nektar's Form 10-K for 2018 employed similar language, even adding to the number of indications: "We and [Bristol-Myers] are jointly developing NKTR-214 under an expansive joint development plan . . . that encompasses more than 20 indications across nine tumor types. . . . Many other registrational studies in additional tumor types and indications are planned to begin in 2019."

78. Crucially, according to the same Form 10-K, the more than twenty indications in nine tumor types were not aspirational: "Under the [Agreement], we and [Bristol-Myers] will collaborate to develop and conduct clinical studies of NKTR-214 pursuant to a joint development plan, which

includes a series of registration-enabling trials *in more than 20 indications in nine tumor types and may be revised only upon mutual agreement of the parties.*"

79.    The number and scope of indications were explicitly linked to the lucrative incentives: "[U]nder the [Agreement], we are entitled to up to $1.43 billion in development milestones that are based upon clinical and regulatory successes from the NKTR-214 development program.[9]  One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated."

80.    For the latter half of 2018 and first half of 2019, Nektar featured the Agreement in its SEC filings, trumpeting that Bristol-Myers was a great partner and that the parties continued to pursue twenty indications in nine tumor types.

**D.    Nektar Reports Success And Then Setbacks Regarding The Efficacy Of N214**

81.    N214 has had a roller-coaster ride of purported successes followed by alleged failures. Nektar announced in December 2015 that the first human patients, with advanced solid tumors, had been dosed with N214.  A little over a year later, on January 10, 2017, CEO Robin explained: "We've designed a new Il-2 molecule [N214] with a biased action to the beta gamma receptors . . . . [where] you can produced significant quantities of CD8-positive [cancer-fighting] cells without affecting the production or the proliferation of regulatory T [immunosuppressive] cells."  As Robin spoke, he presented at least one slide showing that cancer fighting cells increased by an average of 30-fold in the tumors of purportedly ten patients dosed with N214 every three weeks.  Nektar continued to publish positive press releases about N214. For example, on November 11, 2017, Defendant Tagliaferri stated that "in the dose-escalation stage of the PIVOT trial, we've observed important response rates across all three tumor types—melanoma, renal cell carcinoma and non-small lung cancer—in both PD-L1 positive and PD-L1 negative patients."

82.    Certain of Nektar's claims regarding its clinical trials were challenged by some stock market analysts, and, On October 1, 2018, a short seller issued a report that appeared to undercut Nektar's statements regarding the efficacy of N214.  This resulted in the filing of a securities fraud

---

[9] The remaining $350 million of the total $1.78 billion in incentives are tied to sales milestones.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW            18

class action complaint that is now pending before Judge Gilliam of this Court (*In re Nektar Therapeutics Securities* Litigation, No. 4:18-cv-06607-HSG), alleging that Nektar, among other things, knowingly cherry-picked the best data from clinical trials and excluded bad data, misled investors about the performance of N214, and engaged in insider trading during a class period that ends in September 2018.[10]  This case is ongoing.

**E.     Nektar Continues To Tout The Number Of Cancers And Indications For Which It Was Proposing To Test N214**

83.     In light of the disappointing results it had reported for N214 in June 2018, and in an effort to maintain investors' support and confidence, Nektar continued to tout the broad scope of its collaboration agreement with Bristol-Myers.  Thus, at the beginning of the Class Period, on February 28, 2019, Nektar issued a Press Release and corresponding SEC Form 8-K, highlighting the history of the collaboration with Bristol-Myers and reiterating that everything was supposedly on track: "In February 2018, Nektar and Bristol-Myers Squibb entered into a global development and commercialization agreement to evaluate the full potential of [N214] with nivolumab in more than 20 indications in 9 tumor types."  Nektar did not indicate that the number and scope of indications had been revised by mutual consent or unilaterally altered, or were subject to any type of internal discussions or agreements as to present or future reductions.

84.     Further, Defendant Robin doubled-down on the original dynamic in his corresponding Earnings Call: "[T]he joint development plan with Bristol includes about 20 registrational trials across multiple tumor types.  And so far, the first 10 of these trials in the joint development plan, including our accelerated approval strategy in bladder cancer, have been initiated or in the process of starting. . . . The [Bristol-Myers] and Nektar teams have been working very closely together on the program, and we've made tremendous progress over a short period of time in building out a comprehensive registrational strategy across the tumor types in this collaboration."

85.     These statements, as well as other statements outlined below, were false and Nektar knew they were false when made.

---

[10] None of these claims are the subject of the instant Complaint.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW                    19

**F.      By Mid To Late February 2019, Nektar And Bristol-Myers Had Already Abandoned Their Planned Twenty Indications In Nine Tumor Types, And Instead Were Pursuing A Much Smaller Subset**

86.     As early as January 2019, and no later  than mid-February 2019, it was well-known within both companies that the N214 collaboration would need to be severely curtailed in terms of the number of indications and tumor types, notwithstanding Nektar's public statements and affirmations to the contrary.  This decision occurred prior to Nektar's February 28, 2019 false and misleading statements to the market and was corroborated by several former employees from Bristol-Myers and Nektar.

87.     FE1, a Bristol-Myers employee, was assigned by his employer to the N214/Opdivo® collaboration with Nektar, from prior to the Class Period through the late Spring of 2019.  During this period, FE1 was assigned to N214/Opdivo® studies.

88.     FE1 was a direct participant in weekly Webex N214/Opdivo® partnership calls with (i) Nektar's VP of Clinical Operations, Lisa Decker, (ii) a Nektar female Senior Scientific VP (FE1 could not recall her name), (iii) Bristol-Myers's Protocol Manager, Katleen Van Hoeff (Netherlands), (iii) Medical Monitor Sabeen F. Mekan, (iv) about a dozen Bristol-Myers managers doing essentially FE1's job in other geographic areas; and (v) assorted vendors.

89.     FE1 provided information on the timing and decision to reduce indications and tumor types.

90.     FE1 explained that Nektar and Bristol-Myers had individual teams for renal, prostate, melanoma, lung and non-small cell lung. The three teams that were "active"—renal, prostate and lung—created a Research and Development workflow.  The active teams were further broken down into a Country team, which had weekly Webex calls, and a Global team, which had bi-weekly Webex calls.

91.     FE1 stated that it was clear by January 2019 that Nektar did not have conclusive data on all nineteen contemplated indications.  Beginning with kickoff calls involving Nektar and Bristol-

Myers representatives in February 2019, it was discussed that the nineteen indications would be reduced to indications attacking renal cell, prostate, and lung cancers.[11]

92. During the next three to four months, until FE1 left in late Spring 2019, weekly and biweekly conference calls concerning the world-wide development of N214 focused on three indications (renal cell, prostate, and lung): "[I]t was very, very clear, from a clinical study point of view, and the sponsor/investor point of view, that they [Nektar and Bristol-Myers] were only going to pursue the three indications," but she specifically noted that melanoma also was being worked on by Nektar and Bristol-Myers teams.

93. FE1 explained that there was a huge change in staff at Nektar between November 2018 and January 2019, particularly with respect to study managers and logistics managers. Such staff changes exacerbated a larger problem: "Nineteen indications are not possible with these two agents [N214 and Opdivo®]" in such a short period of time.

94. Reasons for the dramatic reduction in indications and tumor types given by Decker, Hoeff, and Mekan during the early calls in January and February 2019, included preliminary analyses, market commercialization, patient population needs, ability to get approval for the drug, and difficulties in recruiting doctors and sites. As to this last point, a major part of FE1's job was leveraging Bristol-Myers's and FE1's network and soliciting interest in the Pivot 2b renal study. But because of the lack of available data and progress, FE1 recalled having "zero" doctors interested, with only one or two being potentially interested.

95. Further, "[p]art of the reason they went from 18" to a much smaller subset is that there is "no treatment" or answers for certain kinds of cancers, which are "big killers." "Less competition [means] less need to justify." Thus, the companies sought to focus on potential cancers with the greatest potential to obtain value. This reason for the reduction in indications was discussed during the Webex calls, but not as bluntly, according to FE1.

96. FE1 asked Barbara (FE1 could not recall Barbara's last name), Lead Data Manager for Nektar, sometime after the February kickoff meeting, why Nektar/Bristol-Myers reduced the

_____

[11] As noted previously, FE1 explained that there was work being done with respect to a fourth indication—melanoma—but she viewed that slightly differently from the three organ groups because it could impact multiple parts of the body.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW          21

indications from nineteen: "[Didn't you] have testing for the other indications?" The Lead Data Manager told FE1 to "ask the data managers and bio-statisticians working for Bristol-Myers." FE1 raised concerns about the lack of data and testing protocols regarding the eighteen to twenty indications to superiors at Bristol-Myers, but was rebuffed. FE1 was resolute that Nektar and Bristol-Myers had agreed by January or February 2019 to significantly reduce indications and tumor types.

97.    Former employees from Nektar corroborate FE1's account and Nektar's knowledge of major reductions as of February 2019.

98.    FE2 was a multi-year employee with Nektar and worked in the Clinical area as a mid-level manager in Compliance for a couple of years prior to the class period through Q1 2019. FE2 supports FE1's understanding regarding the decision to limit the number of indications, recalling being told that indications had been reduced and fewer trials than anticipated would be necessary for N214 during an official announcement at the monthly Department Meeting, Divisional Meeting, or All-Hands Meeting. FE2 could not recall why N214 indications were being reduced, or what possible justification was given, before leaving the Company.

99.    FE3, a Director at Nektar from prior to the class period through mid-Q2 2019, worked primarily on another Nektar program, but also had a peripheral role in the N214 program, and confirmed that Nektar's drug supply people stated that vials needed for N214 trials started falling in the spring of 2019. This supports the understanding of the other FEs that the companies had decided in February 2019 or earlier, to reduce the indications as to which they would seek FDA approval, and thus by Spring 2019, manufacturing had reached a point where many fewer doses of N214 would be needed to support the companies' reduced clinical trial programs.

100.    Nektar hid from the market that it and Bristol-Myers had already agreed, in mid to late February 2019, to significantly reduce the number of indications and tumor types—in stark contrast to the Company's public statements for the first half of 2019. The truth would have reinforced investors' concerns arising from the disclosure of poor clinical trial results in June 2018, and the short seller report later that year, suggesting that N214 would not ultimately turn out to be a blockbuster drug that could be used to treat a large number of cancers.

**G.    Nektar Continued To Make Material Misstatements And Omissions Regarding The Number Of Indications It Was Pursuing And Other Aspects Of Its Plans For N214**

101.    Nektar's May 8, 2019 Form 8-K reinforced the original dynamic: "Nektar continues to advance our immuno-oncology and immunology pipeline with clinical trials initiating for multiple drug candidates across multiple indications. . . . We are working with our partner, [Bristol-Myers], to execute on our broad joint development program for [N214] in combination with nivolumab, with registrational trials in melanoma, RCC, urothelial and non-small cell lung cancer underway and additional trials planned to begin in the coming months."

102.    In the corresponding Earnings Call, Defendant Robin reiterated an earlier statement that the Company planned to disclose data relating to a study of non-small cell lung cancer at the European Society for Medical Oncology ("ESMO") meeting on September 27 to October 1, 2019.

103.    Nektar and Bristol Myers had long disclosed that they were targeting early June 2019, for the submission of Investigational New Drug ("IND") applications for the studies in the their joint development plan.[12]  As part of the information it was providing on May 8, 2019, Nektar announced that it had decided to extend the target date for filing INDs by four months, with respect to those registrational trials in the joint development program that had not yet been started.

104.    During the earnings call on May 8th, an analyst sought additional information about N214 and the "[Bristol-Myers] relationship" regarding timelines and data releases that kept getting pushed back. "Can you comment about what the genesis of that is? Are there any issues at all with enrolling? Or is it owing to shifts of strategy?"

105.    Defendant Robin reinforced the lie: "[I]n regard to the 4-month extension, look, these are very, very complex programs. . . . We're working very closely with [Bristol-Myers].  We have a great relationship with them.  And this is a tremendous amount of work and a lot of thinking must go into these studies to get them right."

106.    Later in the same call, Robin indicated that "the contract and the agreement and the collaboration was to have the trials running by June by next month.  And we've moved that to [the]

---

[12] Research or investigator INDs are non-commercial INDs filed by researchers to study an unapproved drug or to study an approved drug for a new indication or in a new patient population.

end of September.  So we moved that 4 months.  So the new date is end of September."  Missing from all this commentary was any mention that Nektar and Bristol-Myers had already agreed to a severe reduction in indications and tumor types as of February 28, 2019.

107.   Also in the same call, Nektar's CMO, Defendant Tagliaferri, emphasized that the delays did not affect the number and scope of indications: "[W]e have the broadest clinical development program ever known to man in a short period of time.  And really this delay is a factor of going forward with 18 registrational trials in a short period of time.  We were very aspirational. We thought we would hit these 18 in a 14-month timeframe.  And I think what we realized is we need a few more extra months to file all those INDs, design the studies, and get the first patient in."

108.   None of the Company's official disclosures on May 8, 2019 (or any other statements prior to those made on August 8, 2019) hinted at: (i) a reduction in indications, let alone a severe reduction; (ii) a curtailment of the scope of the collaboration; or (iii) any possibility that Nektar's ability to obtain milestone payments might be impaired.  Instead, Defendants reinforced the narrative and the lie that the Company was on track and chugging along towards the original targets.

**H.   Nektar Discovers A Significant Manufacturing Problem With Batches Of N214 Used In Its Clinical Trials**

109.   As a result of the disappointing clinical trial results that Nektar reported in June 2018, it initiated studies of the various factors that could have impacted the results.  As a result of the analysis it undertook, Nektar began to understand by at least March 2019, that there were problems in its manufacturing processes with respect to certain batches of N214 used in clinical trials.  FE6 recounted that, in or around March 2019, Chief Science Officer Jonathan Zalevsky told FE6 that Nektar had become aware of something unexpected in the test results of N214 and had begun investigating.  Zalevsky and others were trying to understand the difference in batches and outcomes by looking across clinical data, biomarkers, and other sources in search of abnormalities which would explain the different data in the test results.  FE6, who left Nektar in Q2 2019, also recalled hearing talk about batch issues in some N214 Clinical Trial Team meetings across departments.

110.   FE4 stated that she first became aware of the manufacturing issue in the middle of May 2019 in a meeting with the Senior Vice President of Development Operations.  The Senior Vice

President said that there was a potential CMC [chemistry, manufacturing, and controls] issue and that preliminary work performed indicated that certain lots may have been different.

111.    FE4 explained in considerable detail what she recalled from that conversation and her opinion as to the eventual public announcement of two bad batches.  The difference was between a crystalline state and anamorphous state. The crystalline state has the lowest energy. Drugs in crystalline state dissolve at different rates than those in an amorphous state. Crystallinity makes a difference so you have to determine if they controlled for crystallinity.

112.    FE5 reported that the N214 program had been subject to a pause that started in the first and second quarters of 2019 and lasted for a number of months.  She stated that the pause was due to the discussion regarding the status of the manufacturing issue and the two bad lots.  She said that the Company was "keeping a lot of things to their chest" regarding the program and the hold and she had never experienced anything like it.

**I.    Nektar Erases $1.8 Billion Of Market Value After Announcing A Severe Reduction In The Planned Indications, And A Manufacturing Issue**

113.    On August 8, 2019, Nektar released a series of statements as to its collaboration with Bristol-Myers that rocked the market.

114.    Nektar issued a press release and corresponding Form 8-K on August 8, 2019, that obliquely stated: "Nektar is making good progress advancing our multiple programs in immuno-oncology, immunology and pain. . . . With our partner Bristol-Myers Squibb, although we've experienced some delays, we are working to finalize the development program for bempegaldesleukin [N214] in combination with nivolumab in a number of tumor types and which are designed to support registration for this unique I-O doublet.  We have a number of registrational trials already started and we recently received a breakthrough designation from [the] FDA for [N214] and nivo in the setting of first-line untreated metastatic melanoma."

115.    In the corresponding Earnings Call that took place at 5 pm EST, after the close of the market, the Individual Defendants amplified on the statements in the press release, providing information that resulted in a drop of nearly 40% in the Company's share price over the next two trading days.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW          25

116.    Investors initially were stunned when the Company announced that Nektar, as of August 8, 2019, only had four active indications running with Bristol-Myers ("one in first-line melanoma, one in first-line cis-ineligible urothelial cancer, one in first-line renal cell carcinoma and one in second-line relapsed non-small cell lung cancer"), and, going forward, the collaboration with Bristol-Myers under the Agreement would focus only "on 5 or 6 key" indications, a significant narrowing of the collaboration, which had long been touted as involving 18 to 20 indications over nine tumor types.

117.    Defendant Robin acknowledged publicly for the first time: "[W]e're not moving forward with 18" indications. "The landscape . . . has clearly evolved and changed":

> Let's just say this, if we get—if we—and I believe we will, have 6 major registrational trials running in 6 different indications with [Bristol-Myers], I do believe that's a good way to develop and focus development of bempeg.  And I would expect that that's where we wind up. Clearly, at this point, running 20 trials is probably not the right thing to do in terms of how we use our resources. But I think if we identify, and I know we will, 5 or 6 very relevant, very significant registrational trials, I would expect that we can bring [N214] and nivo to a very, very good result.

118.    Defendant Robin also announced the manufacturing issue with batches of N214 used in its clinical trial program:

> [W]e conducted a thorough characterization of all of the 22 lots of [N214] produced to date, including all of those which currently supply and will supply our current and future registrational studies. The characterization work from this new assays revealed that 2 of the earliest production batches of [N214] were different than the other 20 batches produced. These 2 early manufacturing lots are known as lots 2 and 5. And at the time of their production beginning in 2016, it was early on in the manufacturing campaign, and these lots were within the manufacturing controls and release specifications. As such, we did not detect any meaningful variability upon their release.

119.    He explained further that Nektar had "identified the cause of the physical differences between these lots, which we now know stemmed from a single sub-optimal batch of in-process intermediate that was used to produce only these 2 lots, lots 2 and 5 of the 22 lots we've made to date. The issue was restricted only to the single batch of intermediate used in lots 2 and 5. . . ."

120.    Nektar further announced that it had withdrawn a presentation at the 2019 ESMO meeting with respect to first-line non-small cell lung cancer results, which it had promised on May

8, 2019, would be delivered at that meeting. It explained that it was enrolling additional patients in the first-line non-small cell lung cancer cohorts, and "those patients are starting treatment with [N214] lots that are not lots 2 and 5," suggesting that the study had been delayed while the manufacturing issue was resolved. Defendant Robin specifically acknowledged that delays in its clinical collaboration with Bristol-Myers, which would include the delayed small lung cell results, was the result of the manufacturing issue: "we had to delay here because of these manufacturing lots that we recently correlated with clinical data."

121. Analyst reports published on August 9 blamed the dramatic stock drop occurring the same day largely on the severe curtailment of indications and tumor types, and referenced the manufacturing issue and the postponement of the small lung cell clinical data. An Analyst from J.P. Morgan sub-titled her August 8, 2019 Nektar Report "Disappointing Updates; Pivotal Plans Substantially Narrowed For [N]214/Nivo" and pinpointed the "narrowing of focus [a]s clearly disappointing." Analysts from H.C. Wainwright & Co. opened their August 9 report with the salvo, "[we've] [n]ever seen anything like this," bemoaning, from their view, the confusing management presentation regarding the manufacturing issue and underscoring that "the ambitious 18 registration studies . . . has now been whittled down to between five or six," noting that "these new developments do not inspire confidence." William Blair stated on August 9, 2019, that "[i]n our view, the [reduction in the number of indications] could have a negative impact on the credibility of Nektar's management team among investors. In addition, the perceived multiple shots on goal offered to investors through conducting 18 pivotal studies is now reduced to five or six, thus putting more pressure on the eventual success of individual trials."

122. Nektar's stock got pummeled—crashing nearly 30% on August 9, to close at $20.92 (down from $29.57 on August 8, 2019). On August 12, after the market was able to fully digest the various analysts' commentary on the confusing disclosures by Defendants, Nektar's share price declined further to $18.58 per share—a share price not experienced since at least 2017.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

123.    Defendants made materially false and misleading statements to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Specifically, Defendants represented that Nektar, in collaboration with Bristol-Myers, was in the process of initiating trials or on track to hit eighteen to twenty indications in nine tumor types, which was false because Defendants had decided prior to or during February 2019, to pursue only four indications initially and a total program of only five or six indications, significantly reducing the potential for N214.  Defendants also misrepresented their ability to provide clinical information regarding the use of N214 for non-small cell lung cancer by September 2019, because they knew that, due to their undisclosed manufacturing problems, such information would not be available until 2020 or later.

### A.     February 28, 2019 Press Release And Earnings Call

124.    The Class Period begins on February 28, 2019, when Nektar issued a press release (the "February 28 Press Release") announcing its financial results for the fourth quarter of 2018.  The February 28 Press Release was attached to the Company's current report on Form 8-K and filed with the SEC on the same day.  Through the press release, Defendants noted that "[i]n February 2018, Nektar and Bristol-Myers Squibb entered into a global development and commercialization agreement to evaluate the full potential of bempegaldesleukin with nivolumab in *more than 20 indications in 9 tumor types*."  Defendants also represented that: "we continue to design and execute on our broad registrational program for NKTR-214 (bempegaldesleukin) with our partner Bristol-Myers Squibb."

125.    On the same day, the Individual Defendants hosted Nektar's fourth-quarter fiscal year 2018 earnings call (the "February 28 Earnings Call").  In his opening remarks, Defendant Robin stated: "As you know, the joint development plan with Bristol includes about 20 registrational trials across multiple tumor types.  And so far, the first 10 of these trials in the joint development plan, including our accelerated approval strategy in bladder cancer, have been initiated or in the process of starting . . . . [t]he [Bristol-Myers] and Nektar teams have been working very closely together on the

program, and we've made tremendous progress over a short period of time in building out a comprehensive registrational strategy across the tumor types in this collaboration."

126. Thereafter, Defendant Labrucherie also provided highlights from the fourth quarter through a review of Nektar's 2019 financial guidance. When highlighting the Company's 2019 R&D investment plan, Defendant Labrucherie stated: "A significant amount of our R&D budget represents our portion of the investment in the broad registrational development plan for [N214] that we are executing with our partner [Bristol-Myers]. We have multiple registrational studies underway with many more registrational studies planned."

127. Defendant Robin's statements identified in paragraph 125 were materially false and misleading because Nektar and Bristol-Myers had already decided to significantly reduce the number and scope of indications prior to the February 28 Press Release and Earnings Call. Falsity/omission of material information is demonstrated by: (1) FE1's recollection that major changes in staffing that occurred between November 2018 and January 2019, made nineteen indications impossible in the given period of time, *see supra* ¶93; (2) FE1's additional recollection that during the February kick-off calls between Nektar and Bristol-Myers, the number of indications were reduced from nineteen, *see supra* ¶91; (3) FE2's recollection that she was told during an official departmental announcement that indications had been reduced and fewer trials than anticipated would be necessary for N214, *see supra* ¶98; (4) FE3's recollection that vials needed for N214 trials started falling in the spring of 2019, *see supra* ¶99; and (5) the other information set forth above demonstrating that Nektar and Bristol-Myers had decided before the end of February 2019, to reduce the number of indications for which FDA approval would be sought from 20 to as few as 6. *See supra* ¶¶ 16-24, 86-100.

128. Defendant Labrucherie's statements identified in paragraph 126 were materially false and misleading and/or omitted material information because he created the impression that Nektar was on track to execute the "broad" developmental plan previously disclosed to investors, but Nektar and Bristol-Myers had already decided to significantly reduce the number and scope of indications prior to the February 28 Press Release and Earnings Call. Falsity/omission of material information is demonstrated by: (1) FE1's recollection that major changes in staffing that occurred between November 2018 and January 2019, made nineteen indications impossible in the given period of time,

*see supra* ¶93; (2) FE1's additional recollection that during the February kick-off calls between Nektar and Bristol-Myers, the number of indications were reduced from nineteen, *see supra* ¶91; (3) FE2's recollection that she was told during an official departmental announcement that indications had been reduced and fewer trials than anticipated would be necessary for N214, *see supra* ¶98; (4) FE3's recollection that vials needed for N214 trials started falling in the spring of 2019, *see supra* ¶99; and (5) the other information set forth above demonstrating that Nektar and Bristol-Myers had decided before the end of February 2019, to reduce the number of indications for which FDA approval would be sought from 20 to as few as 6. *See supra* ¶¶16-24, 86-100.

129. Likewise, Defendants' February 28 Press Release and Form 8-K contained a misrepresentation identified in paragraph 124 and omitted material information, because it represented that Nektar and Bristol-Myers continued to execute on the broad registrational development plan announced in February 2018, which involved "more than 20 indications in 9 tumor types." Falsity/omission of material information is demonstrated by: (1) FE1's recollection that major changes in staffing that occurred between November 2018 and January 2019, made nineteen indications impossible in the given period of time, *see supra* ¶93; (2) FE1's additional recollection that during the February kick-off calls between Nektar and Bristol-Myers, the number of indications were reduced from nineteen, *see supra* ¶91; (3) FE2's recollection that she was told during an official departmental announcement that indications had been reduced and fewer trials than anticipated would be necessary for N214, *see supra* ¶98; (4) FE3's recollection that vials needed for N214 trials started falling in the spring of 2019, *see supra* ¶99; and (5) the other information set forth above demonstrating that Nektar and Bristol-Myers had decided before the end of February 2019, to reduce the number of indications for which FDA approval would be sought from 20 to as few as 6. *See supra* ¶¶16-24, 86-100.

**B.    May 8, 2019 Press Release and Earnings Call**

130. On May 8, 2019, Nektar issued a press release (the "May 8 Press Release") announcing its financial results for the first quarter of 2019. The May 8 Press Release was attached to the Company's current report on Form 8-K and filed with the SEC on the same day. Through the press release, Defendants noted that: "Nektar ***continues to advance*** our immune-oncology and

immunology pipeline with clinical trials initiating for multiple drug candidates across multiple indications. . . . We are working with our partner, Bristol-Myers Squibb, *to execute* on our broad joint development program for [N214] in combination with nivolumab, with registrational trials in *melanoma, RCC, urothelial and non-small cell lung cancer underway* and additional trials planned to begin in the coming months."

131. On the same day, the Individual Defendants hosted Nektar's first-quarter fiscal year 2019 earnings call (the "May 8 Earnings Call"). In his opening remarks, Defendant Robin stated: "The joint development plan with Bristol includes many registrational trials across multiple tumor types. BMS and Nektar are currently working on the designs for the next wave of trials in lung, breast, gastric, and colorectal cancers as well as sarcoma. Our 2 teams have been working very closely together on trial designs in a changing competitive landscape."

132. During the call, Defendant Robin continued to assure investors that the Company was still planning to execute on the broad developmental plan, despite needing an extension of time. When asked by analyst to explain the extension of the timeline, Robin stated: "Look, in regard to the 4-month extension, look, these are very, very complex programs. . . . We're working very closely with BMS. We have a great relationship with them. And this is a tremendous amount of work and a lot of thinking must go into these studies to get them right. It's a rapidly evolving competitive landscape and we want to make sure that we are successful. We want to make sure that we're successful with these trials. I think an extension of 4 months is something that we think is perfectly reasonable in terms of this such a complex development plan. And maybe we were a little aggressive on the initial timelines, but in any case I think we're moving forward rapidly and we have a definite focus between the [two] companies to get this done."

133. Later in the same call, a J.P. Morgan analyst inquired as to the prior deadline for starting the pivotal studies and the new deadline under the Agreement. In response, Defendant Robin stated: "We – the contract and the agreement and the collaboration was to have the trials running by June by next month. And we've moved that to end of September. So we moved that 4 months. So the new date is end of September."

134. After another analyst followed up on the new deadline, Defendant Tagliaferri stated: "[T]his delay is a factor of going forward with 18 registrational trials in a short period of time. We were very aspirational. We thought we would hit these 18 in a 14-month timeframe. And I think what we realized is we need a few more extra months to file all those INDs, design the studies, and get the first patient in."

135. Defendant Robin's statements identified in ¶¶131-33 were materially false and misleading, and/or omitted material information, because Robin continued to affirm that Nektar was working towards completing the registrational trials announced in February 2018. Robin falsely represented that Nektar and Bristol-Myers were "moving forward rapidly" to get the trials done. Robin also stated that "designs for the next wave of trials for lung, breast, gastric, and colorectal cancers as well as sarcoma" were underway. Falsity/omission of material information is demonstrated by: (1) FE1's recollection that major changes in staffing that occurred between November 2018 and January 2019, made nineteen indications impossible in the given period of time, *see supra* ¶93; (2) FE1's additional recollection that during the February kick-off calls between Nektar and Bristol-Myers, the number of indications were reduced from nineteen, *see supra* ¶91; (3) FE2's recollection that she was told during an official departmental announcement that indications had been reduced and fewer trials than anticipated would be necessary for N214, *see supra* ¶98; (4) FE3's recollection that vials needed for N214 trials started falling in the spring of 2019, *see supra* ¶99; and (5) the other information set forth above demonstrating that Nektar and Bristol-Myers had decided before the end of February 2019, to reduce the number of indications for which FDA approval would be sought from 20 to as few as 6. *See supra* ¶¶16-24, 86-100.

136. Defendant Tagliaferri's statements identified in ¶ 134 were also materially false and misleading, because she continued to affirm the notion that the joint developmental plan included at least eighteen registrational trials. Tagliaferri also omitted material information when she failed to disclose the significant reduction in the number of trials, or that the Defendants knew as early as February 2019 that they would not be pursuing all eighteen. Falsity/omission of material information is demonstrated by: (1) FE1's recollection that major changes in staffing that occurred between November 2018 and January 2019, made nineteen indications impossible in the given period of time,

*see supra* ¶93; (2) FE1's additional recollection that during the February kick-off calls between Nektar and Bristol-Myers, the number of indications were reduced from nineteen, *see supra* ¶91; (3) FE2's recollection that she was told during an official departmental announcement that indications had been reduced and fewer trials than anticipated would be necessary for N214, *see supra* ¶98; (4) FE3's recollection that vials needed for N214 trials started falling in the spring of 2019, *see supra* ¶99; and (5) the other information set forth above demonstrating that Nektar and Bristol-Myers had decided before the end of February 2019, to reduce the number of indications for which FDA approval would be sought from 20 to as few as 6. *See supra* ¶¶16-24, 86-100.

137. Likewise, the statements made in the May 8, 2019 Press Release and attached 8-K identified in paragraph 130 were also materially false and misleading, and/or omitted material information, because Defendants were not on track to execute the broad developmental program as previously planned. Falsity/omission of material information is demonstrated by: (1) FE1's recollection that major changes in staffing that occurred between November 2018 and January 2019, made nineteen indications impossible in the given period of time, *see supra* ¶93; (2) FE1's additional recollection that during the February kick-off calls between Nektar and Bristol-Myers, the number of indications were reduced from nineteen, *see supra* ¶91; (3) FE2's recollection that she was told during an official departmental announcement that indications had been reduced and fewer trials than anticipated would be necessary for N214, *see supra* ¶98; (4) FE3's recollection that vials needed for N214 trials started falling in the spring of 2019, *see supra* ¶99; and (5) the other information set forth above demonstrating that Nektar and Bristol-Myers had decided before the end of February 2019, to reduce the number of indications for which FDA approval would be sought from 20 to as few as 6. *See supra* ¶¶ 16-24, 86-100.

138. In the May 8, 2019 conference call, Defendant Tagliaferri stated that the Company planned to disclose data relating to a study of non-small cell lung cancer at the European Society for Medical Oncology (ESMO) meeting on September 27 to October 1, 2019.

139. Defendant Tagliaferri's statement identified in ¶138 was materially false and misleading and contained material omissions, because she knew that, as a result of undisclosed manufacturing problems with respect to certain batches of N214 that had been identified by Nektar

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW                33

as early as January 2019 and which were discussed within Nektar by May 2019, *See supra* ¶¶109-12, Nektar would not be able to present data relating to a study of non-small cell lung cancer at ESMO in late September 2019.

## VI.    LOSS CAUSATION

140.    As alleged herein, Defendants made material misstatements and omissions relating to their joint development agreement with Bristol Myers for N214 by stating on February 28, 2019 and May 8, 2019, that pursuant to the Agreement the parties would pursue a "broad" array of indications (18 to 20) across nine tumor types for N214, and by stating on May 8, 2019, that they would make available clinical information regarding N214's efficacy with respect to non-small cell lung cancer in late September/early October 2019, but failed to disclose and/or affirmatively misrepresented that: (i) as of February 2019 and for the immediate future they only were pursuing four indications and that they had decided to limit their development and testing program to only five to six indications and (ii) they knew prior to May 2019, that they had experienced manufacturing problems with certain batches of N214 to be used in clinical trials and that, as a result of that manufacturing problem, they would not be in a position to disclose clinical results for N214 relating to non-small cell lung cancer until 2020 or later.  Defendants' materially false or misleading statements and omissions of material fact, alleged above in Sections IV. E-J and V., caused the price of Nektar's common stock to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiffs and other Class Period purchasers of Nektar common stock.

141.    Relying upon the integrity of the market price for Nektar common stock and public information relating to the Company, Plaintiffs and other Class members purchased or otherwise acquired Nektar common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. Plaintiffs and other Class members suffered actual economic loss and were damaged when the foreseeable risks of Defendants' misstatements and omissions materialized through the public disclosure of new information concerning the subject matter of the misstatements and omissions. The public disclosures occurred on August 8, 2019.  As alleged above in ¶¶26, 113-20, and in this Section, these corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable

declines in the price of Nektar common stock by removing portions of the artificial inflation in the price of Nektar common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Nektar common stock in response to the public disclosure of new, Company-specific news on August 8, 2019, as alleged herein, negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

142.    As set forth in ¶¶26, 113-20 above, on August 8, 2019, it became apparent to investors and the market that Nektar and Bristol-Myers had substantially narrowed their development plans for N214 and would not be able to provide clinical information regarding the efficacy of N214 for non-small cell lung cancer until at least 2020.  Specifically, Defendant Robin announced during the August 8, 2019 conference call, that Nektar only had four active indications running with Bristol-Myers ("in first-line melanoma, first-line urothelial cancer, and first-line renal cell carcinoma, as well as [a]  new expansion cohort of second-line non-small cell lung cancer patients"), and, going forward, the collaboration with Bristol-Myers under the Agreement would focus only "on 5 or 6 key" indications, a significant narrowing of the collaboration, which had long been touted as involving 18 to 20 indications over nine tumor types.

143.    Defendant Robin further acknowledged publicly for the first time: "[W]e're not moving forward with 18" indications. "The landscape . . . has clearly evolved and changed":

> Let's just say this, if we get—if we—and I believe we will, have 6 major registrational trials running in 6 different indications with [Bristol-Myers], I do believe that's a good way to develop and focus development of bempeg.  And I would expect that that's where we wind up. Clearly, at this point, running 20 trials is probably not the right thing to do in terms of how we use our resources. But I think if we identify, and I know we will, 5 or 6 very relevant, very significant registrational trials, I would expect that we can bring [N214] and nivo to a very, very good result.

144.    Defendant Robin also announced the manufacturing issue with batches of N214 used in its clinical trial program:

> [W]e conducted a thorough characterization of all of the 22 lots of [N214] produced to date, including all of those which currently supply and will supply our current and future registrational studies. The characterization work from this new assays revealed that 2 of the earliest production batches of [N214] were different than the other 20

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW                    35

batches produced. These 2 early manufacturing lots are known as lots 2 and 5.

145.    He explained further that Nektar had "identified the cause of the physical differences between these lots, which we now know stemmed from a single suboptimal batch of in-process intermediate that was used to produce only these 2 lots, lots 2 and 5, of the 22 lots we've made to date. The issue was restricted only to the single batch of intermediate used in lots 2 and 5." Robin indicated, however, that there may be positive benefits to the Company from this production issue because they had "found notable correlations in several cohorts with evidence of an improved clinical benefit in patients who started treatment with lots 1 and 3 as compared to patients who started treatment with lots 2 and 5." Stephen Dobertstein, Nektar's Chief R&D Officer, then extensively commented on the impact of the production issue on clinical test results and indicated that poor test results could have been impacted by the defective batches.

146.    Nektar further announced that it had withdrawn a presentation at the 2019 ESMO meeting with respect to first-line non-small cell lung cancer results, which it had promised on May 8, 2019, would be delivered at that meeting. It explained that it was enrolling additional patients in the first-line non-small cell lung cancer cohorts, and those patients are starting treatment with N214 lots that are not lots 2 and 5, suggesting that the study had been delayed while the manufacturing issue was identified. Defendant Robin specifically acknowledged that delays in its clinical collaboration with Bristol-Myers, which would include the delayed small lung cell results, was the result of the manufacturing issue: "we had to delay here because of these manufacturing lots that we recently correlated with clinical data and to that end."

147.    Analyst reports published on August 8-9, 2019, primarily blamed the dramatic stock drop occurring the same day on the severe curtailment of indications and tumor types, although they also referenced the manufacturing issue and the postponement of the small lung cell clinical data. An Analyst from J.P. Morgan sub-titled her August 8, 2019 Nektar Report "Disappointing Updates; Pivotal Plans Substantially Narrowed for [N]214/Nivo", pinpointed the "narrowing of focus [a]s clearly disappointing," but indicated that she did not see the production issue update as "impacting the probability of clinical success…." In a separate report on the next day, J.P Morgan reduced its

outlook for Nektar from "Overweight" to "Neutral" and reduced its price target from $62 to $33 per share.

148. Analysts from H.C. Wainwright & Co. opened their August 9 report with the salvo, "[we've] [n]ever seen anything like this," bemoaning, from their view, the confusing management presentation regarding the manufacturing issue and underscoring that "the ambitious 18 registration studies . . . has now been whittled down to between five or six," noting that "these new developments do not inspire confidence." William Blair stated on August 9, 2019, that "[i]n our view, the [reduction in the number of indications] could have a negative impact on the credibility of Nektar's management team among investors. In addition, the perceived multiple shots on goal offered to investors through conducting 18 pivotal studies is now reduced to five or six, thus putting more pressure on the eventual success of individual trials."

149. The disclosures described in ¶¶26, 113-20 above were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning Nektar's plans for N214. Moreover, the August 8, 2019 disclosures, revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct. These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning Nektar's development plans for N214. Thus, the August 8, 2019 disclosures also revealed the materialization of the known foreseeable risks surrounding the Company's false statements and omissions regarding the developmental plans for N214.

150. As a direct and proximate result of these corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Nektar common stock declined by nearly 30% on August 9, 2019, to close at $20.92 (down from $29.57 on August 8, 2019). On August 12th, after the market was able to fully digest the various analysts' commentary on the confusing disclosures by Defendants, Nektar's share price decline further to $18.58 per share – resulting in a total decline of more than 37% and a loss in market capitalization of approximately $1.9 billion.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

151.   Numerous additional facts give rise to the strong inference of scienter that, throughout the Class Period, the Individual Defendants: (i) knew or were severely reckless in disregarding that the statements issued and disseminated with respect to the Agreement in the name of the Company were false and misleading; (ii) knew that these statements were issued and disseminated to the investing public; and (iii) knowingly and substantially approved, participated or acquiesced in, and had control and ultimate authority over, the issuance or dissemination of such statements as primary violators of the federal securities laws.   In addition to the specific facts enumerated above, the following facts also support a strong inference of scienter.

152.   <u>First</u>, the fraud at issue involved a "record-smashing" and "transformative" Agreement between Nektar and Bristol-Myers, which, in addition to a massive upfront payment, involved an additional $1.78 billion in milestone payments upon the completion of certain developmental, regulatory, and sales targets.   The Agreement specifically included an upfront cash payment of $1 billion and Bristol-Myers's purchase of 8.28 million in Nektar common stock for another $850 million, giving Bristol-Myers an equity stake of just under 5% in the Company.   Following regulatory approval, Nektar would split global profits of N214 with Bristol-Myers.

153.   The joint-developmental plan was closely watched by the market and continually emphasized by Defendants, as the number and scope of indications were explicitly tied to the lucrative "incentives" under the Agreement.   For example, during Nektar's February 28 Earnings Call, Defendant Labrucherie noted that "a significant amount of our R&D budget represents our portion of the investment in the broad registrational development plan for bempeg that we are executing with our partner BMS."   Defendant Robin reaffirmed that "the BMS and Nektar teams have been working very closely together on the program, and we've made tremendous progress over a short period of time . . ." During the same call, Defendants Labrucherie and Tagliaferri provided clinical updates with respect to the broad registrational development plan for N214, emphasizing that "multiple" registrational studies were either planned or underway.   The importance of the joint-developmental plan for N214 to Nektar's business and bottom line raises a strong inference that the Individual

Defendants knew, or were deliberately reckless in not knowing or disregarding, that their statements about clinical progress were false and/or misleading or omitted material facts.

154. Indeed, much of the Company's share price valuation was tied to the NKTR-214 drug's potential. An author from the website Fierce Biotech concluded: "Nektar Therapeutics is a multibillion-dollar biotech with most of its value tied to a single drug."

155. Second, each of the Individual Defendants had direct access to negative nonpublic information with respect to the Agreement with Bristol-Myers. Any changes with respect to plans under the Agreement were approved jointly by Nektar and Bristol-Myers. Failures in the developmental plan could jeopardize or delay milestone payments. As noted by FE1, the two companies held weekly and bi-weekly Webex N214/Opdivo® partnership calls to discuss matters relating to clinical operations. During one of these calls in early to mid-February 2019, it was made clear to FE1 that Nektar would only pursue three indications (plus melanoma) instead of 19. FE2 also confirmed that Nektar announced during a department meeting that the indications would be reduced. Each of the Individual Defendants, by virtue of their positions, had access to detailed information regarding Nektar's core operations, which included clinical operations under the Agreement. Their knowledge of significant modifications in the joint-development plan can be inferred, because any such modification could significantly impact the lucrative milestone payments Nektar planned to receive.

156. Additionally, each of the three Individual Defendants provided the market with "clinical updates" during the February 28, 2019 and May 8, 2019 Earnings Calls. Thus, the Individual Defendants knew or should have known that the Company was not planning to move forward with the 19 to 20 registrational indications originally contemplated under the Agreement prior to the February 28 Press Release and Earnings Call.

157. Third, Nektar's individual compensation structure supports a finding of scienter. According to the Company's proxy statements, Nektar's compensation policies and procedures centered on "pay-for-performance principles and are strongly aligned with the long-term interests of . . . stockholders." Executive compensation depended on financial performance, where annual compensation could be above industry median for "exceptional performance" or below median in

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW            39

"performance periods where the Company does not perform well."  Nektar's 2019 proxy statement also included a note that "[d]ue to our collaboration agreement with [Bristol-Myers] and related upfront and milestone payments, Nektar's revenue nearly tripled, we had our first positive earnings year since Nektar's inception and our free cash flow was positive" and "[w]e believe that the compensation programs . . . should be evaluated within the context of these significant accomplishments and performance over a sustained period."

158.    Nektar established a "performance-based equity award program" for executive officers that was explicitly tied to the N214 joint-development agreement.  The "performance criteria" for 2018 included "the Company's achievement of each of the following objectives: (1) first patient dosed in at least four (4) registrational trials for [N214] run by Nektar combined with one or more anticancer agents; and (2) the filing and acceptance of two (2) investigational new drug ("IND") applications with the FDA for drug candidates wholly-owned by the Company."

159.    Defendant Robin's compensation, as reported by Nektar, was aligned with the Company's stock performance over the past five years.  In 2018, equity awards made to Robin accounted for 80% of his total direct compensation, with Nektar noting that "[o]ur objective in providing a substantial portion of Mr. Robin's compensation in the form of equity awards is to ensure that substantial compensation value is made available to him that fluctuates based on stock price performance."  Additionally, Defendant Labrucherie was assigned a "target annual incentive for 2018" at 50% under the same structure.  Under Nektar's annual performance-based compensation program, Defendants Robin and Labrucherie received substantial remuneration in 2018 in addition to their base salaries in the form of non-equity incentive plan compensation: Defendant Robin earned $1,647,100 and Defendant Labrucherie earned $631,600.

160.    As a result of the lucrative financial incentives offered by the Company, Defendants Robin and Labrucherie were highly motivated to artificially inflate the price of Nektar stock by making false and misleading statements that concealed material facts surrounding the joint developmental Agreement with Bristol-Myers.  The compensation structure's emphasis on N214 and the execution of four registrational trials also incentivized Defendants Robin and Labrucherie to keep abreast of clinical developments—specifically, the number of indications moving forward.

161.    Fourth, the Individual Defendants' high-level positions and control over the contents of the Company's public statements during the Class Period support an inference of scienter. The Individual Defendants were directly involved in and participated in both the management and day-to-day operations of the Company at its highest levels. Defendant Robin and Defendant Labrucherie were both named executive officers throughout the Class Period. As Nektar's CEO and CFO, respectively, Defendants Robin and Labrucherie were responsible for reviewing approving all of Nektar's filings with the SEC, which included reporting on the Company's revenues and other financial metrics. Due to their high-level positions, Defendants Robin and Labrucherie had the ability and opportunity to prevent the issuance of the false and misleading statements herein prior to or shortly after their issuance or cause them to be corrected. As a result, Defendants Robin and Labrucherie were responsible for the accuracy of Nektar's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.

162.    Defendant Tagliaferri's high-level position as the CMO throughout the Class Period also supports an inference of scienter. Defendant Tagliaferri was directly involved in management of clinical operations with respect to N214. Defendant Tagliaferri was present during the February 28 and May 8 Earnings Calls and provided significant "clinical updates" in response to inquiries from analysts about N214 and the registrational trials. On more than one occasion, Defendant Tagliaferri noted that registrational studies were either in the process or underway. Due to her position, Tagliaferri had the opportunity to prevent the issuance of the false and misleading statements herein prior to or shortly after their issuance or cause them to be corrected. As a result, Defendant Tagliaferri was responsible for the accuracy of Nektar's corporate statements, and is therefore responsible and liable for the representations contained therein or omitted therefrom.

163.    Fifth, as previously alleged, the development of N214 was crucial to the financial viability and well-being of Nektar. See supra Sections I, III.B.2, IV.A-C, and V. In addition, Individual Defendants were directly involved in the development process for N214. See supra id. A core operation concerns a company's primary products or services, and it extends to matters of importance that might significantly impact the company's bottom line. There is no question that Nektar's development of the N214 drug was critically important to the Company's operations and

bottom line. *See supra id.* Because development of N214 was a core operation of Nektar, it is reasonable to assume that senior executives, including Defendants Robin, Labrucherie and Tagliaferri, who repeatedly made material false statements, were aware of the status of its clinical development program with Bristol-Myers. This inference is furthered by the direct evidence of their involvement with the N214 program and their scientific, medical, and drug development backgrounds that would have qualified them to understand the Company's ability to carry out the proposed development program and present the data from trials.

164. Moreover, because of their positions and access to material nonpublic information concerning the Company, the Individual Defendants knew or were deliberately reckless in disregarding that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors, including the statements concerning the number of registrational trial, were materially false and misleading. In addition, the statements made by Defendants during the Class Period, including their affirmations that the Company was on track or still pursuing eighteen or more registrational trials, strongly and plausibly suggest each had access to the disputed information. Indeed, the vast majority of Defendants' material misrepresentations and omissions (*see* Section V., *supra*), explicitly or implicitly, pertain directly to progress with respect to the joint developmental program, and could not have been made with any reasonable basis in fact.

165. Nektar knowingly and/or with deliberate recklessness made, controlled, or had ultimate authority over the materially false and/or misleading statements and omissions alleged herein based on the fact that Individual Defendants knew and/or were deliberately reckless in not knowing that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made. Each of the Individual Defendants was among the most senior Individuals of the Company throughout the Class Period, was acting within the scope of their authority, and was a member of the Company's senior management, and their knowledge may be imputed to the Company.

## VIII.   CLASS ACTION ALLEGATIONS

166.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class, which consists of all persons and entities who purchased the common stock of Nektar from February 28, 2019 through and including August 8, 2019, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

167.   The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Nektar had more than 175 million shares of common stock outstanding and actively trading on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

168.   Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

169.   Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class and securities litigation.

170.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

    (i)    whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

(ii)    whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

(iii)    whether and to what extent the market price of Nektar's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(iv)    whether Nektar and the Individual Defendants acted with the requisite level of scienter;

(v)    whether the Individual Defendants were controlling persons of the Company;

(vi)    whether reliance may be presumed; and

(vii)    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

171.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

172.    At all relevant times, the market for Nektar's common stock was efficient for the following reasons, among others:

(i)    Nektar's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

(ii)    As a regulated issuer, Nektar filed periodic public reports with the SEC and the NASDAQ Global Select Market;

(iii)    Nektar regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    Nektar was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05173-JSW                    44

173. As a result of the foregoing, the market for Nektar's common stock promptly digested current information regarding Nektar from all publicly available sources and reflected such information in the price of Nektar's common stock. Under these circumstances, all purchasers of Nektar's common stock during the Class Period suffered similar injury through their purchase of Nektar's stock at artificially inflated prices, and a presumption of reliance applies.

174. Further, at all relevant times, Plaintiffs and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Nektar common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

175. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

176. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

177. To the extent that any materially false or misleading statement is alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

178. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ

materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

179.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an Individual officer of Nektar who knew that such statement was false or misleading.

## XI.    CAUSES OF ACTION

### COUNT ONE
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Against Defendants Nektar and the Individual Defendants**

180.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

181.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against Nektar and the Individual Defendants.

182.    As alleged herein, throughout the Class Period, Nektar and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Nektar and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Nektar's common stock; and (iii) cause Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

183.    Specifically, Defendants represented that Nektar, in collaboration with Bristol-Myers, was in the process of initiating trials or on track to hit eighteen to twenty indications in nine tumor types, which was false because Defendants had decided prior to or during February 2019, to pursue only four indications initially and a total program of only five or six indications, significantly reducing the potential for N214.  Defendants also misrepresented their ability to provide clinical information regarding the use of N214 for non-small cell lung cancer by September 2019, because they knew that, due to their undisclosed manufacturing problems, such information would not be available until 2020 or later.

184.    The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

185.    As set forth above, Nektar and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased the Company's common stock during the Class Period.

186.    In ignorance of the materially false and misleading nature of Nektar's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nektar's common stock, Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Nektar's common stock declined precipitously, and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of

their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT TWO
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

187.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

188.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiffs and all other members of the Class, against the Individual Defendants.

189.    As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of Nektar's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter, and Nektar is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

190.    As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior Individual positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same. As such, the Individual Defendants had regular access to nonpublic information about Nektar's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

191.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the

Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

192.    The Individual Defendants were culpable participants in Nektar's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased the Company's common stock during the Class Period.

193.    By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment on behalf of itself and the Class, as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court deems just and proper.

## XIII.    DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

Dated: January 24, 2020

Respectfully submitted,

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**

*/s/ Geoffrey C. Jarvis*
GEOFFREY C. JARVIS (*Pro Hac Vice*)
MARK FRANEK (*Pro Hac Vice*)
FARZANA ISLAM (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Tele:   (610) 822-2220
Fax:    (610) 667-7056
gjarvis@ktmc.com
mfranek@ktmc.com
fislam@ktmc.com

ELI R. GREENSTEIN (Bar No. 217945)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001
egreenstein@ktmc.com

*Counsel for Lead Plaintiff Kanti K. Patel, Individually and as Trustee for the Kanti K Patel Living Trust U/A 3/30/16, and Named Plaintiff Henry J. Juske, and Lead Counsel for the Class*

-and-

**THE SCHALL LAW FIRM**
BRIAN SCHALL (Bar No. 290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Tele:  (310) 301-3335
Fax:  (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Kanti K. Patel, Individually and as Trustee for the Kanti K Patel Living Trust U/A 3/30/16*

-and-

**GLANCY PRONGAY & MURRAY LLP**
LIONEL GLANCY (Bar No. 134180)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tele: (310) 201-9150
Fax: (310) 201-9160
LGlancy@glancylaw.com

*Counsel for Additional Named Plaintiff The Tech Trader Fund LP*