# EXHIBIT 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2018**

**or**

☐ **TRANSITION REPORTS PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission File Number: 0-24006**

# NEKTAR THERAPEUTICS
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **94-3134940** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification No.)** |

**455 Mission Bay Boulevard South**
**San Francisco, California 94158**
**(Address of principal executive offices)**

**415-482-5300**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of outstanding shares of the registrant's Common Stock, $0.0001 par value, was 171,402,476 on May 3, 2018.

**NEKTAR THERAPEUTICS**
**INDEX**

**PART I: FINANCIAL INFORMATION**

| | |
|---|---|
| Item 1. Condensed Consolidated Financial Statements - Unaudited: | 4 |
| Condensed Consolidated Balance Sheets - March 31, 2018 and December 31, 2017 | 4 |
| Condensed Consolidated Statements of Operations for the three months ended March 31, 2018 and 2017 | 5 |
| Condensed Consolidated Statements of Comprehensive Loss for the three months ended March 31, 2018 and 2017 | 5 |
| Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2018 and 2017 | 6 |
| Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 4. Controls and Procedures | 24 |

**PART II: OTHER INFORMATION**

| | |
|---|---|
| Item 1. Legal Proceedings | 26 |
| Item 1A. Risk Factors | 26 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 40 |
| Item 3. Defaults Upon Senior Securities | 40 |
| Item 4. Mine Safety Disclosures | 41 |
| Item 5. Other Information | 41 |
| Item 6. Exhibits | 42 |
| Signatures | 43 |

**Item 6.**         **Exhibits**

Except as so indicated in Exhibit 32.1, the following exhibits are filed as part of, or incorporated by reference into, this Quarterly Report on Form 10-Q.

| Exhibit Number | Description of Documents |
|---|---|
| 4.1(1) | Investor Agreement, dated as of February 13, 2018, by and between Bristol-Myers Squibb and Company and Nektar Therapeutics.+ |
| 10.1(1) | Strategic Collaboration Agreement, dated as of February 13, 2018, by and between Bristol-Myers Squibb and Company and Nektar Therapeutics.+ |
| 10.2(2) | Share Purchase Agreement, dated as of February 13, 2018, by and between Bristol-Myers Squibb and Company and Nektar Therapeutics. |
| 31.1(1) | Certification of Nektar Therapeutics' principal executive officer required by Rule 13a-14(a) or Rule 15d-14(a). |
| 31.2(1) | Certification of Nektar Therapeutics' principal financial officer required by Rule 13a-14(a) or Rule 15d-14(a). |
| 32.1* | Section 1350 Certifications. |
| 101** | The following materials from Nektar Therapeutics' Quarterly Report on Form 10-Q for the quarter ended March 31, 2018, formatted in XBRL (Extensible Business Reporting Language): (i) the unaudited Condensed Consolidated Balance Sheets, (ii) the unaudited Condensed Consolidated Statements of Operations, (iii) the unaudited Condensed Consolidated Statements of Comprehensive Income (Loss), (iv) the unaudited Condensed Consolidated Statements of Cash Flows, and (v) Notes to Condensed Consolidated Financial Statements. |

+     Confidential treatment with respect to specific portions of this Exhibit has been requested, and such portions are omitted and have been filed separately with the SEC.

(1)     Filed herewith.

(2)     Incorporated by reference to the indicated exhibit in Nektar Therapeutics' Current Report on Form 8-K filed with the SEC on February 14, 2018.

\*     Exhibit 32.1 is being furnished and shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section, nor shall such exhibit be deemed to be incorporated by reference in any registration statement or other document filed under the Securities Act of 1933, as amended, or the Securities Exchange Act, except as otherwise stated in such filing.

\*\*     XBRL information is filed herewith.

**Exhibit 10.1**

# STRATEGIC COLLABORATION AGREEMENT

**BY AND BETWEEN**

**NEKTAR THERAPEUTICS**

**AND**

**BRISTOL-MYERS SQUIBB COMPANY**

**DATED FEBRUARY 13, 2018**

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

**1.119** "***JDC Dispute***" has the meaning set forth in Section 3.7.

**1.120** "***JEC***" or "***Joint Executive Committee***" has the meaning set forth in Section 2.2.

**1.121** "***JEC Co-Chair***" has the meaning set forth in Section 2.2.

**1.122** "***JFC***" or "***Joint Finance Committee***" has the meaning set forth in Section 9.6(a).

**1.123** "***JFC Co-Chair***" has the meaning set forth in Section 9.6(a).

**1.124** "***JFC Dispute***" has the meaning set forth in Section 9.6(c).

**1.125** "***JMC***" or "***Joint Manufacturing Committee***" has the meaning set forth in Section 5.1.

**1.126** "***JMC Co-Chair***" has the meaning set forth in Section 5.1.

**1.127** "***JMC Dispute***" has the meaning set forth in Section 5.2(b).

**1.128** "***Joint Collaboration Invention(s)***" shall mean any invention or Technology, whether or not patentable, that is made, conceived or first actually reduced to practice by or on behalf of a Party, or by or on behalf of the Parties together (including by a Third Party in the performance of a Collaboration Study or Independent Study), in the performance of the Collaboration Studies, Independent Studies, Statistical Analysis Plan or Bioanalysis Plan, but excluding any Nektar Asset Inventions, BMS Asset Inventions and Joint Third Party Inventions. For clarity, Joint Collaboration Inventions include any invention conceived or first actually reduced to practice under a Collaboration Study or Independent Study and wherein the invention relates, whether generically or specifically, to the use of a combination of (a) one or more BMS Assets with (b) one or more Nektar Assets. As used in this Agreement, Joint Collaboration Inventions exclude Joint Third Party Inventions.

**1.129** "***Joint Collaboration Patent Right(s)***" shall mean any Patent Rights that are Controlled by either Party that Cover any Joint Collaboration Invention or Collaboration Study Data, excluding BMS Background Patent Rights and Nektar Background Patent Rights.

**1.130** "***Joint Development Plan***" shall mean the written Product Development plan (including Monotherapy Collaboration Studies and Combined Therapy Collaboration Studies) undertaken jointly by the Parties (notwithstanding that one Party may lead a Clinical Trial or other activity), as developed and approved by the Parties in accordance with Section 3.1(b), as amended from time to time in accordance with the procedures set forth in this Agreement. The Joint Development Plan excludes Independent Studies. The initial Joint Development Plan, effective as of the Effective Date, is attached hereto as Schedule 3.1.

**1.131** "***Joint Third Party Invention***" shall mean any invention or Technology that is made, conceived or first actually reduced to practice either by or on behalf of BMS, Nektar or a

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

Upon request by either Party, such meetings will be held by audio or video teleconference; *provided that* face-to-face meetings shall occur at least [***], alternating between Princeton, NJ and San Francisco, CA unless otherwise agreed upon by the Parties. There must be a minimum of [***] from each Party at any meeting of the JEC to constitute a quorum for decision-making. No fewer than [***] prior to each meeting, and in any event as soon as reasonably practicable, each Party shall use good faith efforts to disclose to the other Party any proposed agenda items together with appropriate supporting information. The Alliance Managers shall alternate responsibility for preparing and circulating definitive minutes of each meeting of the JEC. Such minutes shall provide a description, in reasonable detail, of the discussions at the meeting, a list of material actions and decisions made by the JEC, a list of action items made by the JEC and a list of material issues not resolved by the JEC. The Alliance Manager who drafts the minutes shall provide the other Alliance Manager and each Party's JEC Co-Chair with the initial draft meeting minutes, who shall return the draft with any proposed changes, and this process shall be repeated until a final version of the meeting minutes is agreed upon and signed (or acknowledged as final via email) by the two JEC Co-Chairs. The Parties shall reasonably cooperate to complete and agree upon a final version of meeting minutes within [***] from the date of the relevant meeting. The final version of the meeting minutes shall be signed (or acknowledged as final via email) by the two JEC Co-Chairs, and each Party shall be provided with a copy of the final meeting minutes for its safekeeping. A reasonable number of additional representatives of a Party may attend meetings of the JEC in advisory capacity with the prior written consent of the other Party; *provided that* any JEC meetings that includes representatives of either Party who are not JEC members may, at the request of any JEC member, include a closed session consisting of only JEC members and Alliance Managers. All representatives to the JEC or attending JEC meetings shall be subject to confidentiality and nonuse restrictions at least as restrictive as those set forth herein.

**2.3Responsibilities of the JEC**. The JEC shall have overall responsibility for the collaboration of the Parties pursuant to this Agreement, including (a) overseeing the Development and Commercialization of the Nektar Compounds and Products; (b) reviewing, resolving, and/or approving such matters as are referred to it by the Alliance Managers, JFC, JDC, JCC, JMC; and (c) performing such other duties as are expressly assigned to the JEC in this Agreement.

**ARTICLE 3**

**JOINT DEVELOPMENT**

**3.1Joint Development Plan**.

(a)Performance of Development Program. Nektar and BMS will act in good faith, using Commercially Reasonable Efforts, to perform their assigned tasks and responsibilities as described in the Development Program.

(b)Joint Development Plan. The Joint Development Plan describes the work to be pursued by Nektar and BMS during each Calendar Year, which plan shall include a

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

Development Budget for each Collaboration Study. The Joint Development Plan may be updated at any time by mutual agreement of the Parties at a meeting of the JDC or by written agreement (including by email acknowledgment) of the JDC Co-Chairs without a meeting. Any material amendments to the Joint Development Plan ("***Material Amendments***"), including the following, will be subject to mutual agreement of the Parties at a meeting of the JDC:

(i)adding or removing a Collaboration Study;

(ii)amending the Development Budget;

(iii)delaying the start of a Collaboration Study by [***];

(iv)approving any investigator-initiated study or investigator-initiated research for a Monotherapy or Combined Therapy;

(v)changing the tumor type(s) for a Collaboration Study;

(vi)changing the Indication or line of therapy for a Collaboration Study;

(vii)changing the compounds used in combination with the Product in a Collaboration Study;

(viii)changing the patient population of a given Collaboration Study;

(ix)changing the primary end points or key secondary end points for the Collaboration Study;

(x)materially changing the number of patients to be enrolled in a Collaboration Study;

(xi)material changes in the Statistical Analysis Plan or a Bioanalysis Plan; and

(xii)any other matters that the JDC or the Parties may agree are Material Amendments.

(c)Neither Party shall be required to continue a Collaboration Study if a Party (i) reasonably deems there to be a Material Safety Issue for such Collaboration Study or (ii) receives communications from a Regulatory Authority ordering or suggesting the discontinuation of such Collaboration Study. Prior to the discontinuation of such Collaboration Study, representatives of the JDC shall meet and discuss in good faith such Material Safety Issue or such Regulatory Authority communication.

**3.2Collaboration Study Management**.

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

(a)The Joint Development Plan will set out each Collaboration Study to be performed under the Joint Development Plan, including the initial NKTR-214 Clinical Trials set forth in the initial Joint Development Plan (each such initial NKTR-214 Clinical Trials, an "***Initial Trial***"). The JDC shall determine the Lead Party and Sponsor for each Collaboration Study and the latest date by which each Collaboration Studies must have its first patient enrolled (the "***Diligence Date***") (subject to Allowable Delays), provided that, unless otherwise agreed by the Parties, Nektar shall be the Lead Party and Sponsor for each Monotherapy Collaboration Study. Notwithstanding anything to the contrary in this Agreement, the Lead Party and Sponsor (if different) for each Initial Trial shall be set forth in the initial Joint Development Plan. Each Initial Trial shall commence as soon as practicable and the last Diligence Date for all such trials is fourteen (14) months from the Effective Date, subject to tolling for Allowable Delays. The Parties intend to agree on end points for each Initial Trial that are intended, if met, to be sufficient to support a Nektar Compound Filing for Regulatory Approval.

(b)The JDC shall consider the capabilities of each Party and how to maximize the efficiency of the applicable Collaboration Study when determining the Lead Party for such Collaboration Study; *provided that* Nektar shall maintain a substantial operational role with respect to the overall clinical Development of the Product.

(c)If all the Collaboration Studies for a particular Collaboration Therapy do not meet their agreed primary end points, such Collaboration Therapy will, unless otherwise agreed by the Parties, be removed from the Joint Development Plan and Schedule 1.43 by written notice from either Party to the other and the Parties shall use reasonable efforts to wind down activities related solely to such removed Collaboration Studies and will apply in this respect the principles set forth in Section 16.6. If BMS is the Lead Party conducting one or more Collaboration Studies in a particular Collaboration Therapy and does not meet its Diligence Date (subject to Allowable Delays) for all of the Collaboration Studies in such Collaboration Therapy, such Collaboration Studies will remain in the Joint Development Plan, but the restrictions set forth in Section 7.3(d) will no longer apply to such Collaboration Therapy.

(d)Each Collaboration Study shall be conducted in accordance with a protocol (each, a "***Protocol***") to be drafted by its Lead Party. Such Protocol shall be mutually agreed upon by the Parties at a meeting of the JDC. Any substantive amendments to a Protocol will be subject to mutual agreement of the Parties at a meeting of the JDC or by written agreement (including by email acknowledgment) of the JDC Co-Chairs without a meeting.

(e)The JDC shall decide under which IND a Collaboration Study shall be conducted under; *provided that*, unless otherwise agreed by the Parties:

(i)if a Collaboration Study is for a Nektar Compound for use as Monotherapy, such trial shall be conducted under an existing IND for which Nektar is the Sponsor or a new IND for which Nektar shall be the Sponsor;

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**
Page 32

(ii)if a Collaboration Study is for NKTR-214 for use as a Combined Therapy, such trial shall be conducted under either (A) an existing IND for which Nektar is the Sponsor or (B) if a new IND is required, a new IND for which the Lead Party shall be the Sponsor; and

(iii)if such Collaboration Study is for a Nektar Compound (other than NKTR-214) for use as a Combined Therapy, such trial shall be conducted under a new IND for which the Lead Party shall be the Sponsor.

(iv)Nektar IND. Nektar shall have complete legal interest in and control of each Nektar IND. Without limiting the obligation to share Net Profits under this Agreement, in no event will Nektar be required to obtain the consent of BMS to transfer or encumber any Nektar IND, and Nektar shall not have any obligation to share with BMS any consideration received in connection with the sale, license, use or other conveyance of any Nektar IND, *provided* that the transferee or encumbrance holder agrees to abide by the terms and conditions of this Agreement. Nektar shall have complete control as to any Right of Cross-Reference granted by Nektar to a Third Party solely with respect to any portion of a Nektar IND relating to a Nektar Compound for use as monotherapy.

(v)Combined Therapy Collaboration IND. Each Party shall have a beneficial one-half interest in each Combined Therapy Collaboration IND; *provided*, *however*, that: (A) in no event will either Party be required to obtain the consent of the other Party to transfer or encumber its interest in a Combined Therapy Collaboration IND; *provided* that (1) the transferee or encumbrance holder agrees to abide by the terms and conditions of this Agreement, (2) any transfer occurs only in connection with, and to the same transferee of, a transfer of all of a Party's rights in its applicable Single Agent Compound, and (3) each Party provide written notice of such transfer or encumbrance to the other Party within thirty (30) calendar days of such transfer or encumbrance; and (B) the Lead Party shall be the sole holder of all legal interests in the applicable Combined Therapy Collaboration IND, and without limiting the obligation to share Net Profits under this Agreement, neither Party shall have any obligation to share with the other Party any consideration received in connection with the sale, license or use of its interest in such Combined Therapy Collaboration IND where permitted by this Agreement. Each Party is permitted to grant any Third Party a Right of Cross-Reference with respect to any portion of a Combined Therapy Collaboration IND relating to a Nektar Compound's use in an Independent Study (and Nektar will cooperate and grant such Right of Cross-Reference solely with respect to any portion of a Nektar IND relating to a Nektar Compound's use in an Independent Study, whether Nektar or BMS is the Lead Party). Each Party shall provide a Right of Cross-Reference to its existing respective INDs or future INDs for its respective Single Agent Compound(s) as necessary to allow Combined Therapy Collaboration Studies to be conducted under applicable Nektar INDs or Combined Therapy Collaboration INDs. For the avoidance of doubt, each Party shall be responsible for (X) drafting and updating as necessary the investigator's brochure for its respective Single Agent Compound(s) and (Y) filing all necessary Regulatory Documentation to the existing or

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

future INDs for its respective Single Agent Compound(s), including the submission to such existing or future INDs of Serious Adverse Events and adverse drug reaction cases emerging from any Collaboration Study or any Independent Study.

(f)Each Party will make available and promptly disclose to the other Party all results of the work conducted by such Party pursuant to the Development Program, and this Agreement, and will keep such records (paper and electronic) as described herein. Each Party will maintain records of the results in sufficient detail and in good scientific manner appropriate for patent purposes, and in a manner that properly reflects all work done and results achieved in the performance of the Development Program (including all data, such as minutes from dose escalation meetings with any Regulatory Authority and all final clinical study reports, in the form required to be maintained under any applicable governmental regulations). Unless already provided pursuant to the Clinical Trial Agreement:

(i)Nektar shall provide BMS with the following relating to each Nektar Compound: [***]. All such disclosures are Confidential Information of Nektar.

(ii)BMS shall provide Nektar with the following relating to the BMS Compound: [***]. All such disclosures are Confidential Information of BMS.

(iii)The Lead Party for each Collaboration Study will make available and promptly disclose to the other Party all safety analyses for each Collaboration Study in accordance with the applicable Statistical Analysis Plan. Each Party shall use any such data provided pursuant to this Section 3.2(f)(iii) solely to evaluate the safety of (A) its own compound for use in the Collaboration Studies and Independent Studies, (B) the Combined Therapy and (C) as permitted elsewhere in this Agreement. All such disclosures are Confidential Information of both Parties; *provided that* any disclosures regarding a Monotherapy Collaboration Study for use of a Nektar Compound as a Monotherapy are the Confidential Information of Nektar.

(g)If further studies, including toxicity studies, are required or suggested by a Regulatory Authority as a prerequisite for conducting any of the Collaboration Studies, then the Parties agree to hold good faith discussions in a timely manner to agree upon a protocol for such studies, each of which will be considered a Collaboration Study and conducted on substantially the same terms as set forth herein (including the Development Cost sharing); *provided that*, if the Parties are unable to agree upon a protocol for such study or if the conduct of such study shall cause a delay deemed unsatisfactory by either Party, then such JDC Dispute shall be referred to the JEC for resolution pursuant to Section 3.7.

**3.3Joint Development Committee**.

(a)General. Promptly after the Effective Date, the Parties shall form a Joint Development Committee (the "***JDC***"). The JDC shall consist of [***]. Each Party shall be responsible for determining the qualifications and substitutions of its JDC members. It is

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

anticipated that each Party's representatives may include experts in finance, clinical development, patient safety, regulatory affairs and pharmaceutical quality. The JDC shall be co-chaired with one chairperson designated by each Party (each, a "***JDC Co-Chair***"). The JDC shall meet at least [***], or at such other frequency as the JDC agrees (and it may appoint working teams to meet more frequently), *provided that* either Party through its JDC Co-Chair may request a meeting of the JDC at any time upon [***] notice to the other Party, with the understanding that the other Party will use reasonable efforts to comply with such request but such other Party will not be in breach of this Agreement in the event that it is unable to comply with such request but is using reasonable efforts to conduct a JDC meeting as promptly as practicable. Upon request by either Party, such meetings will be held by audio or video teleconference; *provided that* face-to-face meetings shall occur at least [***], alternating between Princeton, NJ and San Francisco, CA unless otherwise agreed upon by the Parties. There must be a minimum of [***] from each Party at any meeting of the JDC to constitute a quorum for decision-making. No fewer than [***] prior to each meeting, and in any event as soon as reasonably practicable, each Party shall use good faith efforts to disclose to the other Party any proposed agenda items together with appropriate supporting information. The Alliance Managers shall alternate responsibility for preparing and circulating definitive minutes of each meeting of the JDC. Such minutes shall provide a description, in reasonable detail, of the discussions at the meeting, a list of material actions and decisions made by the JDC, a list of action items made by the JDC and a list of material issues not resolved by the JDC. The Alliance Manager who drafts the minutes shall provide the other Alliance Manager and each Party's JDC Co-Chair with the initial draft meeting minutes, who shall return the draft with any proposed changes, and this process shall be repeated until a final version of the meeting minutes is agreed upon and signed (or acknowledged as final via email) by the two JDC Co-Chairs. The Parties shall reasonably cooperate to complete and agree upon a final version of meeting minutes within [***] from the date of the relevant meeting. The final version of the meeting minutes shall be signed (or acknowledged as final via email) by the two JDC Co-Chairs, and each Party shall be provided with a copy of the final meeting minutes for its safekeeping. A reasonable number of additional representatives of a Party may attend meetings of the JDC in advisory capacity with the prior written consent of the other Party; *provided that* any JDC meetings that includes representatives of either Party who are not JDC members may, at the request of any JDC member, include a closed session consisting of only JDC members and Alliance Managers. All representatives to the JDC or attending JDC meetings shall be subject to confidentiality and nonuse restrictions at least as restrictive as those set forth herein.

(b)Responsibilities of the Joint Development Committee. Each Party shall use Commercially Reasonable Efforts to keep the JDC informed about activities performed by that Party under the Development Program. The JDC will be responsible for the overall oversight of the Development Program. The JDC (or in the absence of a formal JDC meeting the Co-Chairs) shall be responsible for the following:

(i)overseeing the Development Program, including approving the Joint Development Plan and any Material Amendments thereto;

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

(ii)overseeing the activities of the Parties with respect to the Collaboration Studies, and providing a forum for the Parties to discuss, monitor and coordinate all activities and communications regarding the Collaboration Studies;

(iii)approving the annual, high-level Development Budget for each Collaboration Study (as reviewed and provided by the JFC to the JDC), including reviewing and approving any costs for a given budget of a Collaboration Study that are reasonably anticipated to be greater than [***] of the JDC-approved budget;

(iv)determining the Lead Party (and any secondary study sponsor and operational responsibilities of such sponsor) and Diligence Date for each Combined Therapy Collaboration Study;

(v)reviewing (A) the progress of each Collaboration Study, (B) the proposed plan for medical monitoring and site audits and (C) the results of such medical monitoring and site audits;

(vi)reviewing and approving with respect to each Collaboration Study (A) the applicable Protocol and the Statistical Analysis Plan, and any proposed substantive amendment thereto and (B) the CRO Agreement(s) and proposed material amendments thereto;

(vii)reviewing and approving any immunogenicity analysis for each Combined Therapy Collaboration Study, including protocol and Person to do the analysis;

(viii)reviewing and approving any Bioanalysis Plan not set forth in the Protocol, and any material amendments thereto;

(ix)reviewing and providing timely comments to proposed communication strategies and communications with any Regulatory Authority regarding the conduct of the Combined Therapy Collaboration Studies and, if applicable, approving such proposed communications and communication strategies;

(x)approving any IND submitted for a Combined Therapy Collaboration Study, as well as reviewing material submissions to any such IND in accordance with Article 10 (Global Regulatory);

(xi)reviewing any Collaboration Study Regulatory Documentation, or portions thereof, that relate to the Combined Therapy, in accordance with Article 10 (Global Regulatory);

(xii)reviewing any Regulatory Documentation from any Combined Therapy Independent Study, or portions thereof, that relate to the use of the Nektar Compound in the Combined Therapy, in accordance with Article 10 (Global Regulatory);

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**
Page 36

(xiii)subject to Section 3.4(c), agreeing on the final list of proposed clinical trial sites pursuant to Section 3.4(c), and agreeing on communications to clinical trial sites or IRBs relating to patient safety or early termination/cessation of a Collaboration Study;

(xiv)appointing working teams, to be made up of representatives from each Party, that will hold telephone discussions at a mutually agreed-upon frequency to review clinical development, Protocols, patient safety and regulatory issues that arise in the course of a study under the Joint Development Plan, and delegating certain decision-making authority to such working teams;

(xv)determining the quantities of Nektar Assets, BMS Assets, Third Party Asset and any co-medications, necessary for the Collaboration Studies within a sufficient minimum lead time and coordinating the supply of such quantities by the respective Party in accordance with Article 5 and the Supply Agreements;

(xvi)reviewing and approving, in advance, any additional analyses of, or that include, the Collaboration Study Data proposed by either Party that are not included in the Statistical Analysis Plan; *provided that*, for clarity, such review and approval shall not apply to analyses by a Party of the monotherapy data for its own Single Agent Compound (other than the Nektar Compound, in the case of Nektar);

(xvii)reviewing and approving use of any Samples in accordance with Section 11.8 that are not described in the Protocol and ICF, so long as the JDC remains in force and effect;

(xviii)for any CROs or Third Party contractors engaged after the Effective Date, reviewing and approving (A) the selection of any such CRO and Third Party contractor (other than individuals in a Party's workforce who are engaged on an independent contractor basis) that has a material role in each Collaboration Study pursuant to Section 3.4(c) and (B) the terms of any such CRO contract or pharmacovigilance contract ("***CRO Agreement***");

(xix)reviewing and approving the template ICF form, template case report form and template clinical site study agreement to be used in a given Collaboration Study;

(xx)reviewing and approving the countries in which each Collaboration Study will be conducted, as set forth in Section 3.4(a);

(xxi)approving the final clinical trial report (and/or final statistical analysis in accordance with the Statistical Analysis Plan) from each Collaboration Study;

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**
Page 37

(xxii)for each Collaboration Study, delegating to the Lead Party certain decision-making authority in relation to certain JDC responsibilities, in each case that do not constitute Material Amendments or any matters for which a Party has final decision-making authority under Section 3.8;

(xxiii)subject to any Third Party limitations in respect of Confidential Information, reviewing and discussing progress reports relating to the Independent Studies and activities performed by either Party pursuant to Section 3.9; and

(xxiv)discussing any other topics or issues relating to the Collaboration Studies that either Party requests that cannot be resolved at the working team level.

**3.4Operational Authority Generally**.

(a)The Lead Party shall, subject to the oversight and determinations of the JDC as provided in Sections 3.3(a) and 3.3(b), the terms of the applicable Protocol, the decisions and guidance of applicable committee(s) and/or working teams, and applicable terms and conditions of this Agreement: (i) manage and be primarily responsible for the conduct of the applicable Collaboration Study; (ii) be the sponsor and regulatory lead with respect to such Collaboration Study; and (iii) as between the Parties, be the lead with respect to (A) the selection and management of clinical study sites (including budget negotiations with vendors, timelines and contingency planning), subject to Sections 4.2(a)(v), 4.2(b)(x) and 4.2(c)(x) with respect to site selection and subject to the non-Lead Party's consent as to the country(ies) where such Collaboration Study will be conducted, (B) conducting clinical study start-up activities, communicating with and obtaining approval from institutional review boards and/or ethics committees, as applicable, and drafting for both Parties' approval the template informed consent form ("***ICF***") for such Collaboration Study, (C) subject recruitment and retention activities, (D) ongoing site monitoring and quality assurance audits, (E) management of safety reporting by contract research organizations and clinical study sites, (F) ongoing medical monitoring, (G) management, monitoring and audits of CROs in connection with each CRO involved in the conduct of such Collaboration Study, and (H) inquiries from clinical study subjects (subsections (A)-(H), collectively, the "***Operational Matters***"). The Lead Party shall use Commercially Reasonable Efforts to perform such Operational Matters. The JDC shall set up a mechanism for the non-Lead Party or a working team of the JDC to be informed and updated on a timely periodic basis regarding Operational Matters, so that if such non-Lead Party has any concerns or disagreements regarding same, the matter can be escalated to the JDC for review.

(b)The Lead Party shall provide the non-Lead Party with access to the safety information and Study Data of the applicable Collaboration Study in accordance with Sections 4.2(b)(vi), 4.2(b)(viii), 4.2(c)(vi) and 4.2(c)(viii).

(c)BMS acknowledges that Nektar, prior to the Execution Date, has (i) selected and entered into agreements with certain CROs, investigators and Third Party contractors (the list of which is attached as Schedule 3.4(c), (ii) identified a number of clinical trial

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**
Page 38

sites, and (iii) completed study initiation visits, and BMS approves of such sites, investigators, CROs and Third Party contractors. BMS acknowledges that the CRO Agreements and/or any other documents related to such CROs, investigators, Third Party contractors and clinical trial sites have been made available to BMS prior to the Execution Date, and BMS hereby approves the continuation of such agreements on their terms (including the budgets and pricing included therein). For any additional CROs, investigators, Third Party contractors or clinical trial sites proposed after the Effective Date, the Lead Party of a Collaboration Study, after discussion with the non-Lead Party, will create and provide the JDC with a proposed list of potential clinical trial site(s), CROs, investigators (including IMS grant plan analysis and/or a model investigator grant budget) and Third Party contractors that may be used to conduct such Collaboration Study, with the final list to be subject to JDC (or Co-Chairs) approval within [***] (such JDC-approved list being the "***Site/CRO List***"). Except as otherwise noted in this Section 3.4(c), the proposed Site/CRO List will be provided to the JDC prior to the Lead Party initiating site selection negotiations or visits (for sites/investigators) or CRO negotiations (for CROs) for such Collaboration Study. The Lead Party shall have the authority to select the final Clinical Trial sites, CROs, investigators and Third Party contractors from the Site/CRO List. In the event that additional sites, CROs, investigators or Third Party contractors need to be added after the initial list is approved, a new list will be created by the Lead Party that includes the proposed new sites, CROs, investigators or Third Party contractors and such list will be provided to the JDC for approval by the JDC (or Co-Chairs) within ten (10) Business Days per this Section 3.4(c).

**3.5Alliance Managers**. Each of the Parties will appoint one representative to act as its alliance manager under this Agreement as soon as practicable after the Effective Date (each, an "***Alliance Manager***"). The role of the Alliance Manager is to act as a primary point of contact between the Parties to assure a successful relationship between the Parties. The Alliance Managers will attend all meetings of the JDC and support the JDC in the discharge of its responsibilities. An Alliance Manager may bring any matter concerning a Party's performance under this Agreement to the attention of the JDC if the Alliance Manager reasonably believes that such attention is warranted. Each Party may change its designated Alliance Manager from time to time upon written notice to the other Party. Any Alliance Manager may designate a substitute to temporarily perform the functions of such Alliance Manager upon written notice to the other Party's Alliance Manager. Each Alliance Manager will be charged with creating and maintaining a collaborative work environment within the JEC, JDC, JCC, JFC and JMC. Each Alliance Manager also will:

(a)be the point of first referral in all matters of dispute resolution in accordance with Section 15.1;

(b)provide a point of communication both internally within its respective Party's organization(s) and between the Parties regarding the Joint Development Plan and the activities undertaken in connection with such plan as well as Commercialization and Manufacturing matters;

(c)assist in coordinating any collaborative efforts under this Agreement, if any, and any external communications; and

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

(d)take responsibility for ensuring that JEC, JDC, JCC, JFC and JMC activities, such as the conduct of required JDC meetings, occur as set forth in this Agreement and that relevant action items, if any, resulting from such meetings are appropriately carried out or otherwise addressed.

**3.6Joint Development Committee Decision-Making**.

(a)[***]. In the absence of a formal meeting, the JDC Co-Chairs shall have decision-making authority for the JDC, so long as any decisions are documented as provided below.

(b)The JDC shall have the right to make only those determinations expressly enumerated as decisions of the JDC in this Agreement; *provided that* such determinations are documented in the written minutes signed (or acknowledged as final via email) by the JDC Co-Chairs.

(c)Notwithstanding anything to the contrary in this Agreement, the JDC will have no power (i) to amend this Agreement or (ii) to modify either Party's obligations with regard to a study in the Joint Development Plan without such Party's prior written consent; in each case, except by a writing (and that is not the minutes of a meeting) signed by both Parties.

**3.7Dispute Resolution**. The representatives of the JDC shall attempt in good faith to reach consensus on all matters properly brought before the JDC. Except as otherwise provided in this Agreement, if, after a good faith, reasonable and open discussion among the members of the JDC, the JDC is unable to agree on a matter that has been properly before it for a period of [***] and that calls for a decision, either Party may refer the dispute (a "***JDC Dispute***") to the JEC for resolution. If the JEC is unable to reach a resolution within [***] of the referral of the JDC Dispute to the JEC, either Party may refer such JDC Dispute to the Executive Officers for resolution. If the Executive Officers are unable to reach a resolution within [***] of such referral then:

(a)if such JDC Dispute regards whether or not to commence a Clinical Trial as a new Collaboration Study (i.e., include a Clinical Trial (other than an Initial Trial) into the scope of the Joint Development Plan), then such Clinical Trial [***];

(b)if such JDC Dispute regards the initial Protocol and its contents (further to Section 3.2(d)) or the initial budget for any Collaboration Study, in each case before the commencement of such applicable Collaboration Study, then [***];

(c)if such JDC Dispute occurs subsequent to the commencement of a Collaboration Study, and relates to either (1) a material amendment requiring mutual agreement proposed by either Party to an agreed-upon Protocol or protocol synopsis, CRO Agreement, Bioanalysis Plan or Statistical Analysis Plan relating to such Collaboration Study or (2) any other matter relating to the strategy, conduct, rationale, or safety of such Collaboration Study, there shall be no decision on the matter and the then-existing terms of the applicable Protocol, protocol

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

synopsis, CRO Agreement, Bioanalysis Plan or Statistical Analysis Plan relating to such Collaboration Study shall govern. Notwithstanding the foregoing, neither Party shall be required to continue its involvement in a Collaboration Study if a Party reasonably deems there to be a Material Safety Issue for such Collaboration Study. Each Party's safety committee shall, to the extent practicable, meet and discuss in good faith the Material Safety Issue and if unresolved within [***], the applicable Collaboration Study shall be discontinued. The Parties shall use reasonable efforts to wind down activities related solely to such discontinued Collaboration Study in accordance with Sections 16.4 and 16.6; and

(d)if such JDC Dispute is not otherwise addressed by Section 3.7(a), Section 3.7(b), Section 3.7(c), Section 3.8 (Final Decision-Making Authority of the Parties) or Section 5.5 (Manufacturing Option), the dispute shall be resolved through arbitration as provided for in Section 15.3.

**3.8Final Decision-Making Authority of the Parties**. In the event a JDC Dispute is unresolved pursuant to Section 3.7 as set forth above, each Party shall have final decision-making authority as follows:

[***].

**3.9Formulation Development**.

(a)Fixed Dose Combinations. Neither Party shall have the right to (i) conduct any registrational Clinical Trial with any Fixed Dose Combination Product, (ii) make a Filing with respect to a Fixed Dose Combination Product or (iii) Commercialize any Fixed Dose Combination Product, whether alone or in combination with other Persons. Each Party has the right to conduct preclinical and Phase I Studies (but not if such study could also be considered a registrational study) of any Fixed Dose Combination Product at its own cost. If the Parties agree (each at their sole discretion) to jointly Develop or Commercialize any Fixed Dose Combination Product, such Development or Commercialization will be conducted in accordance with a separate agreement, or an amendment to this Agreement, negotiated between the Parties. For clarity, no Party shall be obligated to collaborate with the other Party or to agree on any terms with the other Party with respect to any Fixed Dose Combination Product.

(b)Alternative Formulations. Each Party has the right to conduct preclinical and non-registrational studies and Clinical Trials of any alternative formulation or method of administration of the Nektar Compound or Product (including subcutaneous formulations) at its own cost. If the Parties agree (each at their sole discretion) to jointly Develop or Commercialize any alternative formulations or methods of administration of the Nektar Compound or Product, such Development and Commercialization will be conducted in accordance with a separate agreement, or an amendment to this Agreement, negotiated between the Parties. For clarity, no Party shall be obligated to collaborate with the other Party or to agree on any terms with the other Party with respect to any such alternative formulation or method of administration and neither

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**

Party has any right to seek Regulatory Approval of or Commercialize any alternative formulations or methods of administration of the Nektar Compound or Product under this Agreement.

(c)Each Party shall keep the JDC reasonably informed as to the progress of any activities conducted pursuant to this Section 3.9.

**3.10Conduct**. Each Party shall use Commercially Reasonable Efforts to perform and fulfill its respective Development activities under this Agreement, including all remaining pre-clinical and clinical testing necessary or useful for Developing the Product and the preparation and submission of the appropriate Regulatory Documentation required for the Commercialization of the Products in the Field in the Territory, and each Party shall do so in accordance with Applicable Law.

## ARTICLE 4

## DEVELOPMENT RESPONSIBILITIES

**4.1General Responsibilities of the Parties**. Subject to the terms of this Agreement, each Party shall use Commercially Reasonable Efforts to (a) perform the Development activities assigned to it pursuant to this Agreement; (b) conduct and complete each Collaboration Study for which it is the Lead Party and any Statistical Analysis Plans and Bioanalysis Plans relating thereto on a timely basis in accordance with the Protocol, Bioanalysis Plans, Statistical Analysis Plans and Third Party agreements relating thereto; and (c) timely provide Rights of Cross-Reference where required by this Agreement.

**4.2Specific Responsibilities of the Parties**. Each Party shall use Commercially Reasonable Efforts to conduct and shall be responsible for activities assigned to it by the applicable Protocols and/or the JDC that such Party is not otherwise obligated to perform by this Agreement, *provided that*, except as set forth in this Agreement, in no event shall either Party be obligated to perform any such assigned activities without its prior written consent (which may be reflected in the minutes of meetings of the JDC or in a Protocol). As of the Effective Date, each Party shall be responsible for the following activities:

(a)Responsibilities of the Lead Party. Subject to Section 10.1 and JDC direction and oversight as provided in Section 3.3(b), each Lead Party shall be responsible for the following activities for each Collaboration Study:

(i)with the cooperation of the non-Lead Party, compiling, amending and filing all necessary Collaboration Study Regulatory Documentation with Regulatory Authority(ies) and maintaining and making all required submissions to Regulatory Authorities related thereto on a timely basis;

**[***] Certain information in this document has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to the omitted portions.**