**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
GEOFFREY C. JARVIS (*Pro Hac Vice*)
MARK FRANEK (*Pro Hac Vice*)
FARZANA ISLAM (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Tele:   (610) 822-2220
Fax:    (610) 667-7056
gjarvis@ktmc.com
mfranek@ktmc.com
fislam@ktmc.com

-and-

ELI GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)
PENG SHAO (Bar No. 319624)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001
egreenstein@ktmc.com
skaplan@ktmc.com
pshao@ktmc.com

*Counsel for Lead Plaintiff Kanti K. Patel, Individually and as*
*Trustee for the Kanti K Patel Living Trust U/A 3/30/16, and*
*Named Plaintiffs The Tech Trader Fund LP and Henry J. Juske,*
*and Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| KANTI K. PATEL, Individually and as Trustee for the Kanti K Patel Living Trust U/A 3/30/16, THE TECH TRADER FUND LP, and HENRY J. JUSKE, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiffs,<br><br>v.<br><br>NEKTAR THERAPEUTICS, HOWARD W. ROBIN, GIL M. LABRUCHERIE, and MARY TAGLIAFERRI,<br><br>         Defendants. | Case No. 4:19-cv-05173-JSW<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Date:       August 7, 2020<br>Time:      9:00 a.m.<br>Judge:     The Hon. Jeffrey S. White<br>Dept.:      Courtroom 5, 2nd Floor |

Case No. 4:19-cv-05173-JSW
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
AMENDED COMPLAINT

**SUMMARY OF ARGUMENT**

This case results from numerous false statements and omissions by Nektar regarding the number of indications (*i.e.*, conditions treated by a drug) Nektar was pursuing for N214—a cancer drug. Defendants seek dismissal of this case by misstating facts and applicable law. First, Defendants clearly informed investors that Nektar was continuing to pursue 18 to 20 indications for N214, even though Defendants had decided to pursue only 3-4 indications. Defendants nonetheless argue that the statements are not actionable because they merely referenced contractual terms or purportedly contained some truth. Defendants ignore the fact that the statements are misleading on their face and/or omit material information because they provide a misleading picture of the number of N214 indications being pursued. *See In re Zynga Inc. Sec. Litig.,* 2015 WL 1382217, at *3 (N.D. Cal. Mar. 25, 2015) (White, J.); *see also infra* § III.A.

Second, it is undisputed that on August 8, 2019, Nektar announced a dramatically reduced number of indications for N214. The Former Employees ("FEs") cited in the complaint demonstrate that the decision was made, not in August, but no later than February 2019. Defendants attack the credibility of these FEs, but they are described with particularity and confirm that the number of indications had been massively curtailed before the first false statement/material omission. Defendants ignore that FE1 was assigned by Nektar's partner BMS to an active trial of N214 and, in February 2019, was directly informed by top-level managers of the reduction in indications being pursued. FE2 and FE3 corroborate FE1's testimony from within Nektar. Defendants also present inapposite law on hearsay and incorrectly insinuate that a witness must be employed by Nektar in order for testimony to be reliable. *See infra* § III.B.

Third, Defendants attempt to attack the scienter allegations in the complaint, but fail to address the fact that N214 was Nektar's flagship drug, the expected primary source of its future revenue and had already resulted in billions of dollars in payments from BMS. Nonetheless, Defendants ask this Court to find as a matter of law, before discovery even commences, that they were without knowledge of or had no access to information with respect to Nektar's change in plans for N214's development. This simply is not a plausible inference. *See S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008); *see also infra* § III.C. Finally, Defendants' few pages of argument related to the manufacturing/delay of clinical trials allegations in the complaint wholly lack merit. *See infra* § III.D. Accordingly, Defendants' Motion should be dismissed in its entirety.

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .......................................................................................................... i

I.  PRELIMINARY STATEMENT ..........................................................................................1

II. FACTUAL BACKGROUND.................................................................................................2

    A.  Nektar's Collaboration With BMS Was Crucial To Nektar's Success...............................2

    B.  The Number Of N214 Indications Was Critical To Nektar ...................................................3

    C.  Defendants Conceal That The Indications For N214 Have Been Reduced........................3

    D.  Defendants Continue To Falsely Tout The Number Of Indications Being Pursued Despite The Decision To Abandon Approximately 70% Of Them...................................4

    E.  Nektar Conceals A Manufacturing Defect That Impacted N214 Trials .............................5

    F.  The Relevant Truth Emerges ...............................................................................................5

III. ARGUMENT.........................................................................................................................5

    A.  The CAC Pleads Actionable Misstatements And Material Omissions...............................6

        1.  February 28, 2019 False Statements And Material Omissions...............................6

        2.  May 8, 2019 False Statements And Material Omissions.........................................9

    B.  Plaintiffs Adequately Allege Facts From Former BMS And Nektar Employees That Demonstrate The Falsity Of Defendants' Statements ................................................10

        1.  The Allegations Regarding FE1 Are Reliable And Corroborative Of Falsity.......11

        2.  FE2 And FE3 Corroborate FE1 .............................................................................14

    C.  The CAC Raises A Strong Inference Of Defendants' Scienter ........................................15

        1.  Defendants Had Actual Access To The Disputed Information ..............................16

        2.  It Would Be Absurd To Suggest That Defendants Did Not Know Of A Severe Curtailment In The Indications For Nektar's "Flagship" Drug .................17

        3.  Defendants' Explicit Statements Regarding The Number Of Indications For N214 Support A Strong Inference Of Scienter ................................................19

        4.  Defendants' Motives And Financial Incentives Reinforce Scienter......................21

        5.  Defendants Offer No Plausible Competing Inference .........................................22

    D.  The CAC Pleads Actionable Misstatements And Omissions Regarding Nektar's Manufacturing Defects And Delays In Clinical Trial Results .........................................22

IV. CONCLUSION....................................................................................................................25

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amylin Pharm, Inc. Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003)....................................................................................25

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012) ...............................................................................12, 13, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................................5

*Azar v. Yelp*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................................................................19

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................................................*passim*

*In re BP P.L.C. Sec. Litig.*,
922 F. Supp. 2d 600 (S.D. Tex. 2013) ..............................................................................................13

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ..................................................................................25

*In re Cornerstone Propane Partners, L.P Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ..................................................................................... 21-22

*Costabile v. Natus Med. Inc.*,
293 F. Supp. 3d 994 (N.D. Cal. 2018) ..................................................................................14, 15, 25

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................11, 12, 13, 14, 15

*In re Dura Pharm., Inc. Sec. Litig.*,
548 F. Supp. 2d 1126 (S.D. Cal. 2008).............................................................................................14

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ..............................................................................................19

*In re Extreme Networks, Inc. Sec. Litig.*,
2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)..................................................................................14

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ............................................................................................................25

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017).......................................................................17, 20, 24

*Flynn v. Sientra Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ....................................................................................19

*In re Genetech, Inc., Sec. Litig.*,
1989 WL 106834 (N.D. Cal. July 7, 1989)........................................................................................13

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
AMENDED COMPLAINT

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ............................................................................................7

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................................7

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
    2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)..................................................................19

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016) .........................................................................19

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ......................................................................................6, 23

*Kyung Cho v. UCBH Holdings, Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...........................................................................19

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...........................................................................24

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .........................................................................................14

*Loftus v. Primero Mining Corp.*,
    230 F. Supp. 3d 1209 (C.D. Cal. 2017) ...........................................................................25

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .....................................................................................18, 22

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ...................................................................24

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)..............................................................................................12

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .............................................................................................6

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015) .............................................................................16

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................... 11, 18-19

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holdings Corp.*,
    320 F.3d 920 (9th Cir. 2003) ......................................................................................15, 21

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ................................................................................9, 14

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .........................................................................................19

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .........................................................................................13

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
AMENDED COMPLAINT

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)........................................................................22

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ......................................................................16, 19, 20, 24

*In re Regulus Therapeutics Inc. Sec. Litig.*,
406 F. Supp. 3d 845 (S.D. Cal. 2019)................................................................................22

*Robb v. Fitbit, Inc.*,
216 F. Supp. 3d 1017 (N.D. Cal. 2016) .............................................................................24

*Robb v. Fitbit, Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ......................................................................17

*Roberti v. OSI Sys. Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...............................................................19, 25

*S. Ferry LP # 2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009).........................................................17, 18, 20, 24

*S. Ferry LP #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ......................................................................................i, 16, 17

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ...............................................................................................6

*Sgarlata v. PayPal Holdings, Inc.*,
409 F. Supp. 3d 846 (N.D. Cal. 2019) ...............................................................................14

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...........................................................9, 19, 21, 23

*In re Silver Wheaton Corp. Sec. Litig.*,
2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)....................................................................11

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ................................................25

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) .....................................................................23

*In re Stratosphere Corp. Sec. Litig.*,
1 F. Supp. 2d 1096 (D. Nev. 1998).....................................................................................22

*Szymborski v. Ormat Tech., Inc.*,
776 F. Supp. 2d 1191 (D. Nev. 2011) ................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................*passim*

*In re Tibco Software, Inc.*,
2006 WL 1469654 (N.D. Cal. May 25, 2006) ....................................................................22

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ...................................................................14

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .............................................................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................... 10-11

*In re Zynga Inc. Sec. Litig.*,
    2014 WL 1743383 (N.D. Cal. Mar. 31, 2014).............................................................................11, 14

*In re Zynga Inc. Sec. Litig.*,
    2015 WL 1382217 (N.D. Cal. Mar. 25, 2015)...............................................................................*passim*

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
AMENDED COMPLAINT

On April 10, 2020, defendants (i) Nektar Therapeutics ("Nektar"); (ii) Howard W. Robin ("Robin"); (iii) Gil M. Labrucherie ("Labrucherie"); and (iv) Mary Tagliaferri ("Tagliaferri") (collectively, "Defendants"), filed a motion to dismiss the Amended Class Action Complaint filed by Plaintiffs Kanti K. Patel, Individually and as Trustee for The Kanti K Patel Living Trust U/A 3/30/16, The Tech Trader Fund LP, and Henry J. Juske (collectively "Plaintiffs").[1] Plaintiffs respectfully submit this Memorandum in opposition to Defendants' Motion.

## I.    PRELIMINARY STATEMENT

This case arises from Defendants' false and misleading statements and material omissions regarding the status of Nektar's potential blockbuster drug N214, and the number of "indications" (*i.e.*, conditions for which a drug may be listed as a treatment on its FDA approved label) that Nektar and its collaborator Bristol-Myers Squibb ("BMS") were pursuing for N214 during the Class Period. N214 was Nektar's most important drug and drove virtually all of Nektar's value to investors. Beginning in 2018, market analysts lauded Nektar's collaboration with BMS for N214 as the largest single-drug venture in biotech history which included BMS's "record-smashing" payment to Nektar of $1.85 billion. Crucially, the deal also gave Nektar the ability to earn an additional $1.78 billion incentive tied to the developmental progress of N214, including the number of indications ultimately adopted.

Throughout the Class Period, Defendants repeatedly touted that Nektar was pursuing *18 to 20 indications* for N214 across nine tumor types, was "executing" on that "broad" plan, and was in the process of filing "*all those INDs* [investigational new drug applications]" for the original 18-20 indications. Unbeknownst to investors, however, by February 2019 (as confirmed by several former employees ("FEs") of *both* Nektar and BMS), prior to the start of the Class Period on February 28, 2019, Nektar and BMS had *already decided* to abandon approximately 70% of the original 18 to 20 indications (pursuing only 4 to 6 indications), significantly reducing N214's potential economic value to the Company and investors. When Nektar finally revealed on August 8, 2019, that it was no longer pursuing the 18 to 20 indications for N214, Nektar's share price fell by 40%.

[1] Unless otherwise noted: (i) all capitalized terms have the meaning ascribed to them in Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws ("CAC") (Dkt. 62); (ii) all paragraph citations ("¶¶ __") are to the CAC; (iii) "Mot." or "Motion" refers to the Motion to Dismiss and corresponding Memorandum (Dkt. 73); and (iv) all emphases are added and all internal citations and quotations are omitted.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Defendants' Motion does not and cannot dispute the seminal factual allegations in this case—that Nektar abandoned 70% of the 18 to 20 indications for N214 and that Defendants were aware of that decision when it was made. Defendants' primary falsity challenges boil down to three issues: (i) the precise date on which Nektar and BMS abandoned the N214 indications; (ii) the "credibility" of multiple FEs from *both* Nektar and BMS who confirmed that that decision was made **by February 2019**, at the latest, and (iii) the technical meaning and impression created by Defendants' misrepresentations, which Defendants ask the Court to scrutinize the false statements in isolation and out of context. Defendants' arguments raise fact questions that cannot be resolved at the pleading stage. Moreover, Defendants' dispute about the precise timing of Nektar's *admitted* reduction in the number of N214 indications requires the Court to reject the reports of the FEs as untrue, even though they are well-supported and fully corroborated.

In addition, Defendants make scienter arguments that would require the Court to adopt the utterly implausible inference that Nektar's most senior executives were completely in the dark about massive changes in the development of its most important drug. Likewise, Defendants' self-serving interpretation of their statements ignores their overall context and the clear false impression given to investors—namely that Nektar was continuing to pursue *all* 18 to 20 indications for N214 throughout the Class Period. Defendants' strained inferences fail to undermine the CAC's clear demonstration of falsity and scienter.

Defendants raise other ancillary arguments regarding their personal motivations and misleading statements concerning a manufacturing problem with batches for the N214 trials. These challenges either misconstrue the applicable law, ignore the holistic mix of particularized facts, or require implausible inferences in their favor. Respectfully, the Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Nektar's Collaboration With BMS Was Crucial To Nektar's Success

Nektar is a biopharmaceutical company based in San Francisco. Like many other Bay Area "unicorns," it had limited revenues ($100 million in 2019) compared to its market valuation of nearly $4 billion. ¶ 2. Nektar's "flagship" drug, N214, is a cancer drug with the potential to treat a broad spectrum of cancers, making it a potentially enormous source of revenue. ¶¶ 1, 6, 71. Nektar describes N214 as its "Lead Immuno-oncology Candidate," and it drives virtually all of the Company's value. ¶ 1. Successful development of N214 was thus crucial to Nektar's success. ¶ 163.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

On February 13, 2018, Nektar and BMS entered into a collaboration agreement (the "Agreement") to develop, bring to market, and sell N214. ¶ 3. Under the Agreement, both companies would share the drug's net global profits. BMS would gain the option to purchase Nektar in the future, and Nektar would receive a massive capital injection totaling $1.85 billion. ¶ 66. The deal also provided Nektar with the ability to earn an *additional* $1.78 billion incentive tied to the developmental progress of N214. ¶ 67. This was the largest single-drug deal in biotech history. ¶¶ 69-71. The enormous value the Agreement delivered to Nektar signaled to the market that N214 was a potential "homerun" cancer therapy, ripe for investment. ¶¶ 6, 71-73.

**B.      The Number Of N214 Indications Was Critical To Nektar**

An indication is a condition that makes a particular treatment advisable. For the FDA to approve N214 for a particular indication (for example, a type of cancer), Nektar had to successfully complete registrational trials. The more indications N214 was approved to treat, the larger its ultimate value to Nektar and BMS. ¶ 71. For that reason, a "key component" of the Agreement was the "broad clinical development plan of registration-enabling clinical trials in over 20 indications." ¶¶ 8, 73-75. These numbers were touted by the Company and repeated by the press. ¶ 74.

The "clinical and regulatory successes from the [N214] development program" impacted the incentives Nektar was entitled to under the Agreement. ¶¶ 77-79. As a result, if any of the registrational trials for N214 failed, or Nektar was unable to pursue the 18-20 indications, it would significantly reduce Nektar's payout from N214—both from incentive payments and product sales. ¶ 79.

**C.      Defendants Conceal That The Indications For N214 Have Been Reduced**

On June 2, 2018, just months after the announcement of the collaboration, Nektar publicly disclosed results for an N214 trial that were substantially worse than the market had anticipated. Then, on October 1, 2018, a short seller report challenged the N214 trial results, further shaking investor confidence. ¶ 82. To bolster investor confidence, Defendants continued to tout their N214 partnership with BMS and the number of indications they were pursuing. ¶ 83.

Unbeknownst to investors, however, prior to first day of the Class Period, Nektar had already significantly reduced the number of indications being pursued for N214. ¶¶ 86-100. According to FE1, a BMS Clinical Site Manager and Subject Matter Expert through mid-Q2 2019, who was substantially

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

involved in the collaboration, it was clear by at least February 2019 that Nektar would not pursue all the contemplated indications. ¶¶ 49, 91. On calls in February 2019, Nektar and BMS representatives discussed that the 18-20 indications for N214 would be significantly reduced. ¶¶ 91-92. During the next three to four months, until FE1 left in the second quarter of 2019, FE1 participated in weekly and bi-monthly conference calls concerning the development of N214, which focused on only three indications (renal cell, prostrate, and lung).[2] ¶92. According to FE1, "it was very, very clear, from a clinical study point of view, and the [BMS] point of view, that they [Nektar and BMS] were only going to pursue the three indications." ¶ 92. FE2, a multi-year Nektar employee who worked as a mid-level manager in the Clinical area and who left the Company in the first quarter of 2019, further corroborated Nektar's knowledge and timing of the reductions, observing that the Company internally announced the reductions in indications in a monthly meeting. ¶¶ 50, 98. Despite Defendants speaking directly to the issue of the number of indications, none of these facts were disclosed to investors. ¶ 83.

**D.     Defendants Continue To Falsely Tout The Number Of Indications Being Pursued Despite The Decision To Abandon Approximately 70% Of Them**

On February 28, 2019, Nektar's Form 8-K touted its collaboration with BMS, stating: "In February 2018, Nektar and [BMS] entered into a global development and commercialization agreement to evaluate the full potential of [N214] with nivolumab in *more than 20 indications in 9 tumor types*" **and that "we *continue to design and execute* on our broad registrational program for NKTR-214."** ¶¶ 83, 124. Nektar, however, concealed that the number of indications had already been reduced. ¶ 129. On a same-day earnings call, Nektar's CEO repeated that the BMS joint venture "*includes about 20 registrational trials* across multiple tumor types. . . . [W]e've *made tremendous progress* over a short period of time in building out a comprehensive registrational strategy across the tumor types in this collaboration." ¶ 84.

Nektar's May 8, 2019 Form 8-K also continued to paint a rosy picture. While noting a brief delay in its registrational trials, the Company reiterated that: "We are working with our partner, [BMS], to execute on our broad joint development program for [N214] . . . ." ¶¶ 101, 130. On the same-day earnings call, an analyst pressed Defendants about the delay. In response, Tagliaferri responded that the delays resulted from

---

[2] The former employee also noted that there was work being done with respect to a fourth indication—melanoma—but FE1 viewed that slightly differently from the three organ groups. ¶ 17 n.6 & ¶ 92.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

the broad scope of indications Nektar was "going forward" with: "[R]eally this delay *is a factor of going forward with 18 registrational trials* in a short period of time. . . . And I think what we realized is we need a few more extra months to *file **all** those INDs*, design the studies, and get the first patient in." ¶ 107. Unbeknownst to investors, however, Nektar had already decided to abandon almost 70% of the 18-20 indications. ¶¶ 96, 100, 108.

### E.    Nektar Conceals A Manufacturing Defect That Impacted N214 Trials

In the first and second quarters of 2019, Defendants learned of a manufacturing defect that would result in delays and difficulties in commencing the N214 clinical trials. ¶¶ 109-12. A former Nektar employee (FE6) explained that an internal investigation that began in 2018, uncovered manufacturing issues with several batches of N214 used in clinical trials. ¶ 109. Another former employee (FE4) indicated that he was informed of the problem by mid-May 2019, based on an existing investigation. ¶ 110. Yet another former employee (FE5) explained that, as a result of the manufacturing issue, the N214 program was subject to a pause. ¶ 112. Despite this, in May 2019, Tagliaferri represented that Nektar would present data from the N214 lung cancer study in September, while omitting that the N214 program had been paused as a result of manufacturing issues. ¶¶ 133, 146.

### F.    The Relevant Truth Emerges

On August 8, 2019, Nektar announced that it had only 4 indications running for N214 and, going forward, its N214 collaboration with BMS would only focus on 5 or 6 total indications. ¶ 116. This represented a significant narrowing of the collaboration and curtailment of Nektar's opportunity to receive cash incentives under the Agreement. Nektar further announced that data on a key lung cancer trial would be delayed and disclosed the N214 manufacturing defect. ¶¶ 112, 120. In response, Nektar's stock dropped nearly 40% over two trading days, wiping out almost $2 billion in market capitalization. ¶ 27.

## III.    ARGUMENT

In assessing a Rule 12(b)(6) motion, courts consider the complaint in its entirety, "accept all factual allegations . . . as true" and construe them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007). A complaint should not be dismissed if it contains sufficient factual matter that, accepted as true, states a claim for "relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

### A.    The CAC Pleads Actionable Misstatements And Material Omissions

"Under the PSLRA, actions based on allegations of material misstatements or omissions must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which that belief is formed." *In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *3 (N.D. Cal. Mar. 25, 2015) (White, J.). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Moreover, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Thus, if a company touts positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). The question of whether a statement is materially misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).

Defendants argue that, even if the FEs' allegations are fully credited (an issue that is addressed below, *infra* § III.B), the alleged misstatements are truthful on their face and thus cannot form the basis for fraud. Mot. at 13-18. Defendants' arguments, however, are either based upon a distortion of the facts and statements actually pled, a failure to analyze the statements in context, or a failure to acknowledge well-settled law that statements are actionable if they create a false impression of Nektar's development plans for N214. *See Berson*, 527 F.3d at 985. Defendants also fail to seriously address the *omission* aspect of Plaintiffs' claims, *i.e.*, that their concealment of material facts regarding the abandonment of 70% of the indications "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Zynga*, 2015 WL 1382217, at *4. Thus, their arguments should be rejected.

#### 1.    February 28, 2019 False Statements And Material Omissions

*Press Release and 8-K*. In a February 28, 2019 Press Release, Nektar stated that a year earlier it had "entered into a global development and commercialization agreement to evaluate the full potential of [N214] in *more than 20 indications in 9 tumor types*" and that "we *continue to design and execute* on our broad registrational program for NKTR-214." ¶ 124. Defendants argue that the first part of the

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

statement ("20 indications . . .") is true since it accurately describes the Agreement, but wholly fail to address the second portion of the statement—that Nektar "continue[d] to design and execute" the initial plan. Mot. at 14.[3] It is the *combined* statements that are pled as misleading (¶ 129) and Defendants' attempt to parse the statements into separate segments is improper. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (in evaluating the PSLRA Safe Harbor, the court held "the court should determine whether the statement as a whole, not a particular part, is misleading") (*citing Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) ("If the allegation is that the [whole] statement is misleading, then it makes no sense to slice the [statement] into separate sentences."). Given the CAC's allegations that the initial plan of 18 to 20 indications had been abandoned prior to February 28, 2019 (*see infra* § III.B), the statements are facially false and misleading because Nektar no longer was continuing to "execute" on its "broad registrational program" and, in fact, had reduced the indications by 70%.

Further, even if the first part of the statement is viewed in isolation (which is improper), it is demonstrably misleading because it omits material adverse information regarding the 70% reduction in N214 indications. An omission is actionable where it "render[s] some affirmative public statement misleading as to a material fact" by creating "an impression of a state of affairs that differs in a material way" from reality. *Zynga*, 2015 WL 1382217, at *4. Here, by touting the Agreement to pursue "more than 20 indications," while omitting that the number of indications had already been significantly reduced, Defendants created an impression of a state of affairs that differed in a material way from the one that actually existed.[4]

***Conference Call—Defendant Robin's Statements***. In the earnings conference call accompanying the reporting of fourth quarter results, Defendant Robin stated: "As you know, the joint development plan

---

[3] Defendants also argue that the second portion of the statement—viewed in isolation from the first part—is not false because the CAC does not address the status of any trial. Mot. at 16. Plaintiffs, however, are not attacking the status of trials, but instead the number of indications that actually are being pursued. ¶ 129. Further, Defendants effectively acknowledge that "registrational program" is synonymous with the number of "indications" being pursued—and is not a reference to individual trials. *Compare* Mot. at 14:14-18 (arguing that the term 20 "registrational trials" is merely a recitation of contract terms) *with id.* at 14:4-10 (Agreement refers to "20 indications").

[4] The omitted information is clearly material since there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Zynga*, 2015 WL 1382217, at *4. In fact, Defendants do not argue that information regarding the number of indications for N214 that were being pursued was immaterial to Nektar investors. *See* Mot. at 7-18.

7                    Case No. 4:19-cv-05173-JSW
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

with Bristol *includes about 20 registrational trials* . . . . [A]nd *we've made tremendous progress* over a short period of time in building out a *comprehensive* registrational strategy across the tumor types in this collaboration." ¶ 125.[5] Defendants claim, as they did with respect to the Press Release (Mot. at 14), that the first part of the statement is inactionable because it recites contract terms. Plaintiffs alleged, however, that at the time the statement was made, the "plan" with BMS no longer included 20 registrational trials, thereby rendering this statement false on its face. Regardless, Plaintiffs also alleged that Robin's statement discussing the "20 registrational trials" misled investors by omitting the highly material fact that the Company had already decided to abandon most of those trials. *See Zynga*, 2015 WL 1382217, at *4. Further, the first portion of Robin's statement must be read in combination with the section portion, which affirmatively represented to investors that Nektar was "building out a comprehensive registrational strategy across the tumor types in this collaboration" and "making tremendous progress" on the original plan. The combined statements thus gave investors the misleading impression that the original collaboration for 20 indications was *still* being pursued—when it was not.

Defendants also argue that Robin's statement claiming "tremendous progress" on the Company's "comprehensive registrational strategy" was merely an inactionable expression of corporate optimism. Mot. at 15. This argument is misplaced since Plaintiffs are not challenging any claim of "progress" (tremendous or otherwise), but the undisclosed fact that the overall development program had been massively reduced in scope—a fact that the statement read in context entirely misrepresents.

*Conference Call—Defendant Labrucherie's Statements*. On the conference call, Defendant Labrucherie informed investors that a significant portion of Nektar's R&D budget was being spent on "the *broad registrational development plan for [N214] that we are executing* with our partner [BMS]." ¶ 126. The CAC asserts that this statement was materially false and misleading and/or omitted material information because Defendant Labrucherie created the impression that Nektar was on track to execute the "broad" developmental plan previously disclosed to investors. ¶ 128. Defendants claim this statement is

---

[5] While Robin's statement uses the term "registrational trials" instead of "indications," the two are synonymous as Defendants effectively admit. *See supra* note 3.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

true because the CAC does not address Nektar's R&D budget.[6] Mot. at 16. These arguments are a red herring, since the CAC does not allege any falsity with respect to the R&D budget. Instead, the CAC focuses on the false and misleading impression created by the statement that Nektar was continuing to "execute" the "broad registrational plan" (the pursuit of 18-20 indications). In truth, Nektar and BMS had substantially reduced their plans for the development of N214 prior to this statement. *See Berson*, 527 F.3d at 985 (statement is misleading where it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists"); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) (defendant company misled investors when it made statements about its product that created an inaccurate view of its effectiveness); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1140 (N.D. Cal. 2017) (company created false impression by failing to disclose relevant daily active user metrics).

### 2.    May 8, 2019 False Statements And Material Omissions

***Earnings Conference Call—Defendant Tagliaferri's Statements***. In a conference call on 1Q 2019 financial results, Defendant Tagliaferri, responding to an analyst's question, sought to explain an announced four-month delay in certain trials by referencing the broad scope of Nektar's "18" N214 registrational trials:

> [T]his delay is a factor of ***going forward with 18 registrational trials*** in a short period of time. We were very aspirational. We thought we would hit these 18 in a 14-month timeframe. And I think what we realized is we need a few more extra months ***to file all those INDs*** [investigational new drug applications].

¶ 134. Defendants present absolutely no argument that these statements by Defendant Tagliaferri are not actionable and resort to the argument that there are no "particularized facts" that Nektar had abandoned its

---

[6] Defendants also attack the use of the phrase "on track" in ¶ 123 of the CAC, claiming that the CAC is "deeply dishonest" because the phrase does not appear in Defendant Labrucherie's statements. Mot. at 16. That argument, however, is entirely disingenuous, since the CAC fully recounts the actual statement that was made and asserts that the statement is false because it implies that Nektar is continuing to pursue its broad development plans. ¶ 128. The claim that the phrase "on track" somehow distorts the phrase "are executing"—which Defendant Labrucherie clearly uses—is entirely specious. Significantly, analysts who follow Nektar interpreted Defendants' comments to mean that N214 was "on track" for 20 indications. For example, one analyst reporting on the February 28, 2019 press release and conference call titled his report, "Following a Transformative 2018, Nektar Is **on Track** to Start 20 Pivotal Trials With Bempegaldesleukin Plus Opdivo This Year," William Blair (Feb. 28, 2019) and another analyst, in the body of the report, stated his takeaway: "Broad clinical trial program continues **on track**." SG Cowen (Feb. 28, 2019).

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

plans for 18-20 indications. Mot. at 18. This is merely a reiteration of their attacks on the FEs addressed below and should be rejected for the same reasons. *See infra* § III.B.

*Press Release and Form 8-K*. In its press release reporting 1Q 2019 financial results, Nektar repeated that it was already "execut[ing]" on the "broad joint development program for [N214]." ¶ 130. It then went on to provide detail with respect to a few ongoing trials. *Id.* Defendants again attempt to distract by focusing on the statements discussing the ongoing trials—which Plaintiffs have not even alleged were misleading. Mot. at 17. At the same time, Defendants conjure no real argument that the statements Plaintiffs actually challenge—that Nektar was continuing to pursue the larger and "broad[er]" number of indications (18-20) and planning "additional trials"—were accurate representations. Nor could they; these statements clearly created the false impression that Nektar was still pursuing 18 to 20 indications under the original plan—which was objectively untrue. *See supra* at § II.C–D.

*Conference Call—Defendant Robin's Statements*. During the May 8, 2019 conference call, Robin reiterated his false claims about the continued broad scope of the BMS collaboration, stating "The joint development plan with Bristol includes many registrational trials across multiple tumor types." ¶ 131. He went on to discuss certain delays in the program, but never once indicated that the scope of the program had been significantly reduced. ¶¶ 132-34. Defendants claim that the CAC does not address the specific falsity of these statements, but ignore the information that was omitted—Nektar was no longer pursuing the development plan that had been announced the prior year, but instead had only 4 active indications running and was pursuing *only 5-6 indications total*. *See supra* at § II.F. By omitting this material information, Defendant Robin "created an impression of a state of affairs that differ[ed] in a material way from the one that actually existed." *Zynga*, 2015 WL 1382217, at *6 (alteration in original).

### B.     Plaintiffs Adequately Allege Facts From Former BMS And Nektar Employees That Demonstrate The Falsity Of Defendants' Statements

The CAC alleges, based on corroborating information provided by three separate FEs (FE1, FE2, and FE3), that prior to the Class Period, Nektar and BMS had agreed to dramatically reduce the number of indications for N214 to a small subset of the original 18-20 indications. ¶¶ 89-99. This Court and others credit FE allegations where the complaint provides "an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco Partners, LLC v. Digimarc Corp.*,

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

552 F.3d 981, 995 (9th Cir. 2009); *see also Zynga*, 2015 WL 1382217, at *5 (finding that confidential witnesses stated with specificity that they had access to the information and stated "sufficient personal knowledge of the [information])."[7] As set forth below, the FEs are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the [CAC] contains adequate corroborating details." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

### 1.      The Allegations Regarding FE1 Are Reliable And Corroborative Of Falsity

FE1 is described "with a large degree of specificity," including her "exact title" (Subject Matter Expert for BMS), "job description and responsibilities" (assigned to the to the N214/Opdivo® Pivot 2b renal study to leverage a network of existing relationships with doctors), and the precise source of her personal knowledge of the severe reduction in N214 indications (weekly Webex calls with high-level representatives from both companies from January 2019 through the spring of 2019). ¶¶ 49, 87-96; *see Zynga*, 2015 WL 1382217, at *5. The facts attributed to FE1 are also reliable as they are based on her personal knowledge, actual attendance at meetings, and discussions that she *personally witnessed*, including details such as: (i) the purpose of the weekly meetings and the workflow of the collaboration (¶ 90); (ii) the participants on the weekly calls (¶ 88); (iii) the challenges leading to the major reduction in N214 indications and explanations given by her superiors (¶¶ 91, 93-94); and, most importantly, (iv) the telephonic meetings in February 2019 involving both companies, where it was explicitly discussed that the nineteen indications would be reduced to only melanoma, renal cell, prostate, and lung cancers. ¶¶ 91-92. FE1 also describes how she personally asked managers at both companies for an explanation for the reduction in indications, but was rebuffed. ¶ 96. Further, FE1 reported that during the weekly "country" and bi-monthly "global" calls from the meetings in February until she left BMS in the spring of 2019, only

---

[7] *See In re Zynga Inc. Sec. Litig.*, 2014 WL 1743383, First Amended Complaint for Violation of Federal Securities Laws, ¶¶ 69, 70, 81, 82 (N.D. Cal. Mar. 31, 2014) (complaint set forth allegations from confidential witnesses who provided information that they obtained from daily "scrum" meetings where financial information was discussed and from meetings with senior executives); *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014) (crediting allegations from witnesses "who have provided consistent accounts of the conditions, practices, and procedures of [the company] within their respective spheres."); *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *4 (C.D. Cal. Mar. 25, 2019) (crediting allegations of former employee who in her accountant role had "knowledge regarding the way decisions were made at [the company]").

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

4 indications for N214 were ever discussed—further corroborating that Nektar had already abandoned the other indications. *See supra* p. 4 & note 2.

Defendants' Motion mainly attacks FE1, first claiming she "lack[s] [] personal knowledge" because she focused on "renal cancer trials" and thus could not know about an "abandonment of trials in tumor types other than renal cancer." Mot. at 10. This ignores the fact that FE1 was personally involved in regularly scheduled calls and meetings at which the *entire scope* of the N214 program was addressed. FE1 describes (i) weekly Webex meetings regarding the active studies at the very crux of the CAC for which she was a direct participant; (ii) the notice of a dramatic reduction in scope of the collaboration in January or February by high-level managers at both companies (many listed by name and title), who provided explanations for why the number of total indications was being reduced; and (iii) her own inquiries to representatives at both companies concerning the reduction.[8] FE1's general "focus" on renal cancer does not negate these facts.

Significantly, FE1's allegations were effectively corroborated by Defendants' end of Class Period concession on August 8, 2019, that Nektar was actively executing on only four indications, and, going forward would pursue a total of only "5 or 6 key" indications. ¶ 116. On the same day, Defendant Robin acknowledged publicly for the first time: "[W]e're not moving forward with 18" indications because "the landscape . . . has clearly evolved and changed." ¶ 117. Defendants' admission that Nektar, in fact, abandoned 70% of the indications during the Class Period—lends reliability to her account. *See Daou*, 411 F.3d at 1015 (noting that reliability of a witness depends in part on the corroborative nature of the other facts alleged, including facts from other sources); *see also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("both post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period" because "any information that sheds light on

---

[8] Defendants also accuse FE1 of being unreliable because she supposedly offers "self-contradictory allegations," the sum total of which is that FE1 worked on the renal cancel trials yet states that "zero" doctors were interested, with only one or two being potentially interested. Defendants claim this set of facts is impossible, Mot. at 10, even though FE1's comment does not contradict any alleged fact. Nor is there any inherent impossibility in the fact that Nektar sought to recruit doctors for a study and none wished to participate. Defendants' sole case, *Applestein v. Medivation, Inc.*, is easily distinguishable because there, "the confidential witness statements in the [third amended complaint were] unreliable because they contradict[ed] statements made by the same group of witnesses in the [second amended complaint]" regarding a central issue in the case. 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012). Here, FE1's patient recruitment efforts have nothing to do with her well-pleaded personal knowledge of the companies' dramatic curtailment of Nektar's N214 plans.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

whether class period statements were false or materially misleading is relevant"). Defendants' factual dispute about the precise date that the abandonment occurred—despite two FEs' confirmation that it occurred prior to the Class Period—cannot be resolved on the pleadings. *See In re BP P.L.C. Sec. Litig.*, 922 F. Supp. 2d 600, 634-35 (S.D. Tex. 2013) (Court held that falsity was met because the parties' differing contentions on when a system was actually implemented by the company is an "issue of fact" when plaintiffs' allegations are supported by witness allegations and deposition testimony.); *In re Genetech, Inc., Sec. Litig.*, 1989 WL 106834, at *3 (N.D. Cal. July 7, 1989) ("As an initial matter, whether a statement is misleading, either by itself or by reason of the omission of other facts, is an issue of fact not ordinarily resolved on the pleading level on a motion to dismiss.").

Defendants further attack FE1's allegations that Nektar experienced staff changes between November 2018 and January 2019, by insinuating that a witness must work for the defendant company in order for her allegations to be credited. *See* Mot. at 10-11 (citing *Applestein*, 861 F. Supp 2d at 1033, 1036-38 and *Szymborski v. Ormat Tech., Inc.*, 776 F. Supp. 2d 1191, 1201 (D. Nev. 2011)).[9] The Ninth Circuit has explicitly rejected such a rigid rule. *See, e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting statements from confidential witness who "was not at [the company] during the Class Period"). The relevant inquiry is whether the witness was in a position to possess the information attributed to her. *Daou*, 411 F.3d at 1015. Here, there is no question that FE1—who was consistently on calls with high-level Nektar managers (including VP of Clinical Operations Lisa Decker)—was in such a position.[10] ¶ 88.

---

[9] Defendants' cases are inapposite. *Applestein* did not credit the allegations from the confidential witnesses, not because they did not work for the defendant company, but because they were not "in a position to have the knowledge they profess" as plaintiffs failed to "connect[]" the witnesses' work to defendant's business. 861 F. Supp 2d at 1037. Similarly, *Szymborski* concluded that the confidential witness was no longer working for the defendant company, or for any company involved in the disputed project, and thus she could not provide reliable information about the state of the project during the relevant time. 776 F. Supp. 2d at 1201. Here, FE1's allegations are based on her first-hand experience from inside an active study at the center of a formal collaboration between Nektar and BMS.

[10] Defendants similarly attack FE1's observations that "Nektar did not have conclusive data on all nineteen indications" by January 2019, and part of the reason for Nektar's curtailment was that there is no treatment or answers for certain kinds of "big killer[]" cancers. Mot. at 10-12. These are ancillary issues that do not impact the reliability of her core allegations regarding the meetings she attended confirming the reduction in the number of indications being pursued for N214. At most, they raise factual disputes that eventually will have to be resolved by the trier of fact.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Next, Defendants claim that FE1's allegations are based on unreliable hearsay. *See* Mot. at 11 (citing ¶¶ 88, 91-92 & n.11). To the contrary, FE1 describes her *personal* knowledge and role in the N214/Opdivo® collaboration from January 2019 through the spring of 2019, and recounts the information regarding the reduction in the number of indications being pursued that was provided directly to her and others by their superiors. It is information that she needed in order to perform her job. *See* ¶¶ 88, 91-92, 96. Courts routinely accept such information recounted by persons present at meetings. *Zynga*, 2015 WL 1382217, at *5 (upheld a complaint based in part on confidential witnesses who obtained "personal knowledge" from daily "scrum" meetings where financial information was discussed) (*see Zynga*, 2014 WL 1743383, ¶¶ 69-70, 80-81)); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (overturning district court's hearsay-unreliable determination and noting that "the statements reported by the COO were specific in time, context, and details, and involved important communications from a chief executive officer to his Board"); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *17 (N.D. Cal. Mar. 21, 2018) (confidential witness account of meeting supported falsity).[11] Further, as noted above, FE1's participation in the collaboration and her first-hand knowledge of the N214 indication reductions is described in considerable detail, corroborated by FE2 and FE3, and underscored—in terms of plausibility and coherence—by Nektar's admission in August 2019.

## 2.    FE2 And FE3 Corroborate FE1

FE2 and FE3 corroborate FE1's account, further demonstrating the reliability of the information provided by the FEs. *See In re Dura Pharm., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1132 (S.D. Cal. 2008) (adequate corroborating details from confidential witnesses can establish reliability) (citing *Daou*, 411 F.3d at 1015). FE2 worked in Nektar's Clinical area as a mid-level manager in Compliance for several years

---

[11] Even if FE1's information could be considered hearsay—which it is not—as this Court has concluded, "reliance on hearsay does not disqualify a confidential witness's statements from consideration" where it is "sufficiently reliable, plausible, or coherent." *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1010 (N.D. Cal. 2018) (White, J.). Courts have found hearsay reliable on a lot less. *See, e.g.*, *LifeLock,* 780 F. App'x at 484 n.5 ("We credit the allegations attributed to CW 5 because they form a plausible and coherent narrative and because CW 5 was in a position to be personally knowledgeable . . ."); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *7 (C.D. Cal. Apr. 12, 2016) ("Each witness's statements are based on personal knowledge, not hearsay, and involve various problems they observed in the manufacturing process at STAAR's California facility."). Further, Defendants' reliance on a single sentence from *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019) (Mot. at 11) is inapposite since the statements at issue in that case lacked credibility on their face and failed to connect an individual defendant to knowledge of the fraud.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

prior to the Class Period and through Q1 2019, and was personally involved in a N214 study from early 2017 through mid-2018. ¶ 50. FE2 recalls learning, at an official internal announcement in February 2019, that the number of indications for N214 had been reduced and fewer trials than anticipated would be necessary. ¶ 98. FE3, a Director at Nektar from prior to the Class Period through mid-Q2 2019, confirmed that Nektar's drug supply people stated that vials needed for N214 trials started decreasing in the spring of 2019. ¶ 99. Since Nektar started manufacturing fewer vials for N214 in the spring of 2019, this corroborates FE1's account that after February 2019, Nektar was only pursuing 3-4 indications, which would entail fewer supporting clinical trials and a reduced need for N214 for use in trials. FE2 and FE3 thus add further credibility to FE1's detailed account that the companies had decided by February 2019, to dramatically reduce the number of indications they would pursue for N214.

Defendants fault Plaintiffs for not providing enough detail about FE2's job duties, and attack the credibility of FE2's allegations because she was not working on an active N214 trial at the time of the curtailment announcement and did not describe who made the announcement. *See* Mot. at 8-9. But the CAC alleges that FE2 was a mid-level manager in Compliance for years prior to the Class Period, that she personally worked on a N214 study approximately six months before Nektar announced internally the reduction in the number of indications being pursued (thus the collaboration was known to her), and that she personally recalled an official Nektar announcement that precisely corroborates FE1's allegations. *See, e.g.*, *Daou*, 411 F.3d 1006, 1015-16 (complaint described confidential witnesses "with sufficient particularity to support the probability" that they knew about the fraud). Further, while Defendants attack FE3 on hearsay grounds, as noted previously (*supra* at § III.B.1), Defendants' hearsay arguments fail; testimony is deemed probative of falsity when it is "sufficiently reliable, plausible, or coherent." *Costabile*, 293 F. Supp. 3d at 1010. Here, FE3 reports information that neatly dovetails with the information provided by FEs1 and 2, further adding to its reliability, plausibility, and coherence.

### C.    The CAC Raises A Strong Inference Of Defendants' Scienter

Scienter may be established by alleging that defendants acted either with actual knowledge or with "deliberate recklessness." *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holdings Corp.*, 320 F.3d 920, 932 (9th Cir. 2003). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*,

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

551 U.S. at 324. A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id*. at 326. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.*

Allegations regarding Defendants' high-level positions support a strong inference of scienter in at least three circumstances: (1) "where they are particular and suggest that defendants had actual access to the disputed information" (*S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008)); (2) "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter" (*id.*); and (3) when viewed holistically along with other allegations under *Tellabs*, 551 U.S. at 326. All three are satisfied here.

### 1.    Defendants Had Actual Access To The Disputed Information

Allegations concerning defendants' corporate positions "independently satisfy the PSLRA when they are particular and suggest that defendants had access to the information" at issue. *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015); *see also Reese v. Malone*, 747 F.3d 557, 570-71 (9th Cir. 2014) (upholding scienter allegations where defendant's position suggested access to data). Here, the CAC contains detailed allegations demonstrating that the disputed information—that the number of indications for N214 had been severely reduced—was "well-known" and widely discussed within Nektar no later than mid-February 2019. ¶ 86. For example, beginning in February 2019, the fact that only 3-4 indications, rather than 18-20, were being pursued was discussed on calls that included such high-level executives as Nektar's VP of Clinical Operations, Lead Data Manager, and at least one other Senior VP. ¶¶ 88, 91-92, 155. Moreover, by no later than February 2019, an official announcement was made to Nektar employees at a monthly meeting that indications for N214 had been reduced and fewer trials than anticipated would be necessary. ¶ 98. Given that these crucial facts were widely disseminated and discussed within Nektar, including at the highest level of the Company, Defendants—as CEO, CFO,

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

and Chief Manufacturing Officer—certainly had actual access to them.[12] *See In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) ("[A]s the leaders of the company, [defendants] had access to [materially relevant business information] and could have sought it out"); *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1257-58 (W.D. Wash. 2009) ("*S. Ferry II*") (allegations that CEO responsible for "operational decision-making, and strategic execution" "suggest" knowledge).[13] Moreover, the CAC alleges that any changes to the collaboration with BMS had to be jointly approved by Nektar, which necessarily included its most senior management. ¶ 155. As a result, there is no real question here that Defendants had actual access to information regarding the significant curtailment of the number of indications. *S. Ferry II*, 687 F. Supp. 2d at 1256 ("the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective").

### 2. It Would Be Absurd To Suggest That Defendants Did Not Know Of A Severe Curtailment In The Indications For Nektar's "Flagship" Drug

The Ninth Circuit has explained that "[i]t may be inferred that facts critical to a business's core operations . . . are known to key company officers . . . where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 781, 786. While Defendants suggest this core operations inference "is not easy" (Mot. at 24), they fail to address the unique importance of N214 as the near-singular source of Nektar's stock price valuation. This case presents the quintessential circumstances for the application of the core operations doctrine. *Berson*, 527 F.3d at 989 ("facts were prominent enough that it would be absurd to suggest" that top management was unaware of them").

---

[12] Notwithstanding Defendants' contention that the CAC only contains "boilerplate allegations" of access to information (Mot. at 2, 23-24), the CAC specifically alleges that all three Defendants were directly involved with the day-to-day operations of the Company at the highest levels. ¶¶ 40-47, 155-56, 161-62. Defendants Robin and Labruchere were both responsible for reviewing and approving SEC filings, which included the February 28, 2019 and May 8, 2019 8-Ks touting N214's progress. ¶¶ 40-41, 43, 45-46, 161. As CMO, Defendant Tagliaferri was directly involved in the management of N214's clinical operations. ¶¶ 42, 43, 162. The CAC makes clear that Tagliaferri's role during Earnings Calls included informing investors of "clinical updates" for N214 and answering relevant inquiries. ¶¶ 42, 81, 107, 134, 138, 153.

[13] Given that this information was widely known within Nektar, Defendants' argument that the Individual Defendants supposedly did not attend the specific meetings FE1 described is meritless. Mot. at 23. *See Robb v. Fitbit, Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017) (rejecting defendants' argument that there can be no scienter because CWs lacked direct access to individual defendants and could not link specific reports to defendants).

17     Case No. 4:19-cv-05173-JSW
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

As detailed in the CAC, N214 was Nektar's "flagship" drug with the potential to treat a broad spectrum of cancers, making it a potential enormous source of revenue. ¶¶ 1, 6, 71. Due to the BMS Agreement, which provided billions of dollars in value to Nektar, much of the Company's share price valuation was tied to N214's potential and the number of indications—which were key to achieving that value. ¶¶ 72, 76. Thus, one biotech commenter noted: "Nektar Therapeutics is a multibillion-dollar biotech with *most of its value tied to a single drug*." ¶154. Given the significance of N214 to Nektar, there is no reasonable possibility that senior management—including Defendants—would have been unaware of a 70% reduction in the number of indications (from 18-20 to 5-6) being pursued for the drug that represented virtually all of the value of the Company. As explained by Judge Posner in *Tellabs*, in addressing scienter with respect to the company's "flagship" product that represented only about 50% of its revenue:

> That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 706, 709 (7th Cir. 2008) (Posner, J.).

Given the overwhelming importance of N214 to Nektar and the Individual Defendants, the case for the application of core operations is much stronger here than in *Berson* or *South Ferry*, such that it would be "absurd to suggest" that Defendants were unaware of how many N214 trials were actually planned, or that the indications had been reduced so significantly. In *Berson*, the court found that the operations were so significant as to create a strong inference of scienter where the statements at issue involved the impact on revenue from stop-work orders that primarily impacted revenue from one large customer, much less the company's sole driver of value. 527 F.3d at 987-88. Similarly, in *South Ferry II*, the court concluded that the mortgage underwriting operations of a large commercial bank with multiple other lines of business was sufficiently important to the bank's operations to support a finding of scienter against senior officers. 687 F. Supp. 2d at 1255, 1260. Where, as here, the operations at the heart of the fraud are related to a company's most important product or division—indeed Nektar's *only* significant product—the core operations

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

doctrine routinely is applied to establish scienter.[14] *See Impax Labs*, 36 F. Supp. 3d at 970 ("it is absurd to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company . . .").[15] Further, because Plaintiffs have adequately alleged scienter for Nektar's senior officers, they have established corporate scienter for Nektar itself. *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204-05 (N.D. Cal. 2012) (imputing scienter based on respondeat superior (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990)); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017).

### 3. Defendants' Explicit Statements Regarding The Number Of Indications For N214 Support A Strong Inference Of Scienter

An assertion that Defendants were unaware of an alleged issue can also be "directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]." *Reese*, 747 F.3d at 572; *see also Twitter*, 282 F. Supp. 3d at 1147 (finding that executive "bridged the scienter gap" by referencing disputed data directly); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601 (N.D. Cal. 2019) (finding that plaintiffs established CEO and CFO's scienter where executives demonstrated knowledge of drug pricing issues underlying claims of fraud through statements). Thus, when defendants

---

[14] Defendants' reliance on *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) to refute Plaintiffs' allegations is misplaced. Mot. at 24. That decision primarily focused on a lack of evidence for falsity (a single low-level confidential witness) rather than whether the operations at issue were sufficiently "core" to the company. *Intuitive*, 759 F.3d at 1062-63. Both *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) and *Applestein* are similarly distinguishable. Mot. at 25. In *NVIDIA*, the court relied upon management's explicit statements that the operations related to the fraud were not "core." 2020 WL 1244936, at *11-12. In *Applestein,* the court concluded that allegations that there were defects in a clinical trial concerning one of two drugs under development by the defendant did not support scienter, not because the drug was not important, but because there was no evidence that the third party conducting the clinical trial ever informed the defendant about the defects. 861 F. Supp. 2d at 1041.

[15] *See also Flynn v. Sientra Inc.*, 2016 WL 3360676, at *14 (C.D. Cal. June 9, 2016) (executives presumed to know about problems with product generating all of company's net sales); *Roberti v. OSI Sys. Inc.*, 2015 WL 1985562, at *13 (C.D. Cal. Feb. 27, 2015) (defendants charged with knowledge of "largest and most profitable division"); *Azar v. Yelp*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018) (applying core operations doctrine where program at issue was "prominent enough that it would be 'absurd to suggest' that top management was unaware of" issues); *Twitter*, 282 F. Supp. 3d at 1146 (applying core operations theory where it would be "absurd" for executives to be unaware of information "fundamental" to operations); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016) (noting that particularized allegations were unnecessary where it would be "absurd" for executive to be unaware of facts related to development of critical lung cancer drug).

19                                    Case No. 4:19-cv-05173-JSW
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

make specific factual representations that are false, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese*, 747 F.3d at 572; *see also S. Ferry LP II*, 687 F. Supp. 2d at 1259 (CEO's affirmative statements about risk management capabilities were "enough . . . to find that [the CEO] had actual knowledge of the systems integration and of the hedging capacity of his company").

Here, all three Defendants participated in the Earnings Calls on February 28, 2019, and May 8, 2019. ¶¶ 15, 84, 125-26, 131-34, 138, 153, 156. All three Defendants spoke specifically to N214's *progress*, including claiming that Nektar was pursuing "more than 20 indications in 9 tumor types" and that the scope of the BMS venture "includes about 20 registrational trials across multiple tumor types." *See supra* § II.D. Thus, any "inference that [Defendants] did not have access to the [relevant] data is directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]." *Reese*, 747 F.3d at 572.[16] The fact that Defendants were directly speaking on the topic and the market was fixated on N214's development, clearly gave Defendants ample incentive to seek out information regarding the number of registrational trials planned. *Finisar*, 2017 WL 1549485, at *7 ("[E]ven if [the CEO and board chairman] were not directly involved . . . they were either aware or should have been aware of this materially relevant business information. And if for some reason they were not, . . . as the leaders of the company, both [defendants] had access to it and could have sought it out."). Plaintiffs' access to information argument is strengthened by the fact that Defendants addressed the same topics throughout the first three-plus months of the Class Period. To the extent they claim they had no access at the beginning of the Class Period—a factual argument that they have not made and that is not supported by any allegation in the CAC—Defendants clearly would have been on notice that they needed to ascertain the true state of play before making additional statements on the number of indications. *See, e.g.*, *S. Ferry II*, 687 F. Supp. 2d at 1260 (when defendant does not have knowledge about the subject, "it would be at least actionably reckless to reassure the public about these matters at all").

---

[16] Failure to seek out such information would be, at the very least, deliberately reckless. *S. Ferry II*, 687 F. Supp. 2d at 1260; *accord Reese*, 747 F.3d at 569 ("[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.") (alterations in original).

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**4.    Defendants' Motives And Financial Incentives Reinforce Scienter**

Although motive allegations are not required to establish scienter, courts may consider a defendant's motive to commit fraud as one factor that may support a strong inference of scienter. *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"). Here, the allegations establish that Defendants had a motive to continue painting a rosy picture of N214's progress. First, disclosure of the reduced N214 indications would have reinforced investors' concerns arising from the disclosure of poor clinical trial results in June 2018, and the short seller report later that year. ¶ 100; *see also Twitter*, 282 F. Supp. 3d at 1149 (finding that motive to "live up to the targets" announced publicly may also provide inference of scienter in the absence of stock sales).[17] Second, in light of the problems that they had experienced regarding N214 in 2018, Defendants had strong incentives not to tell investors in early 2019 that they were taking actions that could negatively impact the Company's ability to earn incentive payments under the Agreement with BMS. Third, as detailed in the CAC, Defendants' "performance criteria" for 2018 relating to their incentive compensation, explicitly included milestones related to registrational trials (¶¶ 157-58) and their 2019 compensation similarly was based on the Company filing applications for new indications.[18] Thus, given the importance of N214 indications to performance goals under the various compensation plans, it is inconceivable that they were not aware of major decisions regarding the abandonment of 70% of the N214 indications. *See In re Cornerstone Propane Partners, L.P Sec. Litig.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005) (allegations of incentive

---

[17] Defendants' argument that a lack of insider stock sales cuts against a scienter finding (Mot. at 21) is contrary to controlling authority. *See Am. W. Holding*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock . . .").

[18] Nektar's proxy addressing its 2019 compensation policies was filed on April 29, 2020, and was not available at the time of the filing of the CAC. The Proxy provides: "The performance goal for 2019 is the Company's achievement of two (2) of the following five (5) events: (i) filing two (2) Investigational New Drug ("IND") applications with the FDA for drug candidates wholly-owned by the Company; (ii) two clinical collaborations with significant co-funding support of at least 30% of clinical studies involving Company proprietary drugs; (iii) . . .; (iv) the filing of a [NDA] by the FDA for a Company proprietary drug; and (v) the approval of an NDA by the FDA for a Company proprietary drug." Nektar Proxy, April 29, 2020, at 48, https://ir.nektar.com/static-files/111eeaa3-299d-434d-91f1-ca88ff81dd38. This directly refutes Defendants' arguments regarding the alleged irrelevance of the 2018 compensation goals set forth in the CAC (the only time period for which information was available when the CAC was filed). Mot. at 22.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

compensation indicative of scienter where executive bonuses were "directly tied" to the "very instrument" at issue).[19]

### 5.      Defendants Offer No Plausible Competing Inference

The only competing inference offered by Defendants is the implausible suggestion that the senior-most executives in the Company were somehow in the dark about its singularly most important drug and Nektar's admitted decision to abandon 70% of the N214 indications during the Class Period—despite widespread discussion of the reduction during multiple meetings involving senior Nektar personnel, including multiple VPs. ¶¶ 91-92. That inference strains credulity and fails to undermine the compelling inference of deliberate recklessness. *Tellabs*, 513 F.3d at 709.[20]

### D.      The CAC Pleads Actionable Misstatements And Omissions Regarding Nektar's Manufacturing Defects And Delays In Clinical Trial Results

Plaintiffs allege that Defendant Tagliaferri misled investors when she represented that the Company would present data from the N214 lung cancer study at the ESMO meeting, while omitting that the N214 studies had been paused as a result of manufacturing issues with the batches used in the studies. ¶¶ 140, 146, 162. The Ninth Circuit has made clear that when executives make representations, they are "bound to do so in a manner that wo[]n't mislead investors, including ***disclosing adverse information that cuts***

---

[19] *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *19-21 (C.D. Cal. Oct. 1, 2013) (finding scienter adequately pled through allegations of defendants' involvement in core operations and incentive compensation tied to financial outlook). Defendants' authorities are inapposite as none deal with allegations showing a direct correlation between compensation and fraud regarding a flagship drug or product. Mot. at 22 (citing *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012) (noting that allegation of incentive compensation was insufficient to establish scienter on its own); *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 861 (S.D. Cal. 2019) (declining to find allegations of incentive compensation persuasive, where plaintiffs "failed to plead particular facts" demonstrating a strong correlation between compensation and company's bottom line); *In re Tibco Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) (allegations of incentive compensation insufficient where plaintiffs failed to tie compensation to misstatements).

[20] Defendants' purported "good faith" argument that Nektar "provide[d] investors with accurate information about the trials it was conducting and designing as part of the BMS collaboration" is contradicted by Plaintiffs' well-pled allegations that Defendants no longer were pursuing 18-20 indications for N214, which must be accepted as true. Mot. at 25; *see Tellabs*, 551 U.S. at 322-24; *see also* ¶¶ 91-93, 98-100, 116, 121, 124-39. Additionally, Defendants' assertion that Nektar provided "explicit and detailed risk disclosures" is irrelevant. Mot. at 25. The disclosure of a general risk without discussing specific, on-going issues does not shield Defendants from liability. *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1118 (D. Nev. 1998) (when potential risks are ongoing, defendants "cannot insulate these statements with general language about the risks inherent in every [] enterprise"). It simply cannot be disputed that Defendants failed to disclose the massive reduction in the number of indications being pursued for N214.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

*against the positive information.*" *Khoja*, 899 F.3d at 1009; *see also Berson*, 527 F.3d at 987. By giving investors the impression that Nektar's N214 studies were proceeding as planned, when they had been paused due to undisclosed manufacturing issues, Defendants "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Zynga*, 2015 WL 1382217, at *4. Defendants raise three arguments with respect to these claims. None have merit.

*First*, Defendants argue that "Plaintiffs fail to plead facts showing that Nektar's decision to postpone its presentation [at ESMO] had anything to do with the manufacturing issue." Mot. at 19. On August 8, 2019, however, Defendants conceded that the bad batches (lots 2 and 5) had impacted the lung cancer study results, and they were working at "enrolling additional patients" in the study to start "treatments with [N214] lots that are not lots 2 and 5." ¶¶ 145-46. Robin specifically acknowledged that delays in its clinical collaboration with Bristol-Myers, which would include the delayed small lung cell results, was the result of the manufacturing issue: "we had to delay here because of these manufacturing lots that we recently correlated with clinical data and to that end." *Id*. ¶ 146. There is thus no question that there was a connection between the manufacturing issue and the decision to postpone the lung cancer presentation. Regardless, Defendants' attempts to reinterpret their statements only raise fact questions that cannot be resolved at this juncture.[21]

*Second*, Defendants claim that Plaintiffs have not adequately alleged that Tagliaferri made an "intentionally" false statement or knew with certainty that the lung cancer study would not be presented at ESMO. Mot. at 19-20. In this Circuit, however, scienter is satisfied through allegations that a defendant "acted with . . . deliberate recklessness as to the possibility of misleading investors"—a standard easily met here. *Berson*, 527 F.3d at 987. In particular, Plaintiffs allege that at the same time Tagliaferri was reassuring investors that the N214 lung cancer study was on track for presentation at ESMO, the Company had already discovered issues with the batches used in the studies and, as a result, had put the studies on "pause." ¶¶ 107, 112, 134, 136. FEs also confirm that these issues were being discussed both in meetings across

---

[21] *See, e.g.*, *Berson*, 527 F.3d at 986-87 (rejecting *post hoc* attempt to rewrite phrase in SEC filing because absent "undisputed evidence" that investors would have understood what the phrase meant, the court could not accept defendants' interpretation "as a matter of law"); *Twitter*, 282 F. Supp. 3d at 1139 n.24 (rejecting defendants' alternative interpretation of statement as improper "dispute over the inferences to be drawn"); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (rejecting defendants' attempt to "offer an alternative interpretation of" their statements, which "only demonstrate[d] that a factual dispute exists which cannot be resolved at the pleading stage").

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

departments and by executives at the highest levels of the Company. ¶¶ 109-12, 135-37. Tagliaferri—the Company's top executive in charge of manufacturing—would certainly have been aware of manufacturing issues impacting these studies. Indeed, the N214 studies were "critical to [Nektar's] success. It could be reasonably and strongly inferred that [Nektar's] responsible officers were aware of major discrepancies in" those studies. *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1249-50 (N.D. Cal. 2008). Accordingly, "it would be 'absurd' to suggest that [Tagliaferri] was without knowledge of the matter." *Reese*, 747 F.3d at 576.[22]

Defendants further argue that these well-pled allegations should be discounted because none of the FEs "purports to have had any contact with Tagliaferri." Mot. at 20. However, what matters is not whether the FEs had direct contact with Defendants, but whether they "held positions that exposed them directly to data" that rendered Defendants' statements misleading, which Plaintiffs amply allege and Defendants do not challenge. *Robb v. Fitbit, Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (scienter adequately pleaded based on reports of low-level employees to non-defendant COO despite no allegations that reports were conveyed to six individual defendants); *see also Reese*, 747 F.3d at 571-72 (scienter based on "data to which [defendant] had access").[23]

*Third*, Defendants argue that Tagliaferri's statements are insulated by the PSLRA's safe harbor for forward-looking statements. Mot. at 21. This argument fails. As a threshold matter, Plaintiffs allege that Tagliaferri's statements were misleading because she omitted present facts. As this Court has held, the

---

[22] To the extent Tagliaferri did **no** investigation into N214 trial status before reassuring investors, her statements were *per se* reckless. *See, e.g.*, *S. Ferry II*, 687 F. Supp. 2d at 1260 (when defendant does not have knowledge about the subject, "it would be at least actionably reckless to reassure the public about these matters at all").

[23] *Accord Finisar*, 2017 WL 1549485, at *7 (scienter adequately alleged where plaintiffs pled that "even if [the CEO and chairman] were not directly involved in these negotiations, they were either aware or should have been aware of this materially relevant business information. And if for some reason they were not, . . . as the leaders of the company, both [defendants] had access to it and could have sought it out"); *Berson*, 527 F.3d at 987 (scienter allegations upheld even though "plaintiffs allege no particular facts indicating that [defendants] actually knew about the stop-work orders"). In *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *20 (N.D. Cal. Aug. 7, 2019) (Mot. at 20), by contrast, none of the witnesses were employed at the company when defendants' statements were made, nor were they aware of "any information rendering [their] statements false or misleading."

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

PSLRA safe harbor *does not apply an "omission of present fact*." *Costabile*, 293 F. Supp. 3d at 1013, 1016.[24]

Even if the PSLRA safe harbor did apply (it does not), Tagliaferri's statements are still actionable because "Plaintiff has adequately alleged that Defendants were aware of undisclosed facts tending seriously to undermine the accuracy of" her statements—the serious issues with batches used in the studies and the resulting pause that undermined statements that the N214 lung cancer study would be ready to present in a few months at ESMO. *Zynga*, 2015 WL 1382217, at *6.[25]

Nor was Defendants' purported "cautionary language" adequate. Mot. at 21. Cautionary language is not meaningful where, as here, the risk being warned of *has already transpired*. *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).[26] More specifically, Defendants' caution that *if* manufacturing issues occurred they *could* delay clinical studies was not meaningful in light of their knowledge that manufacturing issues *already existed* and had *already resulted* in the studies being put on pause. Indeed, such "cautionary" language "not only does not cure, but arguably contributes to the alleged misconception." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied. Should the Court deem any portion of the CAC insufficient, Plaintiffs respectfully request leave to amend.

Dated: June 1, 2020

Respectfully submitted,

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

*/s/ Geoffrey C. Jarvis*
GEOFFREY C. JARVIS (*Pro Hac Vice*)
MARK FRANEK (*Pro Hac Vice*)

---

[24] *See also Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1224-25 (C.D. Cal. 2017) (same); *OSI Sys.*, 2015 WL 1985562, at *9 (same); *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) (same).

[25] *See also In re Amylin Pharm, Inc. Sec. Litig.*, 2003 WL 21500525, at *25-26 (S.D. Cal. May 1, 2003) (actual knowledge alleged where defendants were "privy to information . . . which they did not disclose and which seriously undermines any belief Defendants may have had");

[26] *See Zynga*, 2015 WL 1382217, at *6 (defendants' warning "that changes to the Facebook platform could materially adversely impact its business" inadequate where "Plaintiff contends that Defendants knew about the specific content of an impending change to the Facebook platform that would in fact considerably alter the gaming company's accessibility to users on Facebook").

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

FARZANA ISLAM (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA 19087
Tele:    (610) 822-2220
Fax:    (610) 667-7056
gjarvis@ktmc.com
mfranek@ktmc.com
fislam@ktmc.com

-and-

ELI GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)
PENG SHAO (Bar No. 319624)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001
egreenstein@ktmc.com
skaplan@ktmc.com
pshao@ktmc.com

*Counsel for Lead Plaintiff Kanti K. Patel, Individually and as Trustee for the Kanti K Patel Living Trust U/A 3/30/16, and Named Plaintiffs The Tech Trader Fund LP and Henry J. Juske*, *and Lead Counsel for the Class*

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT