Sara B. Brody (SBN 130222)
sbrody@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200

Matthew J. Dolan (SBN 291150)
mdolan@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Telephone: (650) 565-7000

Robin Wechkin (admitted *pro hac vice*)
rwechkin@sidley.com
SIDLEY AUSTIN LLP
1420 Fifth Avenue, Suite 1400
Seattle, WA 98101
Telephone: (415) 439-1799

*Attorneys for Defendants Nektar Therapeutics,
Howard Robin, Gil Labrucherie and Mary
Tagliaferri*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PHILIPPE DAMIBA, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>NEKTAR THERAPEUTICS, HOWARD W. ROBIN, GIL M. LABRUCHERIE, and MARY TAGLIAFERRI,<br><br>    Defendants. | Case No. 4:19-cv-05173-JSW<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS NEKTAR THERAPEUTICS, HOWARD ROBIN, GIL LABRUCHERIE AND MARY TAGLIAFERRI'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Honorable Jeffrey S. White<br>Date:  August 7, 2020<br>Time: 9:00 a.m.<br>Oakland Courthouse, Courtroom 5, 2nd Floor |

## SUMMARY OF ARGUMENT

Plaintiffs' opposition brief confirms the fatal weakness of their claims on both falsity and scienter grounds.

*Scope of collaboration.*  Plaintiffs have significantly clarified the nature of their principal claim:  Plaintiffs explain in their opposition that they do not challenge Nektar's statements about the design and execution of clinical trials under the Company's Strategic Collaboration Agreement (SCA) with Bristol-Myers Squibb.  Plaintiffs' claim thus depends solely on the contention that Nektar and BMS secretly amended the SCA in early 2019 and hid this from investors.  That claim fails because Plaintiffs have not pled the particularized facts necessary to show that any such thing happened.  Plaintiffs' confidential witness accounts – the only support they offer – are not reliable or based on personal knowledge and do not show that any secret agreement was made.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).  In particular, Plaintiffs have failed to allege the facts necessary to plead falsity with respect to a claim that turns on purported omissions about contract formation or terms.  *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994 (N.D. Cal. 2018).

Plaintiffs also fail to plead facts supporting a strong inference of scienter.  Plaintiffs rely largely on generic allegations of access, together with the observation that the BMS collaboration was important to Nektar.  A court in this District very recently dismissed another Section 10(b) case against Nektar based on a substantially similar core operations theory.  *In re Nektar Therapeutics*, 2020 WL 3962004 (N.D. Cal. July 13, 2020).  In addition, the Ninth Circuit has recently held that Section 10(b) plaintiffs cannot establish scienter where – as here – the fraud they allege is not viable on its face.  *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020).

*Delayed lung cancer presentation.*   Plaintiffs claim that Nektar knew in May 2019 that a manufacturing problem would delay a presentation of lung-cancer data planned for September 2019.  This claim fails because Plaintiffs have pled no facts showing a connection between the two issues.  Plaintiffs argue that one of Nektar's own statements reveals such a connection, but that contention depends on a mischaracterization of the statement at issue – and this is fatal.  *In re Ditech Commc'n Corp. Sec. Litig.*, 2006 WL 2319784 (N.D. Cal. Aug. 10, 2006).  Plaintiffs also fail entirely to show that Nektar *knew* in May 2019 that its September 2019 presentation would need to be deferred.

i

## **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................... 1

II.   DISCUSSION ................................................................................................................... 1

    A.    Plaintiffs Fail To Plead Facts Showing That Nektar Made Intentionally False Or Misleading Statements About Its Collaboration With BMS. ................................. 1

        1.    Plaintiffs Concede That Nektar Accurately Reported Its Progress In Designing And Conducting Clinical Trials Under The SCA. ................................. 1

        2.    Plaintiffs' Confidential Witness Allegations Do Not Show That Nektar And BMS Secretly Agreed To Modify The Terms Of The SCA. ................... 3

        3.    Plaintiffs Fail To Plead Facts Showing That The Challenged Statements Were False Or Misleading Even If The Witness Allegations Are Credited. .............. 8

    B.    Plaintiffs Fail To Plead Falsity Or Scienter With Respect To Nektar's Statement That It Planned To Present Data From A Lung Cancer Trial In September 2019. ............ 10

    C.    Plaintiffs' Additional Scienter Allegations Fall Short. ....................................... 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Desisions**

*In re Anchor Gaming Sec. Litig.*,
33 F. Supp. 2d 889 (D. Nev. 1999) ...............................................................................................7

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
2017 WL 8791111 (C.D. Cal. Dec. 21, 2017),
*aff'd*, 782 F. App'x 572 (9th Cir. 2019) ........................................................................................8

*Bao v. SolarCity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .....................................................................................5

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008) .......................................................................................................11

*Colyer v. Acelrx Pharm., Inc.*,
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .............................................................................15

*Costabile v. Natus Med. Inc.*,
293 F. Supp. 3d 994 (N.D. Cal. 2018) ......................................................................................5, 12

*In re Ditech Commc'n Corp. Sec. Litig.*,
2006 WL 2319784 .......................................................................................................................11

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp 3d 580 (N.D. Cal. 2019) ..........................................................................................14

*In re Extreme Networks, Inc. Sec. Litig.*,
2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ..............................................................................6

*Johnson v. Costco Wholesale Corp.*,
2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) ..........................................................................8

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .......................................................................................................6

*McGovney v. Aerohive Networks, Inc.*,
2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ...............................................................................15

*Morgan v. AXT, Inc.*,
2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ..............................................................................8

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ...............................................................................15

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...........................................................................................5, 14

*Omnicare, Inc. v. Laborers' Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).................................................................................................................10

*In re Quality Systems, Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ...................................................................................................6

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ...................................................................................................14

*Robb v. Fitbit, Inc.*,
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ...............................................................................13

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) .....................................................................................13

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)..................................................................................14

*Sgarlata v. Paypal Holdings, Inc.*,
    409 F. Supp. 3d 846 (N.D. Cal. 2019) .........................................................................................5

*In re Silver Wheaton Corp. Sec. Litig.*,
    2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)..............................................................................6

*In re Snap Inc., Sec. Litig.*,
    2018 WL 2972528 (C.D. Cal. June 7, 2018) ...............................................................................11

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
    313 F. Supp. 3d 543 (S.D.N.Y 2018).........................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..............................................................................................3, 6, 7

*In re Zynga, Inc., Sec. Litig.*,
    2015 WL 1382217 (N.D. Cal. Mar. 25, 2015)...........................................................................6, 9

**Statute**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934).............................. *passim*

## I.    INTRODUCTION

Plaintiffs offer an important clarification in their opposition brief:  They do not dispute that Nektar accurately described its work in designing and conducting clinical trials under its Strategic Collaboration Agreement (SCA) with Bristol-Myers Squibb.  Plaintiffs' scope-of-collaboration theory is accordingly very narrow.  It is now based entirely on the premise that Nektar and BMS allegedly entered into a secret agreement to modify the terms of the SCA in early 2019, and then hid that agreement for six months.  Plaintiffs' claim fails, most fundamentally, because Plaintiffs have not pled particularized facts showing that the two companies did any such thing.

Plaintiffs' inability to plead facts supporting a strong inference of scienter also warrants dismissal as to their scope-of-collaboration theory.  The facts relevant to Defendants' purported motivation to commit fraud weigh *against* an inference of scienter.  Meanwhile, Plaintiffs' generic references to "access," "high-level positions" and the like cannot show that Defendants knew about an alleged secret agreement whose existence Plaintiffs have not established in the first place.  The strongest inference arising from the complaint is that when Nektar and BMS made changes to the SCA, Nektar promptly reported that development to the market.

Plaintiffs similarly fail to plead fraud with respect to their attack on Dr. Tagliaferri's forward-looking statement, in May 2019, that Nektar would present data from an ongoing lung cancer trial in September 2019.  Nektar ultimately delayed that presentation, but Plaintiffs have pled no facts showing that Tagliaferri knew there would be a delay when she made the challenged statement.  With respect to both of their theories of fraud, Plaintiffs have failed to carry their substantial pleading burden under the Private Securities Litigation Reform Act.  The Court should dismiss the complaint in its entirety.

## II.    DISCUSSION

### A.    **Plaintiffs Fail To Plead Facts Showing That Nektar Made Intentionally False Or Misleading Statements About Its Collaboration With BMS.**

#### 1.    **Plaintiffs Concede That Nektar Accurately Reported Its Progress In Designing And Conducting Clinical Trials Under The SCA.**

Defendants showed in their opening brief that Nektar provided investors with detailed information about the work it was performing with BMS under the SCA.  Nektar reported that

1

during the purported class period, one clinical trial was underway in each of the four tumor types in the first wave of the BMS collaboration – melanoma, renal cell carcinoma, bladder cancer, and non-small cell lung cancer. Mot. at 3-4. Nektar also reported that it expected soon to begin trials for other indications within those four tumor types. *Id.* As to the remaining five tumor types, Nektar told investors that trials were still at the design stage. *Id.*

Plaintiffs cannot and do not dispute any of this. Instead, they now argue that their claim is unrelated to the status of Nektar's clinical trials and concerns solely "the number of indications that actually are being pursued." Opp. at 7 n.3, 10. This makes very little sense. An "indication," as Plaintiffs recognize, is a specific condition for which a drug may be approved and prescribed. ¶ 8 n.1.[1] As Nektar told investors from the beginning of its collaboration with BMS, the way in which the two companies agreed to "pursue" the indications in the SCA and Joint Development Plan was to design and conduct registrational trials, which if successful could provide the basis for FDA approval. Ex. 4, Item 1.01. On February 28, 2019 and again on May 8, 2019, Nektar provided detailed updates about the two companies' work in pursuing those indications. Mot. at 3-5. Investors knew – because Nektar told them – that Nektar and BMS were further ahead with respect to some indications than others. Investors also knew throughout the class period that with respect to five of the nine tumor types – which includes all indications within those tumor types – the two companies' progress had been limited. On May 8, 2019 investors learned that the two companies' progress in designing and obtaining FDA approval to proceed with trials had been slower than expected – so much so that the companies had agreed to extend certain deadlines in the SCA. *Id.* at 5.

Because Plaintiffs do not dispute that Nektar provided accurate information about the status of its clinical trials, Plaintiffs cannot plausibly claim that Nektar misrepresented the two companies' progress in pursuing the indications specified in the SCA. Plaintiffs' claim thus reduces to the contention that Nektar omitted a single purportedly devastating fact from its public statements – the alleged fact that Nektar and BMS had secretly agreed to depart from the terms of the multi-billion

---

[1] "¶ _" citations in this brief, as in Defendants' opening brief, refer to the paragraphs of Plaintiffs' amended complaint, Dkt. No. 53. "Ex. _" citations refer to exhibits to the declaration Defendants submitted with their opening brief, Dkt. No. 73-2. "Reply Ex. _" citations refer to the exhibit to the concurrently-filed Reply Declaration of Robin Wechkin.

2

dollar SCA. According to Plaintiffs, the two companies entered into this agreement in January-February 2019 and both companies hid it from their investors.

Oddly, Plaintiffs argue that Defendants "do[ ] not and cannot dispute" that Nektar "abandoned" the majority of the indications. Opp. at 2. This is flatly untrue. Defendants' central argument is that Plaintiffs have not shown that the two companies agreed to abandon any indications at the time of the challenged statements. Mot. at 7-13. By its own terms – as Plaintiffs themselves allege – the SCA remained in effect as written unless Nektar and BMS mutually agreed to revise it. ¶ 10. In August 2019, Nektar announced that the two companies were re-evaluating the scope of their collaboration. Ex. 3 at 11. In January 2020 – five months after the close of the purported class period – Nektar announced that the companies had amended the SCA and reduced the number of indications they would pursue. Reply Dec. Ex. A. The agreement Plaintiffs posit was made and reported in early 2020 – not early 2019.

2. **Plaintiffs' Confidential Witness Allegations Do Not Show That Nektar And BMS Secretly Agreed To Modify The Terms Of The SCA.**

In asserting that Nektar and BMS secretly agreed to abandon the majority of contractually-specified indications in early 2019, Plaintiffs rely solely on the purported accounts of FE1, FE2 and FE3. Plaintiffs have not shown, as they must, that these witnesses had personal knowledge of the information attributed to them, nor that their accounts are reliable. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

*FE2 and FE3.* The sum total of information Plaintiffs attribute to FE2 is that this former Nektar employee "recall[ed] being told that indications had been reduced and fewer trials than anticipated would be necessary." ¶ 98. As Defendants have pointed out, FE2 is not alleged to have had any involvement in the development of NKTR-214 after mid-2018, eight months before the beginning of the alleged class period. Mot. at 8. Plaintiffs seek to brush this aside, arguing that FE2 "was a mid-level manager in Compliance." Opp. at 15. This is virtually meaningless: Plaintiffs do not allege what FE2's job entailed, much less show that FE2 was in a position to obtain firsthand information about the BMS collaboration – and that is fatal. Mot. at 9 (citing authorities). Plaintiffs reiterate that FE2 claims to have learned about the purported reduction in indications at either a

3

Department Meeting, a Divisional Meeting or an All-Hands Meeting, Opp. at 15, but this only underscores the vagueness and unreliability of FE2's hearsay account:  FE2 is unable to specify which of these meetings was the source of her information.  And fatally, FE2 provides no clue about *who* told her that "indications had been reduced," or when.  Nor does FE2 say anything about an agreement between the two companies to alter their contractual commitments.

The totality of information Plaintiffs attribute to the concededly peripheral FE3 is that "Nektar's drug supply people stated that vials needed for N214 trials started falling in the spring of 2019."  ¶ 99.  Plaintiffs now claim that this "corroborates FE1's account that after February 2019, Nektar was only pursuing 3-4 indications."  Opp. at 15.  This is difficult to fathom.  A vial is a piece of lab equipment, similar to a test tube but with a flat base.  FE3's single-sentence contribution leaves unclear who is supposed to have provided this equipment in the clinical trials – whether Nektar or the trial sites – which makes the allegation of "falling" vials supplied by Nektar meaningless.  Even if the term "vials" is understood to refer to the drug rather than to equipment, FE3's vague and ambiguous observation about "falling" vials in no way supports Plaintiffs' claim.  There are many reasons for a reduced production of NKTR-214 that have nothing to do with the number of indications being pursued.  In any event, an alleged drop-off in production at a particular time scarcely means that Nektar would *never* need to produce medicine for trials directed at all indications in the SCA – much less that Nektar and BMS had agreed to abandon any indications.

*FE1.*  This leaves FE1, the former BMS employee.  Plaintiffs have pled no facts showing that this witness had personal knowledge of an agreement between Nektar and BMS to abandon tumor types or indications.  FE1 worked to recruit physicians for renal cell carcinoma trials, and Plaintiffs do not dispute that Nektar accurately reported its ongoing trials in this area throughout the class period.  As to indications other than renal cancer, Plaintiffs insist that FE1 "*personally witnessed*" events related to the purported agreement to abandon those indications, Opp. at 11, but the complaint belies that contention.  The central purported fact attributed to FE1 is that during "kickoff calls" in early 2019, "it was discussed that the nineteen indications would be reduced to indications attacking renal cell, prostate and lung cancer."  ¶ 91.  The contention that a subject "was discussed" by others does not show personal knowledge; it shows the absence of personal

4

knowledge. *E.g.*, *Bao v. SolarCity Corp.*, 2016 WL 54133, at \*6 (N.D. Cal. Jan. 5, 2016) (confidential witness who provides information obtained from conversation with company's Director of Corporate Finance does not satisfy *Zucco*'s personal knowledge or reliability requirements); *Sgarlata v. Paypal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019) (information about which CW "was informed" at a meeting is based on hearsay, which undercuts the witness's reliability).

As significantly, even the second-hand facts attributed to FE1 do not support the premise of Plaintiffs' claim – that BMS and Nektar agreed in early 2019 to walk away from their contractual commitments. FE1 says nothing about the SCA and provides no factual information about any agreement between the two companies to modify the contract. Decisions in other Section 10(b) cases turning on the formation or terms of a contract reveal what is missing here. In *Costabile*, for example, the plaintiffs alleged that a critical contract between the defendant company and the Venezuelan government had never been executed. *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1009-11 (N.D. Cal. 2018). Plaintiffs relied on a witness whose personal knowledge was limited to events in the period *after* that in which the contract would have been executed. *Id.* Plaintiffs sought to solve this temporal problem by alleging that the witness had learned the relevant facts about contract formation in the earlier period from other employees. *Id.* This Court rejected the confidential witness allegations in their entirety: Plaintiffs had failed to show that the witness had personal knowledge about contract formation and had likewise failed to plead specific facts showing how the witness came to obtain relevant information about contract formation from other employees. *Id.* The inadequacy of Plaintiffs' FE1 allegations in this case is even clearer than the shortfall in *Costabile*. FE1 supplies no facts at all about a new agreement between Nektar and BMS or the modification of any term in the SCA. FE1 is "resolute" that the two companies agreed to narrow the scope of the SCA in early 2019, ¶ 96, but that is simply a conclusion. Neither FE1 nor Plaintiffs offer a single fact showing how, when or by whom this supposed agreement was made. That is fatal. *See, e.g., Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) (affirming dismissal where "the information attributable" to plaintiffs' confidential witness "lacks any detail" about the facts

purportedly contradicting the company's challenged statements).[2]

On the other side of the ledger is *Silver Wheaton*, in which a confidential witness was alleged to have stated, among other things, that contracts to which a corporate subsidiary was a party were in reality drafted and executed by representatives of the subsidiary's parent. *In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *4 & n.4 (C.D. Cal. Mar. 25, 2019). The witness offering this information was an accountant who had reported directly to senior executives at the subsidiary; based on that description of her duties, the court concluded that it was "reasonable to infer" that the accountant knew about the subsidiary's "financial dealings" and relationship with its parent. *Id.* This underscores by way of contrast what is missing here. FE1 opines on contractual matters – she says the two companies agreed to abandon most of the 20 indications specified in the SCA – but she supplies no facts indicating how or when or by whom this secret agreement is supposed to have been made, let alone facts showing that she was privy to the terms of alleged agreement.[3]

As Defendants showed in their opening brief, lack of personal knowledge is not the only critical defect in FE1's purported account. In multiple ways, FE1's account is incoherent or self-

[2] Plaintiffs argue that Defendants have "insinuate[ed] that a witness must work for the defendant company in order for her allegations to be credited," and contend that the Ninth Circuit rejected any such rule in *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017). Opp. at 13. This is a straw man. The defect in Plaintiffs' FE1 allegations is not that FE1 worked for BMS rather than Nektar; the defect is that Plaintiffs have not shown that FE1 had personal knowledge of the alleged agreement to abandon contractually-specified indications. FE1's reference to purported staffing changes at Nektar, ¶ 93, further illustrates the problem. FE1 provides virtually no information about the changes (other than that "study managers and logistics managers" were involved), and critically does not contend that Nektar *reduced* its staff. Nor does FE1 set forth any basis for her purported knowledge about Nektar staffing. This entirely undermines her opinion that staffing changes made "[n]ineteen indications . . . not possible." *Id.*

[3] Plaintiffs point out, as Defendants noted in the opening brief, that under Ninth Circuit law, hearsay statements from a confidential witness are not "automatically precluded" – though they may reveal the unreliability, implausibility or incoherence of a witness's account. *Zucco*, 552 F.3d at 997 n.4; Mot. at 11. Plaintiffs go on to cite decisions in which witnesses reported that *the defendants themselves* or other comparably high-ranking executives had contradicted the challenged statements. *E.g.*, *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *17 (N.D. Cal. Mar. 21, 2018) (defendant CEO contradicted challenged public statement); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (contractual counterparty's CEO contradicted the defendant company's public statements). These decisions too show what is lacking here. The equivalent in this case would be a witness statement that Nektar's or BMS's CEO told employees that the two companies had agreed to abandon indications. FE1 has not said that; indeed, FE1 has not said that *anyone* at either of the companies referred to an agreement to abandon indications. As to *In re Zynga, Inc., Securities Litigation,* on which Plaintiffs rely heavily, the confidential witness there claimed to have had access to accounting records that contradicted the company's public statements about bookings. 2015 WL 1382217, at *5 (N.D. Cal. Mar. 25, 2015). Plaintiffs again plead no comparable facts here.

contradictory.  FE1 claims that "zero" doctors were interested in the renal cell carcinoma trial for which she was recruiting – notwithstanding the fact that doctors were necessarily participating in the trial, which was undisputedly ongoing during the class period.  Mot. at 10.  FE1 further states that Nektar "did not have conclusive data on all nineteen indications" by January 2019, ignoring the obvious fact that "conclusive data" are the hoped-for outcome of a clinical trial rather than the basis for starting one.  *Id.* at 10-11.  FE1 also offers a garbled account of Nektar's purported objective in going after "big killers," but she neither specifies which cancers come within that category nor refers to any fact suggesting that Nektar or BMS agreed to abandon cancer types that were not "big killers."  *Id.* at 12.

Plaintiffs now invite the Court to view these defects in FE1's purported account as "ancillary issues" or "factual disputes."   Opp. at 12-13 & nn.8, 10.  But under *Zucco*, courts must consider the "coherence and plausibility" of all confidential witness allegations in a complaint, and must assess them "as a whole."  552 F.3d at 995-1000.  Plaintiffs chose to include multiple purported statements by FE1 that undermine the reliability and coherence of her account.  They cannot now claim that the obvious defects in these allegations "have nothing to do with" the use they seek to make of FE1.[4]

***Plaintiffs' "corroboration" argument.***  Plaintiffs finally argue that FE1's account was "effectively corroborated" by Nektar's August 8, 2019 announcement.  Opp. at 12.  This is untrue. Nektar announced in August 2019 that the two companies were re-evaluating the scope of their collaboration – not that they had agreed to abandon any indications covered by the SCA.  Mot. at 6. Critically, moreover, even if Nektar *had* announced an "abandonment" in August 2019, this would not corroborate FE1's charge that such abandonment occurred in January or February 2019.  Courts have long rejected the notion that a company's announcement of unfavorable news on a given date supports the inference that the event or condition at issue also existed earlier, at the time of the challenged statements.  *E.g., In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 894 (D. Nev. 1999) (plaintiffs do not allege fraud by positing that "later, sobering revelations make the earlier,

___

[4] Emphasizing the self-servingly selective approach they advocate, Plaintiffs ask the Court to disregard FE1's self-contradictory statements about recruitment into the renal cell carcinoma trials – the one subject about which this witness *does* have personal knowledge – and to consider only her statements about a purported agreement to abandon trials for other indications – a subject about which she offers no firsthand knowledge.  Opp. at 13 n.10.

cheerier statements a falsehood") (internal quotation marks and citation omitted); *Morgan v. AXT, Inc.*, 2005 WL 2347125, at *14 (N.D. Cal. Sept. 23, 2005) (same); *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *18 (W.D. Wash. Nov. 26, 2019) ("A plaintiff cannot simply seize upon disclosures made in later reports and allege that they should have been made in earlier ones") (quotation marks, brackets and ellipses omitted).

Plaintiffs seek to minimize the issue of timing, arguing that Defendants have merely introduced a "factual dispute" about the "precise date" of the alleged agreement to abandon contractually-specified indications. Opp. at 2, 13. Plaintiffs are missing the point. It is their burden to plead particularized facts – which they seek to do solely through their confidential witnesses – showing that Nektar and BMS made the purported agreement *before* Defendants made the challenged statements. Timing is critical here, as in many Section 10(b) cases. Unless Section 10(b) plaintiffs can plead with particularity that the event at issue had already occurred at the time of the challenged statements, they have not pled fraud. *E.g., In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 8791111, at *5 (C.D. Cal. Dec. 21, 2017) (dismissing Section 10(b) claim because confidential witness's account did not show with the requisite particularity that the event at issue – deaths in a drug trial – had occurred before the challenged statements), *aff'd*, 782 F. App'x 572 (9th Cir. 2019). Because Plaintiffs' confidential witness allegations do not establish with the required particularity that Nektar and BMS made the purported agreement in early 2019, Plaintiffs' scope-of-collaboration theory fails in its entirety, and the Court need go no further in adjudicating this claim.

3. **Plaintiffs Fail To Plead Facts Showing That The Challenged Statements Were False Or Misleading Even If The Witness Allegations Are Credited.**

*Statements about execution under the SCA.* Even if Plaintiffs' confidential witness allegations were creditable, Plaintiffs would not have shown that the challenged statements were false or misleading. Plaintiffs argue, first, that they have sufficiently pled falsity with respect to Nektar's statements that it was progressing or executing on the Joint Development Plan under the SCA. Opp. at 6-7; ¶¶ 124, 125, 131. At the same time, however, Plaintiffs now say that they are *not* questioning the accuracy of Nektar's statements about the status of the clinical trials that are the subject of the Joint Development Plan and the SCA. Opp. at 7 n.3, 10. Indeed, Plaintiffs argue that

8

Defendants' discussion of statements about the status of clinical trials is an "attempt to distract" attention from Plaintiffs' real claim. *Id.* This is baffling. Clinical trials are inseparable from the SCA and Joint Development Plan, which are agreements between Nektar and BMS to collaborate on the design and execution of the clinical trials necessary for FDA approval. Ex. 4, Item 1.01. Because Plaintiffs no longer contend that Nektar's statements about the status of its clinical trials were false or misleading, it is difficult to see what is left of Plaintiffs' claim that Nektar deceived investors about its execution under the SCA.[5]

Plaintiffs' challenge fails for other reasons as well. Plaintiffs choose not to address the law holding that broadly optimistic statements are inactionable, which disposes of Plaintiffs' attack on Nektar's statement that it was making "tremendous progress" on the BMS collaboration. ¶ 125; Mot. at 15 (citing authorities); *Zynga*, 2015 WL 1382217, at *5. Plaintiffs also have little to say about the fact that Nektar did not – as they suggested in the complaint – tell investors that it was "on track" to complete all work specified in the SCA or Joint Development Plan. In a footnote, Plaintiffs cite two *analysts* who used the term "on track," Opp. at 9 n.6, but Defendants are not responsible for the analysts' statements – which Plaintiffs in any event do not mention in the complaint.

*Statements about the four-month extension.* On May 8, 2019, Nektar reported that the two companies had not progressed with their collaboration as quickly as originally expected, and that certain deadlines in the SCA were therefore being extended by four months. Mot. at 5. Although this announcement reflects Nektar's transparency as to events in the BMS collaboration, Plaintiffs claim that the statements disclosing the delay were themselves false or misleading. Opp. at 9-10. Plaintiffs focus on Dr. Tagliaferri's statement that "I think what we realized is that we need a few more extra months to file all those INDs, design the studies, and get the first patient in." ¶ 132. Plaintiffs also target Howard Robin's statement that "I think an extension of 4 months is something

---

[5] Plaintiffs complain that Defendants have improperly isolated the statement in Nektar's February 28, 2019 Form 8-K that "[w]e continue to design and execute on our broad registrational program." ¶ 124. Plaintiffs say that this statement can be analyzed only in connection with a reference in the same Form 8-K to the terms of the SCA; according to Plaintiffs, "Defendants' attempt to parse the statements into separate segments is improper." Opp. at 7. But the statement about execution and the reference to contract terms are not "segments" of a single statement. They are different statements, separated by two pages of text in the Form 8-K. Ex. 5 at 5-6 (ECF pagination). In any event, Plaintiffs have not shown that the reference to contract terms was false or misleading either, *infra* at 10, nor that the two statements are misleading taken together rather than separately.

9

that we think is perfectly reasonable . . . I think we're moving forward rapidly." ¶ 134.

Both challenged statements are plainly matters of opinion. Indeed, the statements are double-level opinions – "I *think* what we *realized*"; "I *think* an extension . . . is something that we *think* is perfectly reasonable." Tagliaferri's statement is a double-level opinion about a projection ("we need a few more extra months"). Defendants pointed out in their opening brief that Plaintiffs have not met the requirements for challenging opinion statements – particularized facts showing either that Robin and Tagliaferri did not subjectively believe their opinions or that they omitted specific material facts about the bases of their opinions that differ from what investors would have expected. *Omnicare, Inc. v. Laborers' Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); Mot. at 18 n.8. Plaintiffs have not cured that defect in their opposition; they do not even mention *Omnicare* or the requirements for challenging opinion statements.

***Statements characterizing the SCA and Joint Development Plan.*** Finally, Plaintiffs challenge statements in which Defendants characterized or reiterated the key terms of the SCA or Joint Development Plan. ¶ 124 (SCA covers "more than 20 indications in 9 tumor types"); ¶ 125 (Joint Development Plan "includes about 20 registrational trials across multiple tumor types"); ¶ 126 (reference to "broad registrational development plan"); ¶ 130 (same); ¶ 131 (same). As Defendants have discussed, such objective descriptions of contract terms are not actionable. Mot. at 14.

Plaintiffs argue otherwise: They claim that the statements were misleading by way of omission because Nektar and BMS had purportedly agreed to abandon their contractual obligations but hid that secret agreement from investors. Opp. at 7-9. As discussed, Plaintiffs' inability to plead with particularity how, when or by whom this purported agreement was made fatally undermines their claims – even if all three former employees' accounts are credited. Mot. at 18.

B.    **Plaintiffs Fail To Plead Falsity Or Scienter With Respect To Nektar's Statement That It Planned To Present Data From A Lung Cancer Trial In September 2019.**

During Nektar's May 8, 2019 earnings call, Tagliaferri reminded investors that the Company had previously announced its plans to present data from a lung cancer trial at a September 2019 conference. Mot. at 18-19. Plaintiffs claim that this statement was misleading based on the manufacturing issue Nektar discussed during its August 8, 2019 earnings call. According to

10

Plaintiffs, Nektar admitted in the August 2019 call that the manufacturing issue had caused the Company to delay presentation of lung cancer data, and Tagliaferri wrongly omitted that information during the May 2019 call. ¶¶ 139, 146.

As Defendants showed in their opening brief, this claim fails in the first instance because Plaintiffs have not shown that the manufacturing issue had any impact on the timing of or data collection in the lung cancer trial. Mot. at 19. The transcript of Nektar's August 8, 2019 earnings call on which Plaintiffs' allegations of falsity are based shows that Robin advised investors that the manufacturing issue would delay decisions about which *future* trials Nektar and BMS would undertake – not that it had delayed or would delay the course of the *existing* lung cancer trial. *Id.* (citing Ex. 3 at 11); ¶ 146. A second executive explained that the delay in presenting lung cancer data was the result of slow enrollment in the trial – not the manufacturing issue. Mot. at 19.

In response, Plaintiffs double down on the allegations in their complaint, insisting that the manufacturing issue and the delay of the lung cancer data were linked. Opp. at 23. But the only basis Plaintiffs cite for that purported link is Robin's August 8, 2019 statement – and the transcript plainly belies their allegation about that statement. Ex. 3 at 11. Unable to argue away the text of the transcript, Plaintiffs now say that Defendants are seeking to "reinterpret their statements," and that this "only raise[s] fact questions that cannot be resolved at this juncture." Opp. at 23.

This is plainly wrong. Ascertaining the content of a statement referred to or paraphrased in a complaint does not introduce a factual dispute. Courts routinely assess motions to dismiss in Section 10(b) cases by carefully examining what defendants said, and they dismiss where plaintiffs' claims depend on a characterization of defendants' statements at odds with the text. *E.g., In re Ditech Commc'n Corp. Sec. Litig.*, 2006 WL 2319784, at *2 & *6 n.2 (N.D. Cal. Aug. 10, 2006) (rejecting plaintiffs' contention that statement made during an earnings call reveals falsity; transcript of call shows that plaintiffs mischaracterized the context and meaning of the statement); *In re Stemline Therapeutics, Inc. Sec. Litig.,* 313 F. Supp. 3d 543, 549 (S.D.N.Y 2018) (dismissing where claim depends on a "complete mischaracterization" of defendant's statement).[6] Because the transcript – on

---

[6] Plaintiffs' authorities are not contrary: In those decisions, courts declined to adopt defendants' interpretation of ambiguous terms. *E.g., Berson v. Applied Signal Tech.*, 527 F.3d 982, 986-87 (9th Cir. 2008); *In re Snap Inc., Sec. Litig.*, 2018 WL 2972528 (C.D. Cal. June 7, 2018). There are no

which Plaintiffs exclusively rely – does not show that Nektar's delay in presenting lung cancer data had anything to do with the manufacturing issue, Plaintiffs have failed to show that Tagliaferri's May 2019 reference to the presentation of lung cancer data was misleading by omission.

Defendants also showed in the opening brief that Plaintiffs have alleged no facts showing that Tagliaferri knew in May 2019 that the manufacturing issue would (purportedly) delay the presentation of lung cancer data. Mot. at 19-20. In response, Plaintiffs point to the account of FE5, who is reported to have said that the manufacturing issue led to "a pause." Opp. at 23; ¶ 112. This does not show scienter. Neither FE5 nor Plaintiffs provide any further information about this "pause" – nothing showing that Nektar halted its ongoing lung cancer trials or stopped providing treatment to lung cancer patients, and certainly nothing showing that Tagliaferri knew in May 2019 that the effect of the unspecified "pause" would be to delay the September presentation.

Plaintiffs finally argue that they need show only that Tagliaferri was reckless in referring to the September 2019 presentation; they then contend they have shown recklessness insofar as the manufacturing issue was discussed at the executive level and Tagliaferri, as Nektar's "Chief Manufacturing Officer," would have known of the issue and its impact. Opp. at 17, 24. Plaintiffs are wrong about the scienter standard for forward-looking statements, which is not recklessness but actual knowledge. Mot. at 20-21 (discussing PSLRA's actual knowledge safe harbor).[7] Even as to recklessness, moreover, Plaintiffs fail to plead facts supporting the required strong inference. Their contention that Tagliaferri was Nektar's "Chief Manufacturing Officer" is frivolous: She was the Company's Chief Medical Officer. Meanwhile, Plaintiffs' confidential witnesses do not claim even that *they* knew in May 2019 that the September 2019 presentation would be delayed, let alone that

such ambiguities in the August 8, 2019 transcript. Robin quite simply did not link the manufacturing issue with the delay in presenting lung cancer results, and this belies Plaintiffs' characterization.

[7] Citing this Court's decision in *Costabile*, Plaintiffs argue that the safe harbor is inapplicable here because they have alleged the omission of a presently-existing fact. Opp. at 24-25. But the situation in *Costabile* was very different. The omitted presently-existing fact there was a contract term, and the contract term had an obvious connection with the company's projection. The company said that it expected payment under the contract by year-end; the omitted contract term showed that the customer had already defaulted on its payment obligation, which largely undermined the company's purported expectation. 293 F. Supp. 3d at 1013. Plaintiffs here allege no comparable presently-existing fact. They have not shown that allegedly omitted information about the manufacturing issue had any impact on the timing of the September 2019 presentation – much less that Tagliaferri (or anyone else at Nektar) could have predicted any purported impact in May 2019.

12

Tagliaferri, with whom they never interacted, knew any such thing.[8]  Plaintiffs' attack on Tagliaferri's forward-looking statement about the September 2019 conference fails in all respects.

C.    **Plaintiffs' Additional Scienter Allegations Fall Short.**

Defendants showed in their opening brief that Plaintiffs' standalone scienter allegations are almost entirely generic, and are as notable for what they lack as for what they include.  In their opposition, Plaintiffs invoke several additional and equally generic concepts.  None of this adds up to a strong inference that Defendants intentionally defrauded investors.[9]

*Motive and incentive compensation.*  The conspicuous absence of insider selling allegations, as Defendants have discussed, weighs *against* an inference of scienter.  Mot. at 21.  Plaintiffs argue in response that scienter can in some cases be established without insider selling.  Opp. at 21 n.17.  Plaintiffs are again missing the point.  Under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), courts must weigh competing inferences, and the absence of insider selling tips the balance against scienter.  Mot. at 21 (citing authority).

Plaintiffs' other motive-related allegations equally fail to support a strong inference of intentional wrongdoing.  Plaintiffs invoke incentive compensation, but do not address the authorities discounting this factor because it is ubiquitous – save to argue that in those cases, the incentive compensation terms were purportedly unrelated to the challenged statements.  Opp. at 22 n.19.  But that is also the case here.  Plaintiffs rely on Nektar's 2019 compensation program, which ties incentive compensation to milestones in the clinical testing and the FDA approval processes.  *Id.* at 21 n.18.  Those milestones are irrelevant to Plaintiffs' fraud claim:  Plaintiffs have now clarified that they are *not* challenging statements related to the status of Nektar's clinical trials.  *Supra* at 2.

Finally, Plaintiffs suggest that Defendants were motivated to deceive investors because

---

[8] Plaintiffs argue that they need not show that their witnesses interacted with Tagliaferri (or Robin), citing *Robb v. Fitbit, Inc.*, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017), and *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016).  Opp. at 17 n.13, 24.  But the witnesses in *Fitbit* were alleged to have given specifically-identified reports to the company's COO, who in turn reported to the CEO.  Plaintiffs do not allege any comparable information flow or reporting structure here.  Nor do they address the many decisions in which courts have discounted confidential witness allegations in the scienter analysis because the witnesses had no contact with the defendants.  Mot. at 12 n.6.

[9] In discussing these standalone factors in their opposition brief, Plaintiffs address only their scope-of-collaboration theory – not their delayed presentation theory.  Opp. at 15-22.  We follow suit here.

13

Nektar had suffered setbacks in the past. Opp. at 21. But all public companies suffer setbacks at some point; this can scarcely be a sufficient basis to infer fraud in subsequent periods. Under recent authority, moreover, Section 10(b) plaintiffs cannot establish a strong inference of scienter for a purported fraud that is not viable on its face. In *Endologix*, the Ninth Circuit rejected the claim that a company made deliberately false or misleading statements about the likelihood of FDA approval for one of its products: Because the market would learn in due course whether or not the product had been approved, the plaintiffs' theory "d[id] not make a whole lot of sense." 962 F.3d at 415. In the absence of stock sales or other indicia of short-term financial benefit, the Ninth Circuit rejected "the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the problem] was revealed." *Id.* That logic applies equally here. If indeed Nektar and BMS had secretly agreed to modify the SCA in early 2019, it would have been only a matter of time before this purported truth came out. Because Plaintiffs' motive allegations "d[o] not resonate in common experience," *id.*, they cannot support a strong inference of fraud.

*Access and position.* Plaintiffs argue that because Defendants spoke publicly about the number of indications Nektar and BMS would pursue, they must have had "access" to information revealing "the true state of play." Opp. at 20. As discussed, courts routinely reject generic "access" allegations unsupported by references to specific documents or discussions. Mot. at 23 (citing authorities).[10] More fundamentally, Plaintiffs have not shown that the "true state of play" in early 2019 encompassed an agreement between Nektar and BMS to abandon contractually-specified indications. Plaintiffs point to FE2's vague recollection of "being told that indications had been reduced" in support of their access argument, Opp. at 16 & ¶ 98, but this does not come close to showing that Nektar and BMS agreed in early 2019 to alter the terms of the SCA.

*Core operations theory.* Plaintiffs finally argue that it would be "absurd" to suggest

---

[10] Plaintiffs' authorities do not hold otherwise. In those cases, the defendants' own public statements signified their access to the specific information at issue. *E.g., Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) (corporate officer could not disavow access to data related to oil pipeline corrosion when she specifically addressed those very data in her public statements); *Evanston Police Pension Fund v. McKesson Corp.,* 411 F. Supp 3d 580, 602 (N.D. Cal. 2019) (defendant executives publicly "claimed that they were 'extremely intimate globally'" with area in which third-party wrongdoing purportedly occurred); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (CEO publicly "represented that he had access to the information that underpinned his sunny announcements about WaMu's risk-management capabilities").

14

Defendants would not have known of an agreement to abandon indications. Opp. at 17-19. Here again, Plaintiffs miss the mark. Nektar's executives doubtless would have known if the multi-billion dollar SCA contract had been amended in early 2019. But Plaintiffs have not shown that this occurred, and the core operations inference therefore does not apply. *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at \*22 (N.D. Cal. Aug. 7, 2019) ("the Court cannot find it would be 'absurd' to assume the Individual Defendants did not know their statements are false and misleading because their statements are not in fact false or misleading"); *Colyer v. Acelrx Pharm., Inc.*, 2015 WL 7566809, at \*13 (N.D. Cal. Nov. 25, 2015) (circumstances in which core operations theory applies "require management to have, at a minimum, made false or misleading statements").

In a related vein, Plaintiffs argue that the importance of the BMS collaboration to Nektar supports a strong inference of scienter. Opp. at 18-20. But as another court in this District recently explained in dismissing a different Section 10(b) action against Nektar, "simply alleging that the partnership with BMS was crucial does not give rise to a strong inference of scienter." *In re Nektar Therapeutics*, 2020 WL 3962004, at \*13 (N.D. Cal. July 13, 2020). Even under Plaintiffs' authorities, moreover, the importance of a product or an issue at most supports an inference that a company's executives would know certain key facts about it – not that they would intentionally deceive the market about it. Once again, Plaintiffs have not established that Defendants knew about a secret agreement between Nektar and BMS in early 2019 because they have not shown that the two companies entered into any such agreement.

As a holistic matter, the strongest and most plausible inference arising from the complaint is that when BMS and Nektar made or contemplated changes to the SCA, Nektar promptly informed the market. In May 2019, Nektar reported that the two companies were extending certain deadlines under the SCA; in August 2019, Nektar reported that the companies were re-evaluating the number of indications they would pursue; in January 2020, Nektar reported that the SCA had been amended. ¶¶ 133, 142, Reply Ex. A. Throughout this period, Nektar also advised investors of risks inherent in both drug development and collaboration. Mot. at 25. None of this supports a strong inference that Defendants decided to conceal a secret agreement with BMS. These uncontested facts support an opposing inference of good faith. The Court should dismiss Plaintiffs' complaint in its entirety.

Date:  July 16, 2020                          SIDLEY AUSTIN LLP

                                              By:*/S/ Sara B. Brody*
                                                 SARA B. BRODY (SBN 130222)

                                              *Attorneys for Defendants*

16