UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PHILIPPE DAMIBA,

Plaintiff,

v.

NEKTAR THERAPEUTICS, et al.,

Defendants.

Case No. 4:19-cv-05173-JSW

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Re: Dkt. No. 73

Now before the Court is defendants' motion to dismiss the amended class action complaint ("CAC"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the motion suitable for disposition without oral argument. See N.D. Civ. L.R. 7-1(b). The Court GRANTS defendants' motions to dismiss.

**BACKGROUND**

Lead Plaintiff Kanti Patel brings this federal securities class action against Nektar Therapeutics ("Nektar"); Nektar's Chief Executive Officer ("CEO"), Howard W. Robin; Senior Vice President and Chief Financial Officer ("CFO"), Gil M. Labrucherie; and Vice President of Clinical Development and Chief Medical Officer ("CMO"), Mary Tagliaferri (collectively, "Defendants"). Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, as well as Section 20(a) against the individual defendants, on behalf of persons and entities that purchased Nektar common stock between February 28, 2019 and August 8, 2019 (the "Class Period").

The CAC alleges the following facts. Nektar is a San Francisco-based biopharmaceutical company that focuses on developing new medicines. (CAC ¶ 2.) Nektar's "flagship" product is a



United States District Court
Northern District of California

drug called NKTR-214 ("N214"), which promises to stimulate the body's own immune system to fight cancer. (*Id.* ¶ 1.) In February 2018, Nektar entered into a collaboration agreement with Bristol-Myers Squibb ("Bristol-Myers")—a much-larger global biopharmaceutical company that owns potentially complementary drugs—to develop and bring N214 to market. (*Id.* ¶¶ 2-3, 63.) The collaboration agreement was the largest single-drug deal in biotech history. (*Id.* ¶ 4.) Bristol-Myers invested $1.85 billion in Nektar and promised to provide $1.78 billion more as incentive payments, contingent on reaching developmental and sales goals. (*Id.* ¶ 5.)

The agreement with Bristol-Myers provided for a "broad joint clinical development plan" to conduct trials of N214 combined with Bristol-Myers' drugs "for over 20 indications in 9 tumor types." (*Id.* ¶ 8.) An "indication" is a medical sign or condition that leads to the recommendation of a treatment. (*Id.* ¶ 8 n.1.) Thus, the collaboration agreement aimed to obtain FDA registration for treating a large number of conditions. (*See id.* ¶ 17.) However, by January 2019, Nektar did not have conclusive data for all of the contemplated indications.[1] (*Id.* ¶ 91.) Instead, a former Bristol-Myers employee who attended calls with Nektar executives claims that "it was very, very clear" that the companies would only pursue three indications—for renal cell, prostate, and lung cancers. (*Id.* ¶¶ 91-92.) A former Nektar employee confirms that she heard that the number of indications was reduced through an official announcement. (*Id.* ¶ 98.)

Nevertheless, Nektar executives continued to tout the broad collaboration agreement involving "twenty indications across nine tumor types." (*Id.* ¶¶ 83, 124.) In February 2019, Nektar executives affirmed that the Company was making "tremendous progress" on the Bristol-Myers development plan and that it continues to "design and execute" on it. (*Id.* ¶¶ 124-26.) In May 2019, Nektar executives further affirmed that it was continuing to plan and execute trials for multiple indications, notwithstanding delays arising from "fil[ing] all those INDs." (*Id.* ¶¶ 130-34.) Furthermore, Nektar's CMO stated that Nektar would present data from a lung cancer study at a conference in September. (*Id.* ¶ 138.)

---

[1] Plaintiff does not allege that Nektar faced deadlines for conducting the trials. Nevertheless, the parties apparently had "target dates" for certain trials and aimed to submit Investigational New Drug applications to the FDA in early June 2019. (*Id.* ¶ 103.) Plaintiff does not allege that failure to meet these deadlines would affect Nektar's ultimate incentive payments.



United States District Court
Northern District of California

In August 2019, however, Nektar announced the Company had only four active indications running and would focus on only 5 or 6 key indications going forward. (*Id.* ¶116.) As shown by the transcript of the call, which is properly subject to judicial notice, *see infra*, Defendants stated that Bristol-Myers is "highly committed to the ongoing registration trials in" three cancers and to one expansion cohort for a fourth cancer. (Dkt. No. 63-5 ("Aug. 8, 2019 Call Tr.") at 10.) The trials for the remaining indications "are under discussion and being planned." (*Id.*) However, the Company and Bristol-Myers planned "to focus on 5 or 6 key registrational trials," while other indications Nektar "may do in partnership with other collaborators." (*Id.*) In other words, the scope of the collaboration agreement had been reduced. Nektar also disclosed a manufacturing issue that caused it to withdraw its lung cancer presentation from the September conference. (CAC ¶ 120.) Nektar's stock dropped by 30% as the result. (*Id.* ¶ 122.)

The Court shall address additional facts as necessary in the analysis.

**ANALYSIS**

**A. Legal Standard.**

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal under Rule 12(b)(6) is granted when the pleadings fail to state a claim upon which relief can be granted. Pursuant to *Bell Atlantic v. Twombly*, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

Where a plaintiff alleges fraud, Rule 9(b) requires the plaintiff to state the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b). Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. *See Kearns v. v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Rule 9(b) "has long been applied to securities complaints." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th

Cir. 2009). However, for claims under Section 10(b) and Rule 10b-5, the complaint must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id.* The PSLRA requires that "a complaint 'plead with particularity both falsity and scienter.'" *Id.* (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002)).

Under the PSLRA, a plaintiff pleading falsity must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A statement is misleading if "it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted). Even if a statement is not false, it may be misleading if it omits material information. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir 2018). "[A]n omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). But omissions are actionable only where they "make the actual statements misleading," not when they simply fail to disclose information investors consider significant. *Markette v. XOMA Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017).

In order to adequately plead scienter, the PSLRA requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u-4(b)(2)). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). In the Ninth Circuit, scienter includes both intentional and deliberately reckless conduct. *Zucco*, 552 F.3d at 991. Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but



United States District Court
Northern District of California

nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)). An inference of scienter is only "strong" for purposes of dismissal if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

To assist the Court in determining whether a plaintiff has satisfied this heightened pleading standard, "the Supreme Court has provided three points of instruction: (1) 'courts must, as with any [12(b)(6)] motion to dismiss . . ., accept all factual allegations in the complaint as true'; (2) 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss'; and (3) 'in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inference.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citing *Tellabs*, 551 U.S. at 322-23).

**B. Request for Judicial Notice.**

Defendants seek judicial notice of transcripts of Nektar's earnings calls on which Plaintiff claims they made false or misleading statements. (Dkt. No. 74.) These documents are subject to incorporation by reference because Plaintiff cites them extensively and they form the basis of the securities fraud claims. *See Khoja*, 899 F.3d at 1003 (finding incorporation by reference proper where plaintiff "refers extensively to the document" or "the document forms the basis of plaintiff's claim"). Defendants also seek judicial notice of certain SEC filings to demonstrate Nektar's cautionary statements and statements about the collaboration agreement. These statements are properly judicially noticed because Plaintiff does not dispute their implications and they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Plaintiff does not oppose Defendants' request. Accordingly, the Court grants Defendants' request.

**C. Plaintiff Has Not Alleged Securities Fraud With Particularity.**

Plaintiff alleges two theories of fraud. First, Plaintiff claims that Defendants made false

and misleading statements in February and May 2019 because they touted the "broad" Bristol-Myers collaboration agreement involving "twenty indications" in "nine tumor types" even though the number of indications had already been reduced to five or six. As part of this theory, Plaintiff challenges statements that Nektar "continues to execute" on the agreement and that delays in May 2019 were due to the scope of the agreement. Second, Plaintiff claims that the forward-looking statement that Nektar would present results from a lung cancer study at a September conference was false or misleading because Defendants knew that the manufacturing issue would prevent them from making the presentation.

Defendants seek to dismiss Plaintiff's claims on that grounds that Plaintiff fails to plead facts that demonstrate a materially false or misleading statement or that Defendants acted with scienter. The Court addresses each theory of fraud.

### 1. Scope of the Collaboration Agreement

#### a. Material Misrepresentation or Omission

Plaintiff claims that Defendants' statements were false or misleading because they created the impression that Bristol-Myers and Nektar were moving forward on a broad collaboration plan involving trials for twenty indications when, in reality, the scope of the agreement had been reduced to only five or six indications by February 2019. Assuming, *arguendo*, that Plaintiff has adequately alleged this theory, the complaint states a claim for securities fraud. *See Schueneman v. Arena Pharma., Inc.*, 840 F.3d 698, 705-07 (9th Cir. 2016) (where defendants choose to tout positive information, they are obligated to disclose adverse information that cuts against it); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142-43 (9th Cir. 2017) (statements that everything is "going fine" and anticipating "a continuation of . . . accelerated expansion" are misleading when expansion is already failing); *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (statements touting value of backlog are misleading when stop-work orders indicate that backlogged orders would be cancelled).

The question, then, is whether Plaintiff alleges enough facts to draw a reasonable inference that Nektar and Bristol-Myers actually reduced the number of indications under the agreement by February 2019. On balance, Plaintiff has not. Plaintiff's allegations regarding the reduced scope

of the agreement rests entirely on statements by three confidential witnesses. Under the PSLRA, confidential witnesses must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)). Moreover, the "statements which are reported by the confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative" of falsity and scienter. *Id.* (quoting *Zucco*, 552 F.3d at 995).

Here, the confidential witnesses fail one or both of these requirements. Starting with FE1, Plaintiff adequately describes the witness's source of knowledge: FE1 is a former Bristol-Myers employee who worked on one of Nektar-Bristol-Myers collaboration studies and attended weekly partnership calls with both Nektar and Bristol-Myers representatives.[2] (CAC ¶¶ 87-88.) FE1 claims that the weekly partnership calls were attended by Nektar's VP of Operations and Senior Scientific VP, who were high-level executives at Nektar. (*Id.* ¶ 88.) However, at the exact point of alleging that the parties agreed to reduce the number of indications, FE1's claims grow vague.

FE1 alleges that "[b]eginning with kickoff calls involving Nektar and Bristol-Myers representatives in February 2019, *it was discussed* that the nineteen indications would be reduced" to three. (*Id.* ¶ 91 (emphasis added).) FE1 does not identify *who* discussed reducing the indications or whether the discussions amounted to a commitment or mere contingency planning that did not become firm until later. Moreover, FE1's allegations appear to be inconsistent with the eventual outcome: FE1 claims that the number of indications was reduced to three, but Nektar ultimately disclosed that it was pursuing "five or six" indications with Bristol-Myers. (*Id.* ¶ 116.) This inconsistency suggests that the "discussions" witnessed by FE1 amounted to less than a commitment to reduce the number of indications under the agreement.

[2] Plaintiff's allegations regarding FE1 are not entirely clear. As an initial matter, Plaintiff refers to FE1 with both male and female pronouns, which, while not critical, raises questions about whether they are the same person. (*See* CAC ¶¶ 87, 92.) Furthermore, the allegations of "kickoff calls" that discussed reducing the number of indications are ambiguous because the complaint alleges multiple meeting types, including weekly "partnership calls" and individual teams for each active indication, broken down by country and global teams. (*Id.* ¶¶ 88, 90.) Plaintiff fails to clarify which team or call-type the "kickoff calls" refer to, which may significantly affect the speakers' personal knowledge.

FE1's remaining allegations are similarly vague. FE1 claims that it was "very, very clear" that Nektar and Bristol-Myers would only pursue three indications. (*Id.* ¶ 92.) But FE1 fails to identify any specific facts to make that clear, particularly since that is not the outcome the parties ultimately reached. FE1 also describes reasons why reducing the number of indications would be desirable, some of which were allegedly discussed by Nektar's representatives, but this again fails to distinguish an actual commitment to reduce indications from mere exploratory or contingency discussions. (*Id.* ¶¶ 93-95.) FE1 then claims that from a test point of view, only three indications were being pursued. (*Id.* ¶¶ 91, 96.) That does not demonstrate falsity because Plaintiff does not allege that additional indications could not be pursued later.[3] Last, Plaintiff alleges that FE1 was "resolute" that Nektar and Bristol-Myers had agreed by February 2019 to reduce the number of indications. (*Id.* ¶ 96.) Absent factual allegations, this conclusory statement is not sufficient.

Turning to FE2, the sum total of Plaintiff's allegations is that FE2, a mid-level compliance manager who left Nektar in Q1 2019, "recall[ed] being told that indications had been reduced" during an "official announcement" at one of three possible meetings. (*Id.* ¶ 98.) These allegations are so vague as to be unhelpful. Plaintiff explains neither how FE2's position as a compliance manager gave FE2 personal knowledge of the agreement nor how FE2 statements are reliable in light of the departure date in Q1 2019.[4] Last, in connection with FE3, Plaintiff alleges that FE3 had a "peripheral role" in the N214 program, but that Nektar's "drug supply people" needed fewer vials beginning in spring 2019. (*Id.* ¶ 99.) Demand for vials cannot reasonably show that the number of indications was reduced both because it does not indicate intent (as opposed to outcome) or that the trials the parties intended to pursue later were reduced.

---

[3] Judicially noticed documents show that Nektar pursued the trials in "waves," with the three indications being part of the first wave, while others were planned for the second wave. FE1's questions to her supervisors about testing for the other indications may have thus simply been premature. (*Id.* ¶ 96.) Plaintiff fails to allege a sufficient link between lack of testing data for indications in the present and the decision not to pursue those indications in the future.

[4] Defendants interpret Plaintiff's allegations to mean that FE2 left Nektar in mid-2018, only a few months after Nektar and Bristol-Myers entered the agreement in February 2018. It seems unlikely that the parties would have reduced the number of indication mere months after agreeing to it. Moreover, as Defendants point out, the allegations related to FE1 and FE2 are hearsay, which, while it does not "automatically disqualify" the statements, underscores their lack of reliability. *See Zucco*, 552 F.3d at 997 & n.4.

Accordingly, Plaintiff fails to allege fraud with particularity because the allegations do not create a reasonable inference that Defendants actually amended their collaboration agreement with Bristol-Myers to pursue fewer than twenty indications. At most, the allegations suggest that some employees at both companies discussed reducing the number of indications and may have had good reasons to do so, which does not show that Defendants' statements about the then-existing form of the agreement were false or misleading. Nor does it show that Defendants' February and May 2019 statements that they were executing on the agreement false or misleading—Plaintiff has not adequately alleged that Nektar stopped trying to execute on the agreement at the time (even as it faced challenges and delays doing so).

For these reasons, Plaintiff has not adequately pled a false or misleading statement.

**b. Scienter**

Because Plaintiff fails to plead falsity, he also fails to plead scienter. The Court addresses the requirement separately to emphasize that the precise content of the alleged discussions matters for scienter. Plaintiff's scienter allegations rely overwhelmingly on the core operations doctrine. Proof under the core operations doctrine is "not easy" and requires showing one of (1) "specific admissions" by an executive of "detailed involvement in the minutia of a company's operations, such as data monitoring," (2) "witness accounts demonstrating that executives had actual involvement in creating false reports," or (3) that the facts are of "such prominence" that it would be "absurd" to suggest the executives were not aware of them. *Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).

Plaintiff does not allege scienter under the first or second standard. Although Plaintiff claims that reduction in the number of indications was discussed internally, including by some high level Nektar executives, "internal discussions" are insufficient to show that the individual Defendants actually received the information. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002), *abrogated on other grounds as stated in In re Arrowhead Pharma., Inc. Sec. Litig.*, 782 F. App'x 572 (9th Cir. 2019) ("[I]f a plaintiff is to rely on the existence of reports as a means of establishing knowledge, she must 'include adequate corroborating details,' such as the 'sources of her information with respect to the reports, how she learned of the reports, who



United States District Court
Northern District of California

drafted them, . . . which officers received them, and 'an adequate description of their contents.'"); *Intuitive Surgical*, 759 F.3d at 1063 (discounting confidential witness allegations of internal discussions without a "link" to individual defendants); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business do not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to fraud.").

That leaves the third standard. Defendants' knowledge under that standard, where Plaintiff needs to show that the facts demonstrating falsity had such prominence that it would be "absurd" for Defendants to not know of them, rests crucially on the exact facts that Plaintiff alleges.[5] It is one thing for a company to amend its biggest contract to the detriment of billions of dollars in incentive payments. It is quite another for lower-level employees to discuss that achieving the agreement goals would be difficult or that some indications need to be deprioritized or delayed to achieve others. Depending on the exact facts that allegedly demonstrate falsity, it may or may not reasonable to infer that the individual Defendants knew about them. In this respect, Defendants' knowledge about the ongoing trials, as demonstrated by their statements about those trials, does not demonstrate that they knew of the challenges facing those trials or, if they did, that they knew that the challenges would cause them to amend the agreement with Bristol-Myers.[6] On the contrary, Defendants' open disclosure of risks associated with trial delay and failure (including that Bristol-Myers may pull out of the agreement), as shown in judicially noticed documents, suggests that they acted openly with investors.

---

[5] Similarly, while Plaintiff claims that Nektar's knowledge can be imputed to the individual Defendants, such imputation is only appropriate where "a company's public statement [are] so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). Otherwise, scienter must be alleged with respect to each individual defendant. *Id.*

[6] Importantly, securities law does not require corporations to disclose all of the challenges facing the company at every earnings call. *See Brody v. Transitional Hos. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Defendants were free not to speak about even an anticipated amendment to the Bristol-Myers agreement, so long as they did not "affirmatively" create a false impression by, for example, stating that the agreement would continue to be in force. *See id.*; *Matrixx*, 563 U.S. at 44.

Accordingly, absent allegations of concrete information communicated to the individual Defendants or facts of such prominence that it would be "absurd" to suggest the Defendants did not know about them, Plaintiff's scienter allegations rest solely on motive and opportunity to commit fraud. That is not sufficient. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP*, 542 F.3d at 784; *see Zucco*, 552 F.3d at 998 (allegations that demonstrate only "motive and opportunity," without more, do not establish a compelling inference of scienter). Plaintiff therefore fails to plead scienter for this theory.

**2. Manufacturing Defect**

Plaintiff also pleads a largely-unrelated theory of fraud related to a manufacturing issue that allegedly prevented Nektar from presenting certain lung cancer study results at a conference. Plaintiff challenges defendant Tagliaferri's May 2019 statement in that the Company "ha[s] plans to present the lung data at [the conference] . . . in September." (CAC ¶ 138.). Three months later, in August 2019, Defendants revealed that there was a manufacturing issue related to two of the batches used in the studies. (*Id.* ¶¶ 118-19.) Defendants also announced that the lung cancer study presentation was delayed. (*Id.* ¶ 120.)

Plaintiff attempts to connect the two issues by selectively misquoting Defendants' statements. Specifically, Plaintiff claims that Defendant Robin stated that "we had to delay here because of these manufacturing lots that we recently correlated with clinical data." (*Id.* ¶¶ 120, 146.) However, the context of the statement, as shown by the transcript of the August 2019 call, shows that Robin was referring to deadlines for new trials under the Bristol-Myers collaboration agreement, not the lung cancer study. (Aug. 8, 2019 Call Tr. at 11.) Plaintiff also relies on statements by Defendant Doberstein that Nektar was "enrolling additional patients" in the lung cancer study who are "starting treatment with" the lots that do not have the manufacturing issues. (CAC ¶ 146.) The transcript of the call shows that although Doberstein was referring to the lung cancer study, he stated that the presentation was delayed "[a]s a result of the current immaturity of the data." (Aug. 8, 2019 Call Tr. at 8-9.) That immaturity was due to slower than anticipated enrollment and "early data" that shows a difference in patients in different cohorts that Nektar was "trying to understand . . . in light of the manufacturing issue." (*Id.*) Read in context, Doberstein's

statement shows only that the manufacturing issue *might* have impacted the study based on "early data" that Nektar may or may not have had in May 2019.

That does not show falsity. Falsity requires *contemporaneous* facts that would demonstrate that Defendants' statements were false or misleading. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017). Here, Doberstein's statements show that even in August 2019, Nektar did not have definitive data that the manufacturing issue actually affected the lung cancer study. Thus, even if Plaintiff has adequately alleged that the manufacturing issue was known to Nektar by May 2019, the complaint still lacks allegations that the issue affected and prevented Nektar from presenting the lung cancer study results in September 2019. For the same reasons, Plaintiff has not shown scienter—the allegations do not suggest that Tagliaferri knew that a manufacturing issue would cause Nektar to delay the presentation in May 2019.[7]

Accordingly, Plaintiff fails to allege a materially false or misleading statement or scienter for this theory of fraud.

**3. Section 20(a)**

Because Plaintiff fails to plead a predicate violation of section 10(b) of the Exchange Act, the "control person" claims under section 20(a) are dismissed as well.

**D. CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss with leave to amend. Plaintiff shall file and serve an amended complaint or a statement that no such amended complaint shall be filed within twenty one days of the date of this Order, and Defendants shall file their response within twenty one days thereafter.

---

[7] As Defendants point out, there are additional issues with Plaintiff's scienter allegations under this theory. The allegations show, at most, that Nektar began "investigating" the manufacturing issue in March 2019, not that it knew the extent of the issue or its effects on any study. (CAC ¶¶ 109-10.) Plaintiff also does not allege that Tagliaferri received any information about the effects of the manufacturing issue on the lung cancer study, which may not have been unknown even if the broader manufacturing issues were known.



United States District Court
Northern District of California

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: January 26, 2021

JEFFREY S. WHITE
United States District Judge